# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FELTON PETROLEUM, INC.,<br>a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>GPM INVESTMENTS, L.L.C.,<br>a Delaware limited liability company,<br><br>        Defendant. | | Civil Action No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

For its Complaint, Felton Petroleum, Inc. alleges as follows:

### The Parties

1.      The Plaintiff is Felton Petroleum, Inc. (hereinafter referred to as "the Plaintiff"), a Delaware corporation doing business within the State of Delaware, with its offices and principal place of business located at 12984 South Dupont Highway, Felton, Delaware (the "Premises"). The Plaintiff operates a BP branded retail gas station at the Premises, which the Plaintiff leases from the Defendant.

2.      The Defendant is GPM Investments, L.L.C. (hereinafter referred to as "the Defendant"), a Delaware limited liability company doing business within the State of Delaware, with its headquarters located at 7443 Lee Davis Road, Suite 301, Mechanicsville, Virginia 23111, that may be served by serving its registered agent, National Registered Agents, Inc., at 160 Greentree Drive, Suite 101, Dover, Delaware 19904. The Defendant leases the Premises and authorizes the use of the BP trademark to the Plaintiff. The Defendant is also the exclusive distributor of motor fuel and related products to the Premises.

**Basis of Jurisdiction**

3.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §2805 and 28 U.S.C. §1331.

4.    The Defendant is subject to personal jurisdiction in this District because the Defendant is a Delaware limited liability company, and is doing and has done substantial business in this District, including business with the Plaintiff's franchise, which is located in this District.

5.    The Court has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. §1367.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 and 15 U.S.C. §2805.

**Nature of the Case**

7.    This is an action for, among other things, injunctive relief to enjoin the unlawful termination, effective January 1, 2008, of a franchise by the Defendant, which leases a retail gas station (and supplies motor fuel) to the Plaintiff.  The Plaintiff is the owner of a protected franchise that, pursuant to applicable law, requires automatic renewal absent statutorily prescribed due cause for termination.  The Defendant unlawfully terminated the Plaintiff's franchise for failing to agree to a one hundred percent (100%) rent increase for the gas station. The aforesaid rent increase cannot be justified under any economic or other rationale and is a blatant pretextual attempt by the Defendant to terminate and purge its existing contractual and statutory obligations by forcing the Plaintiff to forfeit its franchise, so that the Defendant can take possession of the Plaintiff's gas station business, all of which is expressly prohibited by the Petroleum Marketing Practices Act, 15 U.S.C. §2801, et seq.

2

8.   The Plaintiff seeks a temporary restraining order (if necessary) against the termination of the Plaintiff's franchise, a preliminary and permanent injunction against the termination of the Plaintiff's franchise, and statutorily prescribed compensatory damages, punitive damages, and attorneys' fees.

### Background Facts

9.   On December 14, 2006, the Plaintiff purchased the BP branded gas station business located at 12984 South Dupont Highway, Felton, Delaware (the "BP Station"). The BP Station has a convenience store on site and sold approximately 683,000 gallons of fuel through October 31, 2007. The Plaintiff has operated the BP Station in an exemplary manner and has increased sales above those of the previous franchisee.

10.   The Plaintiff operates the BP Station pursuant to a lease agreement dated November 24, 2004 (the "Lease Agreement"). *See* Lease Agreement attached as Exhibit "A".

11.   The Lease Agreement incorporates an exclusive Supply Agreement, whereby the Defendant is the exclusive supplier of motor fuels to the BP Station. *See* Supply Agreement Rider to Lease attached as Exhibit "B".

12.   The Lease Agreement was assigned to and assumed by the Plaintiff, as lessee, when it purchased the business on December 14, 2006. *See* Assignment attached as Exhibit "C".

13.   The Defendant's predecessor in interest, Gles, Inc., consented to the aforesaid assignment and signed the Assignment Agreement.

14.   The Plaintiff purchased the BP Station from the previous tenant by paying the sum of Three Hundred Thirty Three Thousand Four Hundred Forty Five Dollars ($333,445.00) for the assumption of the franchise, and Sixty Six Thousand Two Hundred Ninety Nine Dollars and Five Cents ($66,299.05) for the inventory of fuel and merchandise at the Premises. The

3

Plaintiff also spent additional money cleaning and fixing up the Premises.

15.    Although only approximately one (1) year remained of the three (3) year term of the Lease Agreement, which "expires" on January 1, 2008, the Plaintiff purchased the business because the Lease Agreement cannot be terminated or nonrenewed in the absence of statutorily prescribed due cause pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2801, et seq.  Such a lease agreement is known in the retail gas industry as an "Evergreen Lease" since it does not expire and must typically be renewed for subsequent terms by the franchisor.

16.    Upon information and belief, in February of 2007, the Defendant acquired approximately seventy (70) gas stations and convenience stores from Gles, Inc. for $47,500,000.00, including the BP Station, thereby assuming the rights and obligations under the Lease Agreement as lessor.

17.    On September 6, 2007, approximately nine (9) months after the Plaintiff purchased the business, the Defendant delivered a letter to the Plaintiff, advising, in relevant part, as follows:

> GPM would like to extend the term of the Lease with you for an additional three year term, from January 1, 2008 until December 31, 2010; however, GPM has found it necessary to increase the annual rent under the Lease to $200,000, or $16,666 per month.  I have included a draft of a First Amendment to the Lease with this letter for your review. It will be important that we enter into the First Amendment on or prior to September 21, 2007.

*See* Letter attached as Exhibit "D".

18.    Pursuant to the terms of the Lease Agreement, the current rent for the premises was $8,472.71 per month or $101,672.52 per year.  With the rent at this level, the Plaintiff made approximately $4,055.00 in profit per month or $48,660.00 in profit per year.

19.    The nearly one hundred percent (100%) rent increase demanded by the Defendant

4

would mean that the Plaintiff would operate the business at a *loss* of $4,138.29, on average, per month or $49,659.48 per year, which would eclipse even the modest salary of approximately $18,000.00 paid to Samir Patel, who owns seventy percent (70%) of the Plaintiff and is the day-to-day manager and operator of the BP Station. *See* Average Monthly Profit and Loss attached as Exhibit "E".

20.     On September 6, 2007, after receiving the aforesaid letter from the Defendant, Samir Patel ("Mr. Patel"), on behalf of the Plaintiff, immediately left a message for Max Loper ("Mr. Loper"), who works for the Defendant.

21.     On September 7, 2007, Mr. Patel spoke to Mr. Loper. Mr. Patel explained that he desperately needed Mr. Loper's assistance with finding a compromise on the rent increase because the business would not survive under the increased rent. Mr. Loper stated that the rent increase was based upon the current market value of the real estate. Mr. Patel explained that he had invested his entire life's savings (over $400,000.00) into the business and that he could clearly show with the business' financial information that the BP Station could not support a doubling of the current annual rent to $200,000.00. Mr. Loper suggested that Mr. Patel might be able to take over a different GPM gas station, and that he would get back to him regarding his concerns with the rent increase.

22.     On September 10, 2007, Mr. Patel left a message for Mr. Loper that was not returned.

23.     On September 11, 2007, Mr. Patel left a message for Mr. Loper that was not returned.

24.     On September 12, 2007, Mr. Patel left a message for Mr. Loper that was not returned.

25.    On September 13, 2007, Mr. Patel left a message for Mr. Loper, who called Mr. Patel later that day. Mr. Loper stated that there was nothing he could do with regard to the rent increase, and that the rent increase was based upon the market value of the real estate, which Mr. Loper alleged to be worth $2,000,000.00. Mr. Loper again proposed that Mr. Patel take over a station at a different location. Mr. Loper asked Mr. Patel what rent the station could support, and Mr. Patel said he would be able to survive if rent was not increased beyond $120,000.00 to $125.000.00 per year. Otherwise, if the rent increase proposed by the Defendant went into effect, Mr. Patel said he would have to manage and work at the BP Station for absolutely free. Mr. Loper said he would pass this information on to the company and see what he could offer.

26.    On September 17, 2007, Mr. Patel left a message for Mr. Loper that was not returned.

27.    On September 18, 2007, Mr. Loper called Mr. Patel and told him that the Defendant needed a written commitment regarding whether Mr. Patel intended to accept the rent increase (which would mean Mr. Patel would lose money operating the business) or walk away from the business (which would mean Mr. Patel would lose his life's savings and investment). Mr. Patel asked for copies of the appraisals or comparables that the Defendant was using to value the real estate, but Mr. Loper said he could not provide him with that information.

28.    On September 27, 2007, Mr. Patel again spoke with Mr. Loper, who stated that the Defendant was unwilling to compromise on the rent increase or offer any compensation for the loss of the value of the business. Rather, Mr. Loper offered to allow the Plaintiff to take over a gas station in a different location in Delaware. However, this station was worth less than one-fourth (1/4) of the value of the BP Station. Mr. Loper agreed to allow Mr. Patel until 5:00 p.m. on September 28, 2007 to decide whether to accept the rent increase or the new location.

Otherwise, Mr. Loper stated that the Defendant would serve a Notice of Termination on October 1, 2007.

29.    On September 28, 2007, Mr. Patel sent a letter to the Defendant on behalf of Felton Petroleum, Inc., reiterating his conversations with Mr. Loper and asking that a representative of the Defendant meet with him to reach an amicable resolution to the dispute over the rent increase. *See* Letter attached as Exhibit "F".

30.    On September 28, 2007, the Defendant received a Notice of Termination of Franchise Pursuant to the Petroleum Marketing Practices Act dated September 27, 2007 from the Plaintiff, thereby terminating the Lease Agreement for failing "to agree to changes or additions to the provisions of the Lease, namely the proposed changes in rental rates . . . ." *See* Notice of Termination of Franchise attached as Exhibit "G".

31.    On October 3, 2007, the Plaintiff, through its legal counsel, sent a letter requesting that the parties meet in person to discuss the rent increase and that the Defendant provide any and all backup data to support the rent increase.

32.    The Defendant finally agreed to the Plaintiff's repeated requests to a face-to-face meeting.    The meeting was eventually scheduled for October 2, 2007 at the Defendant's corporate headquarters in Mechanicsville, Virginia.

33.    At the aforesaid meeting, the Defendant's representatives reiterated that the rent increase to $200,000.00 per year was based solely upon their estimation of the market value of the BP Station's real estate ($2,000,000.00) and a ten percent rate of return, and that they would not reconsider the rent increase. However, the Defendant's representatives admitted that (1) they had not performed an appraisal of the Premises or any comparable properties, (2) they estimated the market value for the Premises based upon the purchase price that it paid to Gles, Inc., (3)

they had not conducted an examination of the competitive market of the BP Station or the BP Station's financial records when it decided to double the rent, and (4) they would not provide any backup data to support their valuation of the Premises or the rent increase.

34.    When confronted with the cold and hard financial numbers proving that the BP Station could not support an annual rent of $200,000.00, the only rationale that the Defendant's CEO could offer for how the BP Station might support such a rent increase is if the Defendant itself took over and operated the BP Station, which is specifically prohibited by the Petroleum Marketing Practices Act.  *See* 15 U.S.C. §2802(c)(3)(a)(ii) (prohibiting a franchisor from insisting upon changes to a lease agreement "for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor . . ."). The Defendant ultimately proposed that the Plaintiff consider taking over two gas stations in Delaware that the Defendant suggested would equal the income that the Plaintiff would have received from the BP Station.

35.    Upon information and belief, the Defendant has adopted a company policy that prohibits franchisees from operating any new stores that the Defendant opens and seeks to phase out franchisee-operated stations.

36.    On November 16, 2007, after reviewing the gas stations offered by the Defendant, the Plaintiff sent a letter to the Defendant, noting that the Defendant had misrepresented the actual sales numbers for the proposed stations, which combined would have generated approximately one-tenth of the annual profit of the BP Station, and that the Defendants' bad faith conduct and sham negotiations had left the Plaintiff with no choice but to file suit.  *See* Letter attached as Exhibit "H".

37.    The Plaintiff immediately thereafter prepared the instant Complaint and instituted

the above-captioned civil action.

## COUNT I
## Violation of Petroleum Marketing Practices Act

38.    The Plaintiff hereby restates and realleges each of the allegations set forth in paragraphs 1 through 37 above, as if fully set forth herein.

39.    The Plaintiff is a Franchisee and the Defendant is a Franchisor pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq.

40.    The Petroleum Marketing Practices Act was enacted to protect petroleum franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises and to remedy the disparity of bargaining power between franchisors and franchisees.

41.    In addition, the Petroleum Marketing Practices Act establishes a liberal standard for the issuance of a preliminary injunction. That relaxed injunction standard, which does not require a showing of irreparable harm, was designed to benefit the small retailer, and was intentionally drawn to facilitate the grant of injunctive relief.

42.    Pursuant to 15 U.S.C. § 2802, a franchisor may not terminate or fail to renew a franchise except upon the grounds set forth therein, and in strict compliance with the notice requirements set forth at 15 U.S.C. § 2804.

43.    Pursuant to 15 U.S.C. § 2802(b)(3)(A), a franchisor may terminate or not renew a franchise relationship as a result of "[t]he failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of

the franchise relationship."

44.    The Defendant willfully and unlawfully terminated the Plaintiff's franchise at the BP Station without the proper grounds and for an improper purpose by insisting upon an arbitrary and discriminatory rent increase, which the Defendant knew was unjustifiable, was not determined in the normal course of business, and would force the Plaintiff to forfeit its franchise based upon the economic realities and actual real estate value of the BP Station, solely in an effort to terminate the parties' existing franchise relationship.

45.    The Defendant insisted upon the arbitrary and discriminatory rent increase solely in an effort to force the Plaintiff to forfeit its franchise, thereby purging the Defendant's existing contractual and statutory obligations to the Plaintiff, so that the Premises could be converted to a more profitable franchisor-operated gas station, in direct contravention of the Petroleum Marketing Practices Act and without paying the costs inherent in a buyout of a franchisee.

46.    The Defendant based its rent increase calculations upon a formula and inflated real estate valuations, knowing that such increases would have a disparate and harmful impact upon the Plaintiff and other franchisee-operated stations.

47.    The Defendant also failed to negotiate or agree upon the rent increase in good faith with the Plaintiff by, among other things, (1) insisting upon a rent increase that the Defendant knew was unreasonable and arbitrary, was not determined in the normal course of business, and would force the Plaintiff to forfeit its franchise, (2) failing to provide backup data (or any reasonable justification) for the rent increase, (3) failing to conduct an appraisal to confirm its purported estimate of the market value for the premises, (4) failing to examine the competitive market, (5) refusing to consider and examine the BP Station's financial records, (6) requiring the unconditional acceptance of the rent increase with only twenty two (22) days

10

notice, (7) failing to provide sufficient (and the agreed upon) time for the Plaintiff to respond to the demand for the rent increase prior to terminating the Plaintiff's franchise, and/or (8) refusing to meet to discuss the rent increase.

48.     As a direct and proximate result of the Defendant's violations of the Petroleum Marketing Practices Act, as aforesaid, the Plaintiffs have suffered and will continue to suffer substantial monetary damages and irreparable harm.

## COUNT II
### Delaware Franchise Security Law

49.     The Plaintiff hereby restates and realleges each of the allegations set forth in paragraphs 1 through 48 above, as if fully set forth herein.

50.     The Plaintiff is a Franchised Distributor and the Defendant is a Franchisor pursuant to the Delaware Franchise Security Law, 6 Del. C. § 2551, et seq.

51.     Pursuant to 6 Del. C. § 2552, a Franchisor may not attempt to unjustly terminate a franchise and/or attempt to purge itself of the relationship by refusing to deal with the Franchised Distributor.

52.     The Defendant's actions, as aforesaid, including its insistence upon a rent increase that it knew was unreasonable and arbitrary, and its failure to negotiate with the Plaintiff in good faith, were undertaken in an effort to terminate and purge its existing contractual and statutory obligations to the Plaintiff and, therefore, constitute violations of the Delaware Franchise Security Law.

53.     As a direct and proximate result of the Defendant's violations of the Delaware Franchise Security Law, as aforesaid, the Plaintiff has suffered and will continue to suffer substantial monetary damages and irreparable harm.

54.     Pursuant to 6 Del. C. § 2553, the Plaintiff is entitled to recover damages, which

11

shall be presumed to be no less than five (5) times the profit obtained by the Franchised Distributor, by virtue of the terminated franchise, in the most recently completed fiscal year.

## COUNT III
## Declaratory Judgment

55.    The Plaintiff hereby restates and realleges each of the allegations set forth in paragraphs 1 through 54 above, as if fully set forth herein.

56.    Pursuant to 28 U.S.C. § 2201, the Plaintiff requests that this Honorable Court find that (1) the Defendant failed to negotiate and agree upon new terms to the Lease Agreement in good faith in violation of applicable law, (2) the Defendant's termination of the Plaintiff's franchise is invalid, and (3) the Defendant's proposed rent increase is impermissible and invalid.

57.    The Plaintiff has a legitimate interest in a prompt resolution of its rights under the Lease Agreement and applicable statutory law given the Defendant's attempted termination of Plaintiff's franchise, and the Defendant's absolute failure to negotiate in good faith.

58.    The Plaintiff faces severe economic hardship in the form of the irreparable loss of its business (and Mr. Patel's only source of income) should the parties' dispute regarding the rent increase not be resolved or an injunction enjoining the Defendant from terminating the Plaintiff's franchise not be issued prior to January 1, 2008.

## COUNT IV
## Bad Faith

59.    The Plaintiff hereby restates and realleges each of the allegations set forth in paragraphs 1 through 58 above, as if fully set forth herein.

60.    The Defendant's conduct in failing to negotiate the rent increase in good faith and insisting upon the unreasonable and arbitrary rent increase solely in an effort to purge its existing contractual and statutory obligations to the Plaintiff constitutes deliberate bad faith and unfair

dealing, in blatant and unconscionable breach of the terms and conditions of the aforesaid agreements and the obligation of good faith and fair dealing implied in every contract.

61.     As a direct and proximate result of the Defendant's bad faith and unfair dealing, the Plaintiff has suffered and will continue to suffer substantial damages.

## COUNT V
### Attorneys' Fees

62.     The Plaintiff hereby restates and realleges each of the allegations set forth in paragraphs 1 through 61 above, as if fully set forth herein.

63.     The Plaintiff is entitled to reasonable attorneys' fees pursuant to paragraph 41 of the Lease Agreement.

64.     Furthermore, because the Defendant's conduct as aforesaid is both willful and malicious, the Court should also award the Plaintiff its reasonable attorneys' fees.

65.     In addition, the Plaintiff is entitled to recover attorneys' fees and costs incurred in establishing their rights under and securing enforcement of the Lease Agreement pursuant to 6 Del. C. § 2553 as a result of the Defendant's violation of the Delaware Franchise Security Law, and to recover reasonable counsel fees and costs pursuant to 15 U.S.C. § 2805 as a result of the Defendant's violation of the Petroleum Marketing Practices Act.

WHEREFORE, the Plaintiff respectfully prays that this Honorable Court grant the following relief:

        A.      that Summons issue directing the Defendant to promptly appear and answer this Complaint;

        B.      that this Honorable Court issue an Order granting temporary, preliminary, and permanent injunctive relief enjoining the Defendant from enforcing the Notice of Termination of Franchise;

C.    that this Honorable Court issue an Order declaring that the Notice of Termination of Franchise and the rent increase demanded by the Defendant are illegal and, therefore, null and void;

D.    that this Honorable Court award the Plaintiff compensatory damages in an amount sufficient to fully compensate the Plaintiff for any and all damages sustained by the Plaintiff as a result of the Defendant's conduct as foresaid, together with pre-judgment and post-judgment interest;

E.    that this Honorable Court award the Plaintiff statutory damages pursuant to 6 Del. C. § 2553;

F.    that this Honorable Court award the Plaintiff exemplary damages pursuant to 15 U.S.C. § 2805(d) for Defendant's willful violation of the Petroleum Marketing Practices Act;

G.    that this Honorable Court award the Plaintiff punitive damages for the Defendant's bad faith conduct in an amount sufficient to punish and deter the Defendant from engaging in similar conduct in the future;

H.    that this Honorable Court award the Plaintiff all of its costs and reasonable attorneys' fees incurred in pursuing the claims set forth herein and securing enforcement of the Plaintiff's contractual and statutory rights, including attorneys' fees and expert witness fees pursuant to 15 U.S.C. § 2805; and

I.    that this Honorable Court grant such further relief as the interests of equity and justice may require.

## JURY DEMAND

The Plaintiff demands trial by jury on all issues so triable.

14

**PRICKETT, JONES & ELLIOTT, P.A.**

John W. Paradee  (DE Bar No. 2767)
D. Benjamin Snyder (DE Bar No. 4038)
Kevin M. Baird (DE Bar No. 4219)
11 North State Street
Dover, Delaware 19901
(302) 674-3841
*Attorneys for the Plaintiff*

Date:   November 26, 2007



| LEASE DATA SHEET | |
|---|---|
| LOCATION NO. | 1335-0 |
| DATE: | 11-24-04 |
| LESSOR: | GLeS Inc.  T/A  Sweet Oil Company |
| Address: | 2604 Eastburn Center |
| City, State & Zip Code: | Newark, DE 19711 |
| LESSEE 1: | Fayyad Abdallah |
| Residence Address: | 2108 South 61st Street |
| City, State & Zip Code: | Cicero, IL 60804 |
| LESSEE 2: | |
| Residence Address: | |
| City, State & Zip Code: | |
| Business Address: | |
| City, State & Zip Code: | |

| LEASED PROPERTY: | Felton BP |
|---|---|
| Street Address: | 12984 South Dupont Highway |
| City, State & Zip Code: | Felton, DE 19943 |

- 1 -

# TABLE OF CONTENTS

Pages

Paragraph 1    Leased Properties................................................................. 4

Paragraph 2    Term.................................................................................. 4

Paragraph 3    Rental............................................................................... 4

Paragraph 4    Operations of Stations.......................................................... 4-5

Paragraph 5    Obligations of Lessee............................................................ 5

Paragraph 6    Default.............................................................................. 5-6

Paragraph 7    Convenience Store Offering.................................................... 6

Paragraph 8    Security Deposit................................................................. 6-7

Paragraph 9    Hours of Operations............................................................. 7

Paragraph 10   Use.................................................................................. 7

Paragraph 11   Maintenance....................................................................... 7

Paragraph 12   Licenses/Permits and Additional Agreements............................ 7-8

Paragraph 13   Redelivery......................................................................... 8

Paragraph 14   Holdover........................................................................... 8

Paragraph 15   Gas, Water, Electricity, and Sewer Charges............................... 9

Paragraph 16   Independent Status of Lessee................................................. 9

Paragraph 17   Customer Service at Premises................................................. 9-10

Paragraph 18   Lessor Alterations............................................................... 10

Paragraph 19   Lessee Alterations............................................................... 10-11

Paragraph 20   Leased Premises and Use....................................................... 11-12

Paragraph 21   Equipment and Reporting Obligations....................................... 12

Paragraph 22   Security............................................................................. 12

Paragraph 23   Inventory Controls............................................................... 12-13

Paragraph 24   Product Integrity................................................................. 13

Paragraph 25   Termination by Lessor.......................................................... 13-14

Paragraph 26   Indemnification and Security.................................................. 14

Paragraph 27   Insurance Requirements........................................................ 14-15

Paragraph 28   Minimum Standards............................................................. 15-16

Paragraph 29   Condemnation of / or Affecting Premises................................. 16

Paragraph 30   Destruction of Leased Properties............................................ 16

Paragraph 31   Inspection by Lessor............................................................ 16

NOV.18.2006 08:17

| Paragraph 32 | Assignments, Encumbrances, and Right of Refusal | 16-17 |
|---|---|---|
| Paragraph 33 | Modification | 17 |
| Paragraph 34 | Branding | 17 |
| Paragraph 35 | Early Transfer Fee | 18 |
| Paragraph 36 | Waiver | 18 |
| Paragraph 37 | Approval and Execution by Lessor | 18 |
| Paragraph 38 | Notice | 18 |
| Paragraph 39 | Alternative dispute resolution | 18 |
| Paragraph 40 | Release | 18-19 |
| Paragraph 41 | Attorney's Fees | 19 |
| Paragraph 42 | General Provisions | 19 |
| Paragraph 43 | Compliance With Laws | 19 |
| Paragraph 44 | Force Majeure | 19-20 |
| Paragraph 45 | Entirety of Agreement | 20 |
| Paragraph 46 | Key Person Clause | 20 |
| Signature Page | Signature Page for the Lease | 20 |
| Guarantee of Performance | Guarantee of Performance | 21-23 |
| Key Person Addendum | Key Person Clause | 24-25 |
| EFT Authorization | Electronic Funds Transfer Authorization Debit/Credit Agreement | 26 |
| Corporate Resolution | Corporate Resolution and Incumbency Certificate | 27 |
| Gasoline Guidelines | Guidelines for Handling of Unleaded Gasoline | 28 |
| Inventory Controls | Inventory Controls Acknowledgment | 29 |
| Maintenance Responsibilities Addendum | | 30-33 |
| Supply Agreement Rider | | 34-45 |
| Maryland Disclosure Addendum | | 46 |
| First Right of Refusal Agreement | | 47-49 |
| Supplier Credit Card Agreement | | 50-51 |
| Addendum to Supplier Credit Card Agreement | | 52 |
| 2nd Addendum to Supplier Credit Card Agreement | | 53 |
| Standard of Appearance Checklist | | 54 |
| NSF Addendum | | 55 |

NOV.18.2009 06:07

# LEASE

**THIS LEASE AGREEMENT** ("Lease") is made effective as of **December 1, 2004**, between GLeS, INC., T/A **SWEET OIL COMPANY** a Delaware corporation, its successors and/or assigns (hereinafter referred to as Lessor or Supplier) and **FAYYAD ABDALLAH T/A FELTON BP** (here in after referred to as Lessee or Purchaser).

### 1.   Leased Properties.

Lessor does hereby lease and permit Lessee to enter upon, use, and occupy for the purposes and on the conditions herein set forth the premises, together with the buildings, improvements, fixtures, equipment, and facilities owned or leased by Lessor, now located on the premises, or which Lessor may erect or place thereon during the continuance of this Lease (hereinafter collectively referred to as "Leased Properties"), all situated at **12984 South Dupont Highway, Felton DE 19943** . This Lease is subject to all covenants and restrictions contained in any deed or lease conveying or leasing the Leased Properties to Lessor, and is made subject to all other deed restrictions, zoning laws, easements or encumbrances.

### 2.   Term.

The term of this unless terminated as hereinafter provided in this Lease, shall remain in force and effect for a period beginning **December 1, 2004** and ending **December 31, 2007**. 

### 3.   Rental

Rent for the term shall be as follows:

(1)    For the period of December 1, 2004 through December 31, 2004 rent shall be $ **7331.71** per month.

(2)    For the period of January 1, 2005 through December 31, 2005 rent shall be $ **7331.71** per month.

(3)    For the period of January 1, 2006 through December 31, 2006 rent shall be $ **7881.59** per month.

(4)    For the period of January 1, 2007 through December 31, 2007 rent shall be $ **8472.71** per month.

All lease payments due shall be paid to Lessor VIA EFT draft on the last banking day of the month preceding the month due.

### 4.   Operations of Station

Lessee shall:
(a) Use the station solely for the purpose of operating a first-class motor vehicle service station for the sale of motor fuel and, upon approval of Lessor, for the operation of a first-class convenience store offering for sale items customarily sold at convenience store, unless otherwise agreed in writing by Lessor.
(b) Not use the station for storage of junk, disabled vehicles, used tires or batteries, other than on a temporary basis in connection with servicing customers of the station
(c) Not use the station, without the prior written consent of Lessor, for auto, truck or equipment rentals or as a parking lot
(d) Not obstruct any entrance, exit, pump island or service area so as to deny free access to the motoring public or block delivery carriers access to storage fill pipes
(e) If the construction, maintenance and/or operation of the Station is pursuant to a conditional use permit or other approval ("permit") by a zoning board or other governmental agency, use the Station in accordance with all requirements contained in such permit. If the Station is subject to such a permit, Lessee is responsible for obtaining and maintaining the permit
(f) Conduct all operations lawfully and in strict compliance with all statutes and all ordinances, regulations, and other requirements of governmental authorities
(g) Except as required by law or as agreed to in writing by Lessor and Lessee, not display signs except those usual and customary to advertise products and services offered for sale at the Station by Lessee;
(h) Not place any buildings or other permanent improvements at the Station, or remove or make any alterations or changes in or to the existing buildings and permanent improvements at the Station without prior written permission of Lessor;

-4-

(i) Not store or sell intoxicating liquors or illegal or prescription drugs or permit the same to be used or consumed at the Station;

(j) Lessee (or where Lessee is a corporation, the Key Person as designated in the Key Person Addendum attached herein) shall be present at the premises at lease 30 hours per week.

(k) Attend all Lessor provided training.

(l) Operate the Station responsibly, with due care, prudence, good judgment, and skill;

(m) Treat all customers of the Station courteously;

(n) Not engage in dishonest, fraudulent, or scare-selling practices

(o) Promote diligently the sale of motor fuel by the Station

(p) Perform all services in a good, work manlike manner;

(q) Maintain the restrooms in a clean, sanitary, and well lighted condition and adequately provided with necessary supplies

(r) Provide sufficient trained and courteous personnel to serve the needs and desires of the motoring public

(s) Keep the Station, driveways, yards, lawns, shrubs, and other plantings neat and free from weeds, debris, snow, ice, and rubbish;

(t) Keep the Station open for business and properly lighted during all hours of operation

(u) Purchase and properly place all branded gasoline marketing material

(v) Lessee may also be required to operate the convenience store under a trademark or trade name furnished by Lessor and to provide offerings of a kind and quality offered at other convenience stores bearing the same trademark or trade name

## 5. Obligations of Lessee

(a) Lessee shall, at his expense: maintain the Station, make all repairs and replacements in accordance with the attached Maintenance Responsibilities Addendum in addition to; (i) pay all water, gas, electricity, telephone and other utility bills; (ii) pay all real estate taxes; (iii) pay all premiums and contributions required by Workmen's Compensation, Unemployment Insurance, old age benefits and other programs measured by the remuneration for employees; (iv) pay all occupation and business licenses necessary for distributing and selling products at the Station. If Lessee fails to fulfill the obligations set, Lessor may, in cases of urgency, without waiving any other remedy allowable under law, take care of such maintenance, make such repairs and replacements, or otherwise perform such obligations. Lessee shall reimburse Lessor upon demand by EFT or any other payment form Lessor deems necessary, if it is necessary for Lessor to fulfill Lessee's obligations.

(b) Lessee shall be responsible for all maintenance, repairs and replacements not specifically covered in the Maintenance Responsibilities Addendum herein attached.

(c) Providing there are no purchase limitations caused by governmental requirements or availability of products, and LESSEE does not purchase a minimum of __853,483__ gallons of motor fuel per year from Lessor under this Agreement, LESSEE will pay to Lessor a sum of **3 cents** per gallon times the number of gallons below said minimum. Should Lessee fail, in any contract year, to purchase aforementioned minimum volume, Lessor may non-renew this agreement.

## 6. Default

The Lessee shall, without any previous demand therefore, pay to the Lessor, or its agent, the said rent at the times and in the manner above provided. In the event of the non-payment of said rent, or any installment thereof, at the times and in the manner above provided, and if the same shall remain in default for ten (10) days after becoming due, or if the Lessee shall be dispossessed for non-payment of rent, or if the Premises shall be deserted or vacated for longer than seven (7) days, the Lessor or its agents shall have, in addition to any and all other legal rights and remedies under the law or this agreement, the right to accelerate and in addition to any and all other legal rights and remedies under the law or this agreement, the right to accelerate and declare immediately due and payable all future unpaid rent or, the right to enter the said Premises as the agent of the Lessee, either by force or otherwise, without being liable for any prosecution or damages therefore, and may re-lease the Premises as the agent of the Lessee, and receive the rent therefore, upon such terms as shall be satisfactory to the Lessor, and all rights of the Lessee to repossess the Premises under this Lease shall be forfeited. Such reentry by the Lessor shall not operate to release the Lessee from any rent to be paid or covenants to be performed hereunder during the full term of this Lease. For the purpose of re-leasing, the Lessor shall be authorized to make such repairs or alterations in or to the Premises as may be necessary to place the same in good order and condition. The Lessee shall be liable to the Lessor for the cost of such repairs and alterations, and all expenses of such re-leasing. If the sum realized or to be realized from the re-leasing is insufficient to satisfy the monthly or term rent provided in this Lease, the Lessor, at its option, may require that the Lessee pay such deficiency month by month, or may hold the Lessee liable in advance for the entire

- 5 -

déficiency to be realized during the term of the re-leasing. The Lessee shall not be entitled to any surplus accruing as a result of the re-leasing. The Lessor is hereby granted a lien, in addition to any statutory lien or right to distrain that may exist, on all personal property of the Lessee in or upon the Premises, to secure payment of the rent and performance of the covenants and condition of this Lease. The Lessor shall have the right, as agent of the Lessee, to take possession of any furniture, fixtures or other personal property of the Lessee found in or about the Premises, and sell the same at a public or private sale and to apply the proceeds thereof to the payment of any monies becoming due under this Lease, the Lessee hereby waiving the benefit of all laws exempting property from execution, levy and sale on distress or judgment. The Lessee agrees to pay, as additional rent, all attorney fees and other expenses.

### 7. Convenience Store Offering

Lessee may be required to operate the convenience store under a trademark or trade name furnished by Lessor and to provide offerings of a kind and quality offered at other convenience stores bearing the same trademark or trade name.

### 8. Security Deposit

a. The Lessee has previously deposited with the Landlord the sum of $ 6,000.00 as security for the full and faithful performance by the Lessee of all the terms, covenants and conditions of this Lease upon the Lessee's part to be performed, which said sum shall be returned to the Lessee after the expiration of the term herein, provided the Lessee has vacated the Premises and has otherwise fully and faithfully carried out all of said terms, covenants and conditions on Lessee's part to be performed. In the event of a bona fide sale of the premises by the Landlord, subject to this Lease, the Landlord shall have the right to transfer the security to the purchaser for the benefit of the Lessee, and Landlord shall be considered released by the Lessee from all liability for the return of such security; and the Lessee agrees to look to the new Landlord solely for the return of the said security and it is agreed that this shall apply to every transfer or assignment made of the security to a new Landlord. The security deposited under this Lease shall not be mortgaged, assigned or encumbered by the Lessee without the written consent of the Landlord. Landlord shall not be required to keep the security deposit separate from its own funds, and shall not be required to keep the security deposit in an interest-bearing account. Landlord shall have no fiduciary responsibilities or trust obligations whatsoever with regard to the security. Landlord shall have the right from time to time to adjust Lessee's security deposit to an amount equal to two (2) times the then-current Rent and Additional Rent (including but not limited to real estate taxes, insurance contributions, and common area maintenance charges) when in its sole discression Landlord determines Lessee's financial condition may have changed adversely since the effective date of the start of this lease. Lessee shall pay such additional security deposit to Landlord within thirty (30) days of written demand therefore from Landlord. Landlord may, at its sole option, retain, use, or apply the whole or any part of the security deposit to the extent required for any payment of Rent, Additional Rent, or any other sums due from Lessee pursuant to this Lease (including estimated utility, insurance, and common area maintenance charges as of the expiration or termination of this Lease), or any costs incurred or damages suffered by Landlord by reason of any default by Lessee hereunder, or in connection with the cleaning, repair or restoration of the Premises upon expiration or earlier termination of the Lease. If Landlord uses, applies or retains all or any portion of the security deposit during the term of this Lease, Lessee shall restore same to its original amount (as adjusted from time to time pursuant to the terms of this Section) within thirty (30) days of written demand therefore from Landlord. Lessee's failure to timely comply with this Section shall be a material default of this Lease.

b. **In addition, Lessor reserves the right to require a letter of credit, or personal guaranty in accordance with Lessor's Security Policy in effect from time to time.**

c. Lessee shall provide, at its sole cost, during the term of the Sales Agreement upon written notice by Supplier, a "Standby Bank Letter of Credit" (LOC) in an amount to be determined by seller in its sole discretion, as collateral guarantee of performance of Sales and payments of sums due under this lease. The LOC shall bind Lessee to GLeS, Inc., t/a Sweet Oil Company a Delaware corporation, its successors and/or assigns (Lessor), provide a waiver of subrogation in favor of Lessor, and provide for written notice of cancellation or material change. Notice of cancellation or change shall not affect coverage afforded Lessor until 60 days after written notice is received. The LOC shall be delivered to Lessor prior to commencement of the Lease.

d. Lessor will assess an administrative fee in accordance with Lessor's NSF Policy as modified from time to time (see attached NSF Addendum) upon Lessee for payments that are returned or rejected for any reason. All overdue sums owed to Lessor will bear interest at the maximum lawful rate per annum from the date due until

-6-

paid. Further, if Lessee fails to make timely payment of any amount due Lessor, in addition to all other rights or remedies available, Lessor may take such action as Lessor deems reasonable under the circumstances. Without limiting the generality of the foregoing, Lessor may (i) set off or equitably recoup against any amount then due Lessee, (ii) defer further deliveries of the Products until payment of all outstanding indebtedness is made, or (iii) demand advance cash payment for further deliveries. Lessee shall comply with the terms of any reclamation notice issued to Lessee by Lessor under applicable Law.

**9.   Hours of Operation.**

Lessee agrees to remain open for the sale of motor fuel to the motoring public a minimum of 18 hours per day 7 Days per week, each and every week of the calendar year. Lessee agrees to maintain these hours of operation during the term hereof.

**10.   Use.**

Lessee shall use the Leased Properties solely for the retail sale of motor fuels, petroleum products, and services, and food and beverage items. Lessee shall not use the Leased Properties for any other purpose, i.e., vehicle sales or rentals, trailer sales or rentals without Lessor's prior written consent. Lessee also agrees not to use the Leased Properties for any unlawful, offensive, hazardous, unsightly or other objectionable purpose, and agrees not to violate or permit any of its employees or invitees to violate any applicable federal, state, or local law, regulation or ordinance. Lessee agrees to comply with and shall be responsible for complying with all laws applicable to Lessee occupation, use, and maintenance of the leased premises or performance hereunder. Lessee agrees that Lessor shall have the right to restrict the size and location of any signs displayed on the Leased Properties.

- Excepting and reserving, however, from the foregoing Leased Properties that portion of the premises on which there is now or may hereafter be located and installed a public telephone booth, billboard sign, cell phone tower, or any other use other than permitted uses as defined under this lease (hereinafter referred to as Alternative Uses) for so long as such portion is so used; it being expressly understood and agreed by and between Lessee and Lessor that this Lease is subject to a right of access to such Alternative Uses by the servicing company which owns the same and a right of access to and use by the public in common with Lessee and Lessee's customers of such Alternative Uses as well as a further right of the servicing company which owns such Alternative Uses to maintain on the Leased Properties a sign or signs customarily displayed by such servicing company to advise the public of the availability of Alternative Uses; provided, however, that such sign or signs shall be so located as not to interfere with the retail facility business carried on at the Leased Properties.

**11.   Maintenance.**

Lessee shall, at Lessee's expense, maintain the Leased Properties in good repair and in a clean, safe, and orderly condition during the term of this Lease. Maintenance responsibilities may change from time to time and will be amended in writing. Upon ten (10) days notice after receipt of a maintenance violation letter and failure to cure, Lessee maybe automatically enrolled in a maintenance program and billed monthly via EFT. Unless re-stated in a more recent amendment, maintenance responsibilities of Lessee shall include, but shall not be limited to, necessary repair, replacement, maintenance and other appropriate action as described in the attached **Maintenance Responsibilities Addendum.**

**All repairs and replacements performed by the Lessee must meet or exceed the specifications of the existing equipment (e.g., a 5-horsepower air compressor must be replaced with a 5-horsepower air compressor), of equal quality, as well as comply with Lessor's image standards, if applicable. If Lessee is unsure about a specific standard, Lessee should consult with Lessor.**

**12.   Licenses/Permits and Additional Agreements.**

In its own name, and at Lessee's expense, Lessee shall obtain and post all necessary licenses or permits to do business which are or may be required by any municipal ordinances, state law or regulation, governmental authority, or otherwise, and shall pay all fees in connection therewith, as well as fees imposed by reason of inspections of the Leased Properties. Lessee must also furnish Sweet Oil Company via fax with an updated copy of: Lessee Petroleum Product Business License and Motor Fuel Tax License and all renewals thereafter.

(a) This Lease and the obligation of Lessee to pay rent hereunder and perform all of the other covenants and agreements hereunder on the part of Lessee to be performed shall not be affected, impaired or excused because Lessor is unable to supply or is delayed in supplying any service expressly or implied to be supplied or is unable to

- 7 -

make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Lessor is prevented or delayed from so doing by reason of any Act of God or governmental preemption in connection with a State of Emergency declared by the appropriate authority, or in connection with any rule, order or regulation of any department or subdivision thereof of any governmental agency or by reason of the conditions of supply and demand which have been or are affected by such State of Emergency.

(b) Any amendment to this Lease must be in writing and signed by both parties.

(c) Lessee agrees to install and maintain whatever fire prevention and extinguishing equipment which Lessor or its insurer deems necessary and proper. Lessee also agrees to install-said equipment within ten (10) days of notice from Lessor or Lessor's insurer.

(d) Lessee agrees to pay as Additional Rent **100%** of any real estate taxes and assessments for the property of which the Premises are a part.

(e) Lessee accepts the Premises in "as is" condition, with all work to be done by Lessee at Lessee's own expense including the maintenance and repair, including but not limited to the Heat/AC units. Lessor agrees to put said unit in good working order prior to Lessee's occupancy. Upon the signing of this lease, Lessee has inspected all plumbing and HVAC systems, and agreed they are in good working condition.

(f) Lessee shall not permit the distribution or posting of any notices, handbills or other solicitations at or about the Premises. Lessor reserves the right to require removal of any signs, advertisements or other materials posted in or on the windows and/or doors of the Premises.

(g) Lessee shall promptly pay any fines levied against Lessor or against the Premises or the building or property of which the Premises are a part by any federal, state or local authority, and to immediately cure any non-monetary violations or citations issued by any federal, state or local authority, on account of Lessee's use or occupancy of the Premises

## 13. Redelivery.

Upon the expiration, termination, or non-renewal of this Lease, Lessee shall yield up and return to Lessor the Leased Properties in as good condition as when received by Lessee, ordinary wear and tear excepted, and shall remove all Lessee's personal property, inventory and equipment from the Leased Properties. If Lessee made any change, addition or alteration to the Leased Properties, Lessee agrees to remove the same prior to the expiration, termination, or non-renewal of this lease, and to restore the Leased Properties to as good condition as when received by Lessee, ordinary wear and tear excepted. If Lessee fails to immediately remove such changes, additions or alterations, or restore the Leased Properties, Lessor may remove or cause the same to be removed, or make such restoration as is necessary, and charge Lessee for the expenses involved in such action. In addition, Lessee agrees to pay to Lessor, as liquidated damages for such failure to remove and/or restore, $300.00 per day for each day from the date of expiration, termination, or non-renewal to the date of removal and restoration.

## 14. Holdover.

(a) If this Lease terminates, nonrenews or expires and has not been extended or further extended, Lessor has a right to reenter and to take immediate possession of the Premises. If Lessee retains possession of the Premises from and after the date of such expiration, then Lessor shall have the right (in addition to its other rights), to elect from the remedies available to it under law. Such remedies include, but are not limited to, treating Lessee as a periodic Lessee, a Lessee at sufferance, or a trespasser. Lessee will be treated as a periodic Lessee only upon express written consent of Lessor and acceptance of damages as provided for in subsection (b) of this Section shall not be deemed written consent.

(b) In addition to any other rights Lessor may have at law or equity or pursuant to the Lease, for each day or fraction thereof after termination or expiration of the Lease that Lessee fails or refuses to vacate the Premises and surrender the Loaned Equipment, Lessee shall pay Lessor upon demand as minimum damages (i) a sum equal to two (2) times the previous monthly installment of rental as prescribed in Paragraph 3, computed on a daily basis or (ii) a sum equal to the maximum amount of damages recoverable by law for Lessee's holding over after the expiration, termination, or nonrenewal of this Lease. Lessor's acceptance of either sum shall in no way affect Lessor's right to

immediate possession of the Premises and shall not afford Lessee any right of possession beyond the date of termination, expiration, or cancellation of the Lease.

### 15. Gas, Water, Electricity, and Sewer Charges.

Lessee shall, during occupancy of the Leased Properties, pay all charges for trash collection, gas, water, electricity, and sewer use. Upon Lessee's, failure to do so, Lessor may pay such charges and invoice Lessee therefore. Lessee agrees to pay such charges to Lessor within thirty (30) days of invoice date via EFT.

### 16. Independent Status of Lessee.

This Lease shall not reserve, give or grant to Lessor any right to manage or control the day-to-day business of Lessee conducted on the Leased Properties, and neither Lessee nor its employees or agents shall be agents or employees of Lessor for any purpose whatsoever. Lessee is and shall at all times be an independent business entity that is free to select its customers, to purchase and sell products of its choice, to set its own selling prices and terms of sale, and generally to conduct its business as it determines. Lessee has the sole right to hire, control, supervise and discharge its employees and agents, and Lessee shall have the sole right to control the performance of and the sole responsibility for the sale of motor fuels and any maintenance or automotive repair work, if any is permitted, at the Leased Properties by Lessor.

### 17. Customer Service at Premises.

Lessee shall:

a. operate the Premises responsibly, with due care, prudence, good judgment and skill;
b. provide services comparable with competitive stations of similar type, and style;
c. treat courteously all persons entering the Premises for any legitimate purpose;
d. not engage in dishonest, fraudulent, or scare selling practices;
e. promote diligently the sale of motor fuels;
f. make no unlawful or offensive use of Premises;
g. perform all services in a good, workmanlike manner;
h. maintain the restrooms in a clean, sanitary, well-lighted, and usable condition, adequately provided with necessary supplies;
i. actively and personally participate daily in the management of Premises to ensure compliance with this lease and    proper use and maintenance of Premises;
j. not use Premises for the parking, storage, rental, or sale of motor vehicles, trailers, or any other vehicles or equipment;
k. keep the Premises open for business, fully and adequately staffed with **personnel capable of conversing in English** with law enforcement, fire, and government officials and other safety professionals, in addition to customers, and properly lighted during all agreed-upon hours as set forth;
l. forward to Lessor immediately upon receipt, by facsimile or overnight delivery service, copies of all notices from governmental or administrative authorities that may apply to or affect Lessor's interest or rights in Premises, or that result from actual or alleged violations of laws or standards at Premises;
m. use all equipment provided under this Lease, including the Loaned Equipment, within the limitations imposed by the equipment manufacturers. In regard to tanks, lines, dispensers, pumping devices, spill containment, overfill prevention, vapor recovery dispensers, pumping devices, spill containment, overfill prevention, vapor recovery, environmental – or safety-related devices, and/or all monitoring and testing equipment (collectively "Tank Systems") on Premises, Lessee shall not install any such Tank Systems on the Premises, in whole or in part, without the express prior written consent of Lessor and, if consent is given, any such installation shall be made in accordance with all terms and conditions of that consent;
n. provide well-trained, uniformed, courteous, and neat-appearing personnel to serve the needs and desires of the public;
o. operate the Premises and Loaned or leased equipment in strict adherence with service and appearance standards adopted by Lessor;
p. keep legible, visible, and fixed at their selected, commercially advantageous locations all trademarks and signs provided by Lessor;
q. do or permit nothing to be done to Premises or any part of them which is prejudicial to Lessor's title thereto or interest therein; and

- 9 -

NOV.18.2006 09:00

r. maintain the Premises in accordance with the appearance standards established for a retail facility selling the brand of motor fuel which Lessee sells, which appearance standards shall either be provided to Lessee or shall be made available to Lessee upon request;

s. Lessee agrees to assume the transfer and responsibility of any existing ATM including but not limited to all monitoring service fees. Lessee shall protect, defend, indemnify and hold Lessor harmless from and against any suits, cause of action, judgments, costs or penalties arising out of or related in any way to ATM at the Premises.

t. If Lessee shall fail to perform maintenance or repair within ten (10) days following notice by Lessor to Lessee, Lessor shall have the right but not the obligation, to perform any maintenance or repair which is the responsibility of Lessee under this Lease. Lessee shall pay to Lessor the cost of such maintenance or repair within thirty (30) days of Lessor's billing for same via EFT;

u. Participate in any Sweet Oil Company promotions including but not limited to radio, newspaper, and/or television ads, sign and banner programs, product specials.

## 18. Lessor's Alterations.

Except to the extent limited by applicable Law, at any time during the term of this Lease, Lessor may, at Lessor's sole discretion, make Alterations to the Premises, including without limitations to convert the Premises for use as a modern, first class convenience store operation, with associated gasoline dispensing facilities, and other offerings that Lessor deems reasonable to enhance the capacity of the premises for sales of motor fuels and other items. Lessor shall be authorized to convert the Premise for the aforesaid purposes through a demolition of existing improvements of the premises by a reduction, enlargement or re-shaping of the land constituting the Premises and a change in the means of ingress and egress to and from the Premises. Such demolition, rebuilding, Alteration and reconfiguration shall be at Lessor's expense. Lessee acknowledges and understands that any demolition, rebuilding, Alteration, modernization, or reconfiguration of the existing improvements and/or land and other facilities at the Premises (hereinafter the "Work") for the aforesaid purposes may require a temporary closure of the gasoline dispensing facility and, if applicable, convenience store and other facilities at the Premises and/or temporary closure and/or curtailment or adjustment of Lessee's operations thereon and that such temporary closure and/or curtailment or adjustment of Lessee's operations may result in a loss of business income and business opportunities for Lessee that will not be reimbursed by Lessor. Lessor may reduce or suspend the rent payable during the period that the Work is being performed.

(2) In the event that Lessor decides to proceed with the Work as outlined above during the term of this Lease, Lessor shall provide Lessee with thirty (30) days advance written notice outlining the Work to be performed at the Premises and Lessor's estimate of the date of completion thereof. Lessor shall not commence the Work until the expiration of the thirty (30) day period. Upon completion of the Work, Lessor shall provide Lessee with an itemization of all and costs and expenses incurred by Lessor for the Work, including without limitation all associated legal and other fees and expenses, debt service, architectural designs and engineering work, site layout, and permits. New monthly rentals shall be established by Lessor and paid by Lessee to Lessor commencing on the date that Premises reopens for business (hereinafter "New Rent"). The New Rent for the Premises shall be the sum of the following:

(a) the Rent as provided in Paragraph 3 of this Lease, plus

(b) an amount equal to an appropriate return on investment, as outlined above, and determined by Lessor in good faith, at Lessor's option, on either:

(1) Lessor's investment in the reconfigured Premises or;
(2) the enhanced value thereof, such return prorated over the remaining term of the Lease. If Lessee is not satisfied with the New Rent, Lessee may terminate the Lease.

Lessee shall be responsible for purchasing all of its inventory for resale at any convenience store constructed at the Premises and for purchasing coolers and other equipment necessary for the operation thereof. Lessee may also be required, in Lessor's sole discretion to operate the convenience store under a trademark or trade name furnished by Lessor and to provide offering of a kind and quality offered at other convenience stores bearing the same trademark or trade name.

## 19. Lessee's Alterations.

- 10 -

Lessee may not make any Alteration to the Premises without Lessor's prior written consent. Any Alteration authorized by Lessor will be at Lessee's own expense, must be made in accordance with plans and specifications approved by Lessor and any agreement between the parties, and must be performed by a Contractor approved by Lessor. Lessee shall, at Lessee's expense, maintain the Alteration in a good and safe condition. If Lessee fails to maintain the Alteration, Lessor may do so and charge Lessee its reasonable expenses. At Lessor's election, upon termination or nonrenewal of the franchise relationship, Transfer of the Lease or as other wise agreed to by all parties, any Alteration made by Lessee will become a part of the Premises and property of Lessor, without any cost to Lessor. In the alternative, upon written notice to Lessee, Lessor may require that Lessee, within 30 days after termination or nonrenewal of the franchise relationship, remove any Alteration and restore the Premises to the condition prior to making the Alteration.

20. **Leased Premises and Use.**

    (a) Lessor leases the Premises to Lessee under the terms of this Lease. Lessee shall use the Premises solely for the operation of motor fuel dispensing station or, if approved by Lessor, an automobile service station, except where Lessor has given its prior written consent for other, additional uses. If Lessor consents to Lessee's additional use, Lessor reserves the right to a portion of the fees, income or other revenue generated by such use.

    (b) Notwithstanding anything to the contrary stated herein, Lessor reserves the right to make use of the Premises for other business uses so long as any such use does not materially interfere with the authorized uses of the Premises then being made by Lessee. Lessor reserves the exclusive right to any fees, income, rentals or other revenue generated by such use by Lessor. (i.e.: cell phone tower, advertising billboard, etc.)

    (c) This Lease is subject to all covenants and restrictions contained in any deed or lease conveying or leasing the Premises to Lessor and all other deed restrictions, zoning laws, easements or encumbrances affecting the Premises, now or after the Effective Date of this Lease. Lessor reserves the right to grant a mortgage or security interest in the fee and leasehold interests affecting the Premises. This Lease is also subject and subordinate to any mortgage affecting the Premises now or after the Effective Date of this Lease provided the mortgage contains a "non-disturbance" clause requiring that the mortgagee not disturb the possession of Lessee, its successors, and assigns as long as they are not in default under this Lease. Upon Lessor's request, Lessee shall promptly execute and deliver to Lessor any instrument required by a mortgagee relating to Lessee's subordination of its rights under this Lease. Lessor also reserves the right to grant easements, rights-of-ways, and licenses affecting the Premises.

    (d) Lessee may not use the underground storage tank ("UST") system, including the associated product lines, or motor fuel dispensing equipment provided by Lessor under this Lease to store, handle, distribute, market or sell motor fuels supplied by any distributor other than the Lessor or as directed by the Lessor (even if other distributor is offering the same brand as identified by the station ID), or not bearing the brand that Lessee is permitted to use under the Agreement without the prior written consent of Lessor.

    (e) Lessee shall not either place or remove any buildings or other permanent improvements at the Premises or make any alterations or changes in or to the Premises or any part of the Premises without prior written permission of Lessor;

    (f) Lessee shall not store or sell intoxicating liquors unless properly permitted and licensed by State and local authorities, illegal or prescription drugs, or permit intoxicating liquors or illegal drugs to be used or consumed at the Premises;

    (g) Lessee shall not perform body or fender repair on Premises;

    (h) Lessee shall report immediately to Lessor (and anyone else to whom notice is required by law or regulation) any serious accidents including, but not limited to, fires or explosions; and

    (i) Lessee shall operate the Premises in accordance with the terms of the Lease, the Agreement and applicable safety rules issued by all competent governmental authorities, in addition to those safety rules issued by the Lessor's Lessor, as the term Lessor is defined in the Agreement and by the Lessor, including, but not limited to, the following Safety Rules:

        (1) Class I Safety Rules: (a) keep fully operational fire extinguishers on Premises at all times; (b) do not use or maintain or permit to be used or maintained on the Premises welding equipment of any type or any open-flame equipment; (c) do not drain or permit the drainage of gasoline inside buildings on the Premises; (d) do not

store or permit gasoline to be stored inside the buildings on the Premises; (e) do not burn or permit burning of trash in the vicinity of any building or the underground storage vents on the Premises; (f) do not use or permit to be used on the Premises for cleaning purposes any flammable liquids such as gasoline, naphtha, or lacquer thinners; (g) do not permit gasoline or waste to enter the ground or any public or private water system, storm drain, or sewage disposal system; and (h) do not permit flammable material (including but not limited to, smoking materials such as tobacco, pipes, etc.) near pumps, tanks, trucks, lube or wash bays.

(2) Class II Safety Rules: (a) do not use air pressure on anti-freeze drums; (b) do not use or permit the use of any defective electrical equipment; (c) store oil-soaked rags only in covered metal containers; (d) notify Lessor immediately of any unsafe conditions, including any cracks and holes in the pavement that affect safety.

## 21. Equipment and Reporting Obligations.

In addition to compliance with all the requirements contained in the Paragraph labeled Customer Service at Premises under the Agreement, Lessee agrees as follows:

(a) Lessee agrees to adopt and maintain procedures to be followed by all those persons handling the product or equipment or both to prevent accidents in the handling and use thereof.

(b) Lessee shall take reasonable steps to prevent sales of any contaminated product. If any product is found to be contaminated, Lessee shall not permit the sale of such contaminated product.

(c) Failure by Lessee to comply with the requirements of this Article shall constitute a waiver of any and all claims of Lessee. Further, Lessee agrees to reimburse Lessor for any and all expenses incurred as a result of leakage of product because of Lessee's failure to notify Lessor thereof.

## 22. Security.

Lessee shall be solely responsible for making all improvements to the Premises, including but not limited to the installation of equipment and fixtures, which Lessee deems necessary to secure the Premises against unlawful intrusion, vandalism, and criminal activity or to provide for the safety of Lessee's employees, customers or invitees (hereinafter "Security Improvements"). In the event Lessee desires to make Security Improvements, Lessee shall proceed to do so with the approval of Lessor, which approval shall not unreasonably be withheld. Lessor shall not be liable to any person for any claim of deficiency or malfunctioning of any security equipment at the Premises. Lessee shall protect, defend, indemnify and hold Lessor harmless from and against any suits, cause of action, judgments, costs or penalties arising out of or related in any way to the existence and/or level of security at the Premises. Lessee agrees to assume the transfer and responsibility of any existing security systems including but not limited to all alarm monitoring service fees.

## 23. Inventory Controls.

(a) Lessee understands and acknowledges that the leakage of petroleum products from underground storage tank systems is a concern and that operators of retail facilities must take diligent and continual precautions to discover and stop any such leakage. Lessee agrees to keep and reconcile inventory records daily in accordance with all laws applicable thereto to indicate bulk petroleum product losses. These records shall be maintained for each operating day and for every delivery and shall include the following information for each grade or type of bulk petroleum product: (1) opening physical inventory, (2) sales, (3) product used other than sold, (4) receipts, (5) closing physical inventory, and (6) variation (over or under).

(b) Lessee agrees to promptly and immediately notify Lessor orally (1) of any sudden, unexplained variance from its normal pattern, (2) when relatively small losses are occurring but trending larger, or (3) of any sudden increase of water in an underground tank, or of more than one inch of water in a tank. Water level measurements shall be taken daily and each time an underground tank is gauged. Measurements of water shall be made to the nearest one-half inch. Lessee shall confirm in writing to Lessor any oral notification within forty-eight (48) hours. In any case, Lessee agrees to notify Lessor by phone and in writing of any situation in which there is a loss of 150 gallons or more of one product in one day of where there is an overage or shortage of more than 300 gallons in any three consecutive days.

(c) Lessee agrees to retain inventory records and inventory reconciliation records for a minimum of three (3) years, to make such records available to Lessor for inspection and copying during normal business hours, and to allow

- 12 -

Lessor to take physical inventory of Lessee's bulk petroleum products and meter readings during normal business hours. Lessee shall furnish Lessor with these records via fax no later than the 7th day of the following month.

(d) Lessee agrees to inspect petroleum product storage and handling facilities and surrounding areas at least once a week for indications of possible leakage. This inspection should include, but is not limited to the following areas: (1) around and under product dispensers, (2) inside remote pump access boxes, (3) inside product fill boxes, and (4) low areas, such as sumps, hillsides or culverts. Any indication of leakage (actual product or odors thereof) should be reported promptly as stated above. Lessee shall comply with all applicable local, state and federal laws applicable to underground storage tanks.

(e) Lessee, in addition to the provisions of the Paragraph labeled Indemnification, specifically agrees to indemnify Lessor and to hold them harmless from all clean-up costs, personal injury, death or property damage claims, and fines or penalties which arise out of or are related in any way to the undetected leakage of petroleum products due to Lessee's failure to comply with the provisions of this paragraph. (See 40 Code of Federal Regulations (CFR) 280.43 method of release detection for tanks.)

(f) Inventory sold to Lessee will be secured by appropriate UCC-1 filing authorizations executed by Lessee and incorporated as part of this Agreement and filed in the State and Local government offices where the site is located.

## 24. Product Integrity.

As detailed in the Paragraph labeled Inventory Controls, Lessee is responsible for the daily monitoring for the presence of water in underground product tanks. To eliminate the possibility of dispensing water mixed with gasoline into one of Lessee's customer's vehicles, Lessee is to shut off the dispensing system and notify Lessor, under Paragraph labeled "Inventory Controls", whenever two inches or more of water is measured in an underground product storage tank. Regardless of anything herein to the contrary, Lessor will not be liable nor will Lessor or Sweet Oil Company be responsible to reimburse or satisfy any customer of Lessee for repairs that result from water contaminated gasoline dispensed into a vehicle by Lessee or Lessee's employees. However Lessee, immediately upon receiving any notice of any claim from any customer regarding the performance of any BP motor fuels, oils, or other BP-branded products, must advise Lessor and Sweet Oil Company orally and in writing of the customer's name and address, (who makes the claim) the date the product was purchased, and description of the product and quantity of the product purchased, and a detailed description of the nature of the complaint.

## 25. Termination by Lessor.

In addition to any other rights of termination which Lessor may have, upon the occurrence of any of the following events, which the parties agree are both reasonable and of material significance to the relationship hereunder, or upon such other grounds as are set forth in the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as amended from time to time, Lessor may terminate this Lease:

a. Upon default in the payment of any installment of rent or any other sum due Lessor from Lessee when due; whether such sum is due under the terms of this Lease or any other agreement or obligation between the parties;

b. If Lessee fails to comply in whole or in part with the maintenance responsibilities and minimum standards;

c. If Lessee sells non-BP motor fuel or any mixture or adulteration of BP motor fuel with any other product or material other than solely BP Motor fuel under the trademarks or brand names of BP, if Lessee sells BP motor fuel under any name other than BP or under any other brand names or trademarks; or if Lessee uses BP's trademarks, trade names or brand names in a manner which deceives or causes a likelihood of confusion to the motoring public or sells motor fuel which Lessee knows or has reason to believe does not meet state or federal specifications, **or if Lessee purchases any motor fuel including gasoline, diesel, kerosene, propane, off-road diesel fuel, or any other petroleum product from any other supplier other than Sweet Oil Company;**

d. If Lessee fails to comply with any applicable law, ordinance, regulation, judicial or administrative order, or other legal requirement of any governmental authorities pertaining to this Lease and/or the loading, unloading, storage, handling, transportation, delivery, or sale or offer for sale of petroleum products;

- 13 -

e.  If Lessee attempts to sell, assign, give, grant, devise, or otherwise dispose of Lessee's interests in this Lease, without the advance written consent of Lessor;

f.  If bankruptcy or insolvency proceedings are begun by or against Lessee under the Bankruptcy Code or if the Lessee becomes insolvent;

g.  If Lessee makes or furnishes any false or misleading statement or fails to disclose information to Lessor, its agents or employees, concerning any material fact for the purpose of inducing Lessor to make any payment, deliver product, extend or continue to extend credit or increase credit or issue any credit memorandum to Lessee or to any other party acting in concert with Lessee;

h.  If any attachment, garnishment, execution, lien or colorable lien, or other legal process or proceeding is levied or begun by anyone other than Lessor against or involving the Leased Properties, or if any other financial impairment exists as to the Leased Properties, and such is not removed, cured, bonded, or satisfied within forty-five (45) days from such date of levy, execution, lien or colorable lien, or other legal process or other commencement of proceedings;

i.  If the Leased Properties are vacant, unattended or not operated for the retail sale of motor fuels for seven (7) consecutive days or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

j.  If Lessee fails to comply with hours of operation; or

k.  If Lessee dies or becomes severely physically or mentally disabled.

Lessee shall not suffer, permit or allow the occurrence of any of the events enumerated in Sub-Paragraphs (a) through (j) above. The occurrence of any of the events enumerated in Sub-Paragraphs (a) through (k) above constitutes a failure by the Lessee to comply with a provision of this Lease which is both reasonable and of material significance to the relationship between Lessor and Lessee, and shall constitute good cause to cancel or terminate this Lease as the term "good cause" or any similar term is or may be used in any federal or state statute affecting the rights of the parties to terminate this Lease. Lessor's rights of termination for good cause as defined above shall not in any way be affected by any previous waiver, forbearance or course of dealing.

**26.  Indemnification and Security.**

a.  Lessee, to the maximum extent permitted by law, shall defend, protect, indemnify and hold harmless Lessor and his agents ("Indemnified Parties") against all claims, demands, suits, liabilities, judgments, losses and expenses (including, without limitation, attorneys' fees and costs of litigation, whether incurred for an indemnified party's primary defense or for enforcement of its indemnification rights) on account of any personal injury, disease or death of any person(s), damage to or loss of any property, or money damages or specific performance owed to any third party (by contract or operation of law), and any liens, penalties, assessments, environmental response costs or injunctive obligations imposed upon any Indemnified Party caused by, arising out of, or in any way incidental to, or in connection with, Lessee's performance, or the performance, acts or omissions by any resale customer, or consumer served by Lessee (including employees, agents, Purchasers and Invitees of Lessee and Lessee's resale customers and consumers), or any other person.

b.  It is the intention of the parties that the indemnity obligations of Lessee are without regard to whether the negligence, fault, or strict liability of an Indemnified Party is a concurrent or contributory factor, and such obligations are intended to protect the Indemnified Parties against the consequences of their own negligence, fault, or strict liability. Only those matters which are determined by a final non-appealable judgment to be a result of the sole negligence or fault of an Indemnified Party or defects in Lessor's products not caused or contributed to by the negligence or fault of Lessee or Lessee's employees, agents, Purchasers, invitees, resale customers or consumers shall be excluded from Lessee's duty to indemnify the Indemnified Parties; provided, however, Lessee shall not be relieved from its duty to defend and protect the Indemnified Parties under such circumstances. Such duty to defend and protect the Indemnified Parties shall include, without notation, investigation and costs of defense and settlement, including reasonable attorney's fees up through final appeal of a trial court judgment or arbitration. Lessor expressly reserves the right to participate in its defense with counsel of its own choosing Lessee's indemnity obligations shall survive the expiration, termination or non-renewal of this Lease.

- 14 -

**27. Insurance Requirements.**

Lessee shall maintain, at its sole cost, during the term of this Lease, the insurance coverage set forth with companies satisfactory to Lessor and policy limits not less than as stated hereunder. The insurance coverage required hereunder shall name Lessor as additional insured, provide a waiver of subrogation in favor of Lessor, state that coverage is primary to any other valid insurance available to Lessor or its affiliates, allow cross liabilities and provide for written notice of cancellation or material change. Notice of cancellation or change shall not affect coverage afforded Lessor until 30 days after written notice is received. A certificate evidencing these coverages shall be delivered to Lessor prior to commencement of this Lease. The insurance coverage and certificate of insurance shall be applicable, without regard to the allocation of liability provisions contained in this Agreement, to the extent of any claim, loss or liability within the scope of the following required insurance:

1. Commercial General Liability Insurance, according to the current unamended state approved Insurance Services Office Form, or Comprehensive General Liability Insurance, with broad form endorsement, with limits of not less than $2,000,000.00 each occurrence, and $2,000,000.00 general aggregate, provided that Endorsement CG 2503 or CG 2504, amending aggregate limits, should apply.

2. Business Automobile Liability Insurance for all operations of the Purchaser, including owned, non-owned, and hired vehicles, with limits of liability of not less than: Bodily injury $2,000,000.00 each person, $1,000,000.00 each accident; Property damage $1,000,000.00; or a combined single limit of $1,000,000.00 for Bodily Injury and Property Damage, such policy to be endorsed with MCS-90, when material transportation is involved.

3. Workers' Compensation Insurance, as required by laws and regulations applicable to, and covering, employees of Lessee.

4. Employers' Liability Insurance protecting Lessee against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship, with a limit of not less than $500,000.00.

5. Garagekeeper's Legal Liability Insurance, with a limit of not less than $ 125,000.00 per occurrence. (Only required for those locations engaged in automotive repairs.)

**28. Minimum Standards.**

Lessee agrees to conduct its operations in accordance with the minimum standards set forth below. These standards may change from time to time, and a detailed explanation of these minimum standards will be provided upon written request:

(a) Lessee's place of business, including building, signs, restrooms, driveways, grass or planting areas, and storage areas shall be maintained, inside and out, in a clean and orderly appearance, in accordance with Sweet Oil Co. Standards of appearance.

(b) Lessee shall equip retail outlets to provide services comparable with competitive outlets of similar types, age, and style. Lessee shall keep all equipment neat and clean, and in good repair. Pumps and dispensers, which dispense motor fuel, shall be properly identified with product and other decals, which may be required by applicable laws, rules, and regulations. Trademarks signs, logos, and other identification will be kept clean, in good repair, and painted, where required

(c) Lessee and Lessee's employees shall, at all times, present a good personal appearance, observe clean, neat, and safe working habits, render prompt, courteous, and honest service to customers, and take reasonable actions to promote the motor fuels they sell. Lessee and Lessees and Employees shall at all times wear appropriate branded uniforms with name tags and be able to converse clearly and efficiently in English.

(d) Mystery Shopper – Sweet Oil will hire a Mystery Shopper to periodically visit each and every location to evaluate the service and appearance as well as the customers experience. Scores will be based upon Sweet Oil Co. minimum standards of appearance requirements. Should the location receive a score of 90 points or greater, the cost of the visit will be paid by Sweet Oil. Should the score be less than 90 points the location will be charged the cost of the visit. Any image or service violation which may surface as a result of the mystery shop, will be considered a

- 15 -

violation of this lease. Upon receipt of 2 consecutive scores of **80** points or less, the Landlord reserves the right to terminate this lease in accordance with its rights as provided under the PMPA.

(e) Maintain a minimum of 200 points on every scoring by Sweet Oil representatives based on the attached Standard of Appearance Checklist.

(f) Where a convenience store is authorized under this Agreement, Lessee shall (i) operate such convenience store as a first class convenience store; (ii) insure that all shelves are fully stocked with all inventory items customarily offered for sale at first class convenience stores sufficient to meet customer demands; (iii) insure that all equipment including without limitations, coolers and other refrigerator appliances are in good operating condition; (iv) fully staff said convenience store with knowledgeable, courteous employees with the ability to communicated in the English language with law enforcement, fire, and government officials and other safety professionals; and (v) keep the convenience store open for business during operating hours for the Retail Facility.

### 29.  Condemnation of / or Affecting Premises.

In the event of any taking or damaging during the lease term, or any extension or renewal thereof, of all or any part of the Leased Properties, or any interest therein by reason of any exercise of the power of eminent domain, whether by a condemnation proceeding or otherwise, or by any voluntary transfer (the right to make the same being hereby reserved to Lessor without liability of any sort or nature to Lessee) of all or any part of the Leased Properties or any interest therein made in lieu or avoidance of an exercise of the power of eminent domain (any such taking, damaging or transfer being hereinafter referred to as an "Appropriation"), Lessor shall be entitled to the entire award including, but not limited to, compensation, damages, and interest, if any, made with respect to the Appropriation, and Lessee hereby assigns to Lessor all of Lessee's interest, if any, in and to all and any part of such award, unless Lessee owns the fee title to or holds the prime lease of the Leased Properties, in which event Lessee shall be entitled to the award or that portion thereof, if any, made for the said fee title or prime leasehold estate owned by Lessee or, if no court apportionment of the award is made, Lessor and Lessee shall be entitled to share therein according to the value of their respective estates in the premises. In the event of an Appropriation of all or a part of the Leased Properties, which Lessor determines in its sole discretion materially interferes with the use of the Leased Properties for the retail sale of motor fuels, Lessor may within one hundred twenty (120) days after the date of the receipt of notice of Appropriation, terminate this Lease by giving Lessee ninety (90) days prior written notice. In the event this Lease is not so terminated by reason of any Appropriation of less than all of the Leased Properties, such Appropriation shall not alter, impair or otherwise affect, in any way, the liability of Lessee to pay the full rental and to perform all of the covenants and conditions contained in this Lease. If as a result of such Appropriation, this Lease is not terminated but in Lessor's sole opinion work must be done by Lessor on or at the Leased Properties for its continued satisfactory operation as a petroleum retail station, Lessee hereby grants to Lessor the right to do or cause such work to be done and waives any claim for damages sustained by reason thereof, including, but not limited to, damages for loss of business.

### 30.  Destruction of Leased Properties.

If the Leased Properties or any part thereof shall be totally destroyed or so damaged that Lessor in its sole discretion shall decide not to rebuild or repair, either party may terminate this Lease as of the time such damage or destruction occurred. In such event, rental shall be abated for the un-expired portion of the Lease as of the date of termination.

### 31.  Inspection by Lessor.

Lessee shall permit Lessor and its agents, to enter into and upon the Leased Properties at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining or making repairs or alterations, Lessee shall also permit Lessor or its agents to enter the premises during normal business hours and to extract from any and all motor fuel dispensing pumps sufficient samples of such motor fuels for testing purposes.

### 32.  Assignments, Encumbrances, and Right of First Refusal.

(a) This Lease is personal to Lessee. Lessee shall have no power to assign, transfer in any way including transfer upon retirement, mortgage, pledge, bequeath, or sell this Lease, in whole or in part, directly or indirectly by operation of law or otherwise without Lessor's prior consent, which consent will not be unreasonably withheld. Such consent shall be required notwithstanding any decision by Lessor to decline to exercise its right of first refusal as described more fully below. Lessee understands and agrees that such consent shall be subject to an evaluation of the prospective transferee as provided herein below. Any attempts to Transfer this Lease or any right under it, in whole

- 16 -

or in part, directly or indirectly, without the Lessor's prior written approval shall be null, void, invalid, and of no effect. A request for Lessor's approval of the Transfer shall be made in writing at least ninety (90) days prior to the date on which Lessee desires to make the Transfer. Lessor will have ninety (90) days (or any lesser period specified by Law), after receipt of Lessee's request for consent to Transfer and all information required to conduct the evaluation more fully described below to provide Lessee with written notice of its decision to grant or withhold its consent.

(b) Lessor's consent to any request to Transfer Lessee's rights and obligations under this Lease shall be subject to an evaluation of the ability of the prospective transferee to operate the a retail service station at the Premises. Such evaluation shall consist of, without being limited to, an examination by Lessor of the following factors or information concerning the prospective transferee to be provided to Lessor: (i) business experience during the preceding five (5) years of the prospective transferee; (ii) description of any pollution or contamination of any kind, regardless of fault, that occurred or was discovered at any site at which the prospective transferee was an owner, employee, or operator; (iii) a financial statement of the prospective transferee for the preceding three (3) years; (iv) a copy of the proposed sales, and assignment agreement between the Lessee and the prospective transferee; (v) the business reputation of the prospective transferee; (vi) credit worthiness and reliability of the prospective transferee; (vii) the ability of the prospective transferee to communicate verbally and in writing in the English language, and (viii) a business plan with 1, 3, and 5 year business projections, (ix) and other relevant information concerning the prospective transferee. Lessee shall cause the prospective transferee to provide Lessor with all documents and information concerning the prospective transferee reasonably necessary to conduct such evaluation.

(c) In addition to the requirement that the prospective transferee undergo an evaluation as provided hereinabove, the consent of Lessor to any assignment or transfer of Lessee's rights an obligations under this Lease may be conditioned upon the agreement of the prospective transferee to enter into a Trial Franchise Lease of one (1) year pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. Section 2803.

(d) It is mutually agreed that the terms and conditions of this Lease shall be binding upon, and shall inure to the benefit of, the Parties hereto, their heirs, successors, and assigns, respectively.

(e) Where Lessee is not a Business Entity, Lessee may designate, in writing, a surviving spouse, adult child, stepchild, or parent of Lessee ("Designee") for Lessor to consider accepting as a new franchise in the event of Lessee's death, provided (if permissible under applicable law) the Designee meets all the evaluation standards set forth in (b) above for prospective transferees. Lessee's designation revokes all prior designations, and will terminate upon termination, nonrenewal, or Transfer of this Lease, upon Lessee's delivery to Lessor of a written revocation or new designation, or upon Lessees divorce from a designated spouse. If the Designee has been significantly involved in the Lessee's business at the Premises (as reasonably determined by Lessor) and meets all the standards normally required by Lessor of a franchisee, Lessor shall offer to enter into a new lease to replace the Lease and a motor fuel supply agreement constituting a franchise between the parties at the Premises with the Designee on Lessor's then-current terms and conditions; provided, however, Lessor shall not be required to extend credit to the Designee without adequate security. If the Designee meets all of the standards normally required by Lessor of a franchisee, but has not been significantly involved in Lessees business at the Premises (as reasonably determined by Lessor), Lessor shall offer to enter into a trial franchise of one year pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2803, which franchise shall include a lease for the Premises and a motor fuel supply agreement with the Designee; provided, however, that Lessor shall not be required to extend credit to the Designee without adequate security.

(f) Right of First Refusal – see attached addendum

## 33. Modification.

Lessor retains the absolute right to modify the Lease terms upon 30 days prior written notice to Lessee, upon completion of any capital expenditures whether required by law, re-zoning, change of use, modernization or brand substitution/image requirements. If Lessor shall become obligated by federal, state or local laws, rules or regulation to install or construct additional equipment, facilities, or improvements on the Premises in order to permit continued operation of retail service stations thereon, and in Lessor's sole judgment the cost of such installation or construction would be uneconomical to Lessor, Lessor shall have the right to terminate this Lease; provided however, in lieu of termination Lessor may at its sole discretion refrain from termination if Lessor and Lessee are able to agree to an increased rental. Lessor, however, retains the right to terminate this Lease notwithstanding any offer of rent that Lessee may make.

### 34. Branding.

It is clearly understood that Lessor may at anytime and/or reason substitute "Brands" of gasoline and corresponding identification during the term of this Lease or any extension thereof.

### 35 Early Transfer Fee - (ALL STATES BUT VA, NH, MD & DC).

(a) Lessee shall pay to Lessor a franchise transfer fee, (herein referred to as "Fee"), in the form of a bank cashiers check, prior to or at the closing of any franchise transfer, (including the sale of any shares of stock), hereunder, based on the length of time Lessee has been a branded Lessee at the leased premises, as follows:

    (1)     less than one (1) year, 35%
    (2)     from one, (1), year to less than two, (2), years, 30%
    (3)     from two, (2), years to less than three, (3), years, 25%
    (4)     from three, (3), years to less than four, (4), years, 20%
    (5)     from four, (4), years to less than five, (5), years, 15% then 0% thereafter

(b) The amount of the transfer fee will be based on a figure which is calculated by multiplying the difference between Lessors original bill of sale price and Lessees agreed current sale price with the proceeding percentages.

    (1) At the time of any transfer, Lessee will execute an Affidavit of Consideration, certifying the gross sales price which will establish the baseline to be used at the time of any transfer.
    (2) At the time of any subsequent transfer, the Lessee shall submit the contract of sale, with inventory values to remain separate.

In addition to the exceptions to the fee noted herein, no fees will be payable in the event of any transfers resulting from the death, long term disability or sickness, (6 months or more), of the Lessee.

### 36. Waiver.

It is agreed that the waiver by Lessor or by any predecessor in interest of Lessor of any breach of any covenant, condition, or stipulation contained herein or contained in any prior agreements between Lessor and Lessee or between any predecessor of Lessor and Lessee shall not be considered to be a waiver of any subsequent breach of the same or any other covenant, condition, or stipulation of this Lease or any other agreements in existence between Lessor and Lessee nor affect or prejudice any of Lessor's rights or remedies hereunder.

### 37. Approval and Execution by Lessor.

This Lease shall not be binding on Lessor until approved and signed on its behalf by a duly authorized individual, commencement of performance hereunder prior to such approval and signing shall in no cause be construed as a waiver by Lessor of the foregoing requirement.

### 38. Notice.

Notices from Lessor to Lessee shall be sufficient if personally delivered in writing to Lessee, if sent via facsimile machine with written confirmation of successful transmission, or if placed in the United States mails postage prepaid, addressed to Lessee's place of business stated herein, or if left at Lessee's place of business stated herein in any manner. The postmark date shall be the date of any notice sent by United States mail.

### 39. Alternative dispute resolution.

Except for an action brought by Lessor to enforce a termination or nonrenewal of this Lease or to collect indebtedness, if a dispute arises between the parties concerning their respective rights under this Lease, and where commercially reasonable and practicable, the parties shall seek to resolve the dispute by seeking an appropriate form of alternative dispute resolution prior to initiating litigation proceedings. If the parties are unable to reach resolution with in 60 days following notice of written claim, either party may initiate litigation proceedings. Except for an action brought by Lessor to collect indebtedness, neither party, however, may institute court proceedings against the other more than one year after the incident giving rise to the claim.

### 40. Release.

The parties release each other, their respective members, subsidiaries, affiliates and joint venture partners, and their respective directors, officers, employees, and agents as of the effective date of this Lease and the extent permitted by law, from all claims which each party may have against the other (whether or not now known), arising directly or indirectly out of or in connection with any prior Lease, excepting, however, claims of Lessor against Lessee for indebtedness, reimbursement, or indemnification. Lessee understands that this release waives any limitation with regard to a general release that may exist under applicable law and that even if Lessee or Lessor should later become aware of a claim arising out of events or circumstances not now known or suspected to exist, Lessee or Lessor, as the case may be will not be able to assert such claim against the other.

### 41. Attorney's Fees.

It is hereby agreed to and understood by the parties to this Lease that if a party obtains a judgment against the other for breach of any provisions hereof, the complaining party's contract damages shall include all attorney's fees and other litigation expenses incurred by the complaining party in obtaining such judgment. In no event shall Lessor be liable for prospective profits or special, indirect or consequential damages. The provisions of this Section shall survive any termination, cancellation, or expiration of the Lease, however arising.

### 42. General Provisions.

a.   It is expressly provided that "Maintenance" responsibilities, as stated in the Maintenance Responsibilities Addendum, may be altered at any time by Lessor, and shall become legally binding when a Maintenance Amendment is delivered to the Lessee.

b.   Except as expressly provided under this Lease, this Lease may be amended or supplemented only in writing by both parties.

c.   Any waiver of any provision of this Lease must be in writing signed by the parties. Delay or failure by either party of its right to enforce any provision of this Lease, and course of dealing, or trade custom or usage will not operate as a waiver compliance with that provision or a waiver or estoppel of the part's right to enforce any other provision of this Lease.

d.   The provisions of this Lease are severable. If any provision of this Lease is, for any reason, invalid or unenforceable, the remaining provisions of this Lease are valid and enforceable if the basic intent of the parties is still capable of being achieved.

e.   This Lease is binding upon and enforceable against the parties' respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.

f.   Neither this Lease nor any subsequent agreement amending or supplementing this Lease is binding on Lessor unless a duly authorized representative of Lessor signs the Lease, amendment, or supplement.

g.   If requested by Lessor, Lessee shall enter into an access agreement provided by Lessor that will provide access to the Premises by Lessor for the purpose of remediation and cleanup of the Premises, removal and installations of underground storage tanks on the Premises, and other related activities associated therewith.

### 43. Compliance With Laws.

Lessee shall comply with all laws, licenses, and permits relating to the Premises or any use thereof, including, but not limited to, any special zoning or other governmental restrictions and any laws pertaining to environmental protection, safety, and health matters.

### 44. Force Majeure.

(a)  Lessor need not meet any of its obligations under this Lease and is not liable for losses or damages including but not limited to, damage for loss of goodwill, specials or consequential damages, or damages for failure to meet any of its obligations under this Lease where its failure results from any cause substantially beyond its control, in the

sole discretion of the Lessor, whether or not such cause is or was reasonably within the contemplation of the parties at the time this Lease was executed or came into effect or thereafter. Where it is possible for Lessor to remove or ameliorate such cause, as for instance in labor disturbances which could be settled by Lessor's acceding to the demands of the labor group, Lessor is not obligated to take measures to effect such removal or amelioration of such measures will involve substantial additional expense or departure from Lessor's normal practices. Without limitation of any other possible causes, compliance by Lessor with any law, regulation, order or request issued by any person, organization, agency, or department of any government or governmental authority with jurisdiction over Lessor, Lessor's assets or Lessor's operations and acting under color of Law shall constitute a cause substantially beyond Lessor's control.

(b) Upon cessation of any cause and effects, identified in the previous subparagraph, performance hereof, shall be resumed by such failure or delay shall not operate to extend the term of this Lease, nor obligate either Party to supply omitted performance.

(c) Nothing herein contained shall excuse Lessee from paying Lessor, when due, any amount payable hereunder or pursuant hereto.

(d) In the event any law, regulation, order or request issued by any person, organization, agency, or department of any government or governmental authority with jurisdiction over Lessor, Lessor's assets, or Lessor's operation, and acting under color of law (hereinafter referred to generally as legislation) prohibits or alters Lessor's ability to perform under this Lease or makes necessary additional costs for Lessor, the Lessor at its sole discretion may terminate this Lease or any other agreement between the Parties at the effective date of the legislation or thereafter on thirty (30) days written notice to Lessee without incurring any liability for damages including but not limited to goodwill.

(e) If at any time a person with right, title and interest in the Premises superior to those of Lessor shall make proper demand upon Lessor for possession, Lessor may terminate this Lease without liability to Lessee.

### 45. Entirety of Agreement.

This Lease as of the Effective Date hereof cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Lease, except those written agreements relating to any indemnification, reimbursement, indebtedness, or debt security obligations (including, but not limited to, any security interest, security agreement, guaranty, mortgage, deed of trust, promissory note, or UCC filing).

### 46. Key Person Clause – see attached addendum

IN WITNESS WHEREOF the Lessor and Lessee have signed this Lease.

GLeS, Inc. d.b.a. Sweet Oil Company (Lessor)                    Fayyad Abdallah t/a Felton BP (Lessee)

By: _____                                   By: _____
        Officer

By: _____                                   By: _____
        Witness                                                        Witness

- 20 -

## GUARANTY OF PERFORMANCE

This Guaranty of Performance (the "Guaranty") from Fayyad Abdallah t/a Felton BP (hereinafter "Guarantor" or "Purchaser"), to **GLeS, Inc T/A Sweet Oil Company** (hereinafter "Seller"),

### WITNESSETH

1. The Guaranty. In consideration of the financial accommodations to be given, made or afforded by Seller to Grantor, Guarantor hereby unconditionally guarantees the full and prompt payment when due of the following ("Liabilities"):

    (a) The payments to be made and other duties to be performed by Purchaser under the terms of a certain Retail Facility Lease, dated 12/01/04 between Seller and Purchaser (the "Lease"), the terms of which provide that Seller agrees to lease to Purchaser, and Purchaser agrees to leaser from Seller, the retail service station located at 12984 South Dupont Highway, Felton DE 19943, subject to the terms and condition of said Lease.

    In the event that Purchaser fails at any time to make any part of all of its payments or perform its obligations under the Purchase and Sale Agreement or the Lease, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.

    If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Seller are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

2. Joint and Several Obligation. The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3. Renewals, Extension, and Substitutes. The renewal, extensions and substitutions of and for indebtedness and liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4. Waivers of Guarantor. Guarantor hereby waives each of the following:

    (a) Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller Purchaser, and of the amount of the Liabilities that may exist from time to time.

    (b) Presentment, demand, protest, or notice of dishonor, nonpayment, or other default with respect to any of the Liabilities

    (c) Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any

NOV.18.2005 09:05

part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "collateral"), prior to enforcing any rights it has under this Agreement, or otherwise against Guarantor.

(d) Any right of subrogation with respect to the Liabilities or the collateral until Seller shall have received payment in full of the Liabilities.

(e) Any defenses now or hereafter arising or asserted by reason of (i) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the collateral, (ii) the fact that any of the property, a part of the collateral, may at any such time be in default or be incorrectly estimated, or (iii) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the collateral.

The existence of any conditions hereinabove waived shall in no way affect or release the obligations or Guarantor hereunder.

5. Rights of Seller. Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the collateral, including, but not limited to, the following rights:

(a) To modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(b) To extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(c) To forbear from calling for additional collateral, to consent to the substitution or release of all or any part of the collateral, whether or not of the same or different character or value than the collateral surrendered by Seller;

(d) To release or to forbear to proceed against all or any part of the collateral, or to substitute any new for any existing collateral;

(e) Any payment received by Seller from Purchaser, or from any other source other than Guarantor may be applied to the Liabilities of Purchaser to Seller in whatever order Seller elects, and any payment received from Guarantor may be applied to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects.

The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the collateral.

Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharge, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code of from the decision of any court.

6. Assignment of Liabilities. If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided

NOV.18.2006 09:06

that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

7. Consent of Guarantor to Jurisdiction and Venue. Guarantor hereby agrees that all actions to enforce the terms and provision of this Guaranty shall by brought and maintained within the State of Delaware, and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State of Delaware. The Guarantor hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

8. General Provisions. The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any other. No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this agreement or any obligation created hereby will be effective unless in writing signed by Seller. The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.

Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

Seller:  GLeS Inc. t/a Sweet Oil Company
         2604 Eastburn Center
         Newark, DE 19711

Guarantor:

Name:         Fayyad Abdallah
Address:      2108 South 61st Avenue
City, State:  Cicero, IL 60804
SSN:          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

Executed as of the 1st day of December, 20 04.

Guarantor: _____            _____
                    Signature                        Signature

_____            _____
        Signature                        Signature

                    Witness: _____
                    Witness: _____

- 23 -

`.  .  .  .`

# KEY PERSON CLAUSE

### (Fayyad Abdallah t/a Felton BP)

1.  The covenants and agreements set forth below are entered into by and between GLcS Inc. t/a Sweet Oil Company (referred to hereafter in this Key Person Clause as "SWEET OIL COMPANY") and Fayyad Abdallah t/a Felton BP , (referred to hereafter in this Key Person Clause as "DEALER"). The covenants and agreements set forth below are hereby incorporated into and made a part of each of the agreements referenced and marked below (referred to hereafter in this Key Person Clause as "franchise agreement(s)") and may be enforced as if fully set forth therein.

     X              Retail Services Station Lease between SWEET OIL COMPANY, and __Fayyad Abdallah t/a Felton BP_, as "LESSEE", the designated term of such lease agreement which is _12/01/04_ to _12/31/07_.

   N/A         Retail Service Station Sales Agreement between SWEET OIL COMPANY as "SUPPLIER" and _____ as "BUYER", the designated term of such sales agreement which is _____ to _____.

2.  DEALER represents that it is a corporation, all of the stock of which consists of ____ shares which are owned as follows:

____ _____ shares owned by *Fayyad E. Abdallah*

residing at ____ ____ ____ ____ ____ ____ ____ ____ ____ ____.

____ _____ shares owned by ____ _____ ____ ____ ____ ____ ____,

residing at ____ ____ ____ ____ ____ ____ ____ ____ ____.

_ ____ _____ shares owned by _ _____ ____ ____ ____ ____,

residing at ____ ____ ____ ____ ____ ____ ____ ____ ____.

It is agreed that, unless otherwise agreed to by SWEET OIL COMPANY in writing, if any of the stock of the foregoing Shareholder(s) is leased, mortgaged, pledged, assigned, sold, or transferred in any way or if there should be a transfer of any of said stock by levy or attachment, bankruptcy, or transfer by operation of law or death, then the franchise agreement(s) referenced and marked in Section 1 hereof may be terminated or non-renewed by SWEET OIL COMPANY. DEALER covenants and agrees to notify SWEET OIL COMPANY in writing immediately upon the occurrence of any of the events enumerated in the preceding sentence.

3.
   a) It is understood and agreed that _____ is designated the "Key Person" under the franchise agreement(s) referenced and marked in Section 1 hereof. As Key Person, he/she shall personally operate on a daily basis the service station business, which is the subject of the franchise agreement(s). The phrase "operate on a daily basis the service station business" shall mean that the Key Person must manage the service station business and must have authority to make all business decisions that a sole proprietor SWEET OIL COMPANY DEALER normally makes concerning the operations of an SWEET OIL COMPANY DEALER-operated business. In particular and not to the exclusion of subjects not set out herein, the Key Person shall have the authority to buy and sell service station equipment, motor fuel, tires, batteries, and accessories; to enter into financing agreements on behalf of DEALER to finance the purchase of service station equipment, motor fuel, tires, batteries, and accessories; and to do merchandising and/or advertising programs.
   b) (This subsection shall be inoperative unless the blank herein has been completed.) In the event that the Key Person named in Section 3(a) does not, for any reason, personally operate on a daily basis the service station business which is the subject of the written request of DEALER to SWEET OIL COMPANY, be designated as an acceptable Key Person under the franchise agreement(s) referenced and marked in Section 1 hereof. When acting as the Key Person, this alternate Key Person shall be subject to all terms and conditions of this clause and as well as the terms and conditions of the franchise agreement(s) referenced and marked in Section 1 hereof. The Alternate Key Person is hereby designated to be _____

- 24 -

c) Should the Key Person, or all of the Key Persons if an alternate Key Person is designated, cease to operate on a daily basis the service station business which is the subject of the franchise agreement(s) referenced and marked in Section 1 hereof, then the franchise agreement(s) referenced and marked in Section 1 hereof may be terminated and/or nonrenewed by SWEET OIL COMPANY.

4. The franchise agreement(s) referenced and marked in Section 1 hereof may also be terminated and/or nonrenewed by SWEET OIL COMPANY if an act or event occurs concerning or involving any person named in this clause, either as a Shareholder or Key Person, which would permit termination or nonrenewal under the Petroleum Marketing Practices Act, (15 U.S.C. 2801 et seq.), if such act or event concerned or involved a sole proprietor franchisee.

5. If any of the acts or events described above as grounds for termination or nonrenewal of the franchise agreement(s) referenced and marked in Section 1 hereof shall occur, whether involving Shareholder(s) or Key Person(s), DEALER may seek SWEET OIL COMPANY's agreement to change or delete, by amendment, one or more of the names listed above. SWEET OIL COMPANY shall be entitled to withhold its agreement to the proposed change or deletion if, in its sole discretion and judgment, the proposed change or deletion would not be acceptable. Without limiting SWEET OIL COMPANY's discretion in determining the acceptability of any proposed change or deletion, any such request for change may and usually will be denied if the acts or events concerning or involving any Shareholder or Key Person, which permit termination or nonrenewal by SWEET OIL COMPANY, affect or pertain in any way to the operation of the service station business. Any such request shall be in writing and shall include such information as SWEET OIL COMPANY may designate as necessary to determine the qualifications of the prospective Shareholder(s) or Key Person(s). SWEET OIL COMPANY will consider and respond to DEALER's request within thirty (30) days following receipt of DEALER's written request.

| | | |
|---|---|---|
| Witness | SWEET OIL COMPANY | Execution Date |
| Witness | Dealer | Execution Date |

_Fayyad Abdallah t/a Felton BP_
Corporate Title

- 25 -

## ELECTRONIC FUND TRANSFER AUTHORIZATION
### DEBIT/CREDIT AGREEMENT

| Fayyad Abdallah | Felton BP | | 1335-0 |
|---|---|---|---|
| Lessee | Station Name | | SVB |

| 12984 South Dupont Highway | Felton | DE | 19943 |
|---|---|---|---|
| Station Address | City | State | Zip |

| | | | |
|---|---|---|---|
| Mailing Address (if different) | City | State | Zip |

| 302-284-8843 | 303-703-3836 |
|---|---|
| Station Telephone Number | Station FAX Number |

The above named LESSEE hereby authorizes GLeS, Incorporated d.b.a. Sweet Oil COMPANY, a Delaware corporation, its successors and or assigns (Lessor), to initiate electronic funds transfers, ("EFT"), for: (1) withdrawal of funds, ("Debit Entries"), to effect payment by LESSEE for motor fuel purchases, all rental payments to Lessor, and payment of any other amounts owed to Lessor, by LESSEE, whether arising under the Lease, Sales Agreement, or for any other reason, and (2) payment to LESSEE, ("Credit Entries"), by Lessor for any reason. LESSEE also authorizes Lessor to originate adjustments of erroneous Debit Entries and Credit Entries. LESSEE represents and warrants that the accounts designated below are not established or utilized primarily for personal, family, or household purposes, and will not be used for such purposes during the term of this authorization, and LESSEE shall indemnify and hold Lessor harmless from any damages, costs, or expenses that it may incur, should this representation and warranty not be true at anytime during the existence of this authorization.

LESSEE hereby authorizes the Bank(s) Financial Institution(s) named below to make EFT Debit Entries, Credit Entries, and adjustments of erroneous entries initiated by Lessor from or to the bank account(s) designated below.

| | |
|---|---|
| Bank/Financial Institution Name | Bank Account Number |
| | |
| | Please attach a voided check from Bank account to this form |
| Branch | Transit Routing Number |
| | |
| Street Address or PO Box No. | Bank Contact |
| | |
| City/State/Zip | |

This authorization becomes effective on the _____ day of _____ 2004 and shall continue so long as LESSEE has a franchise relationship, pursuant to the Petroleum Marketing Practices Act, with Lessor. LESSEE may not terminate this authorization during the term of the franchise and any extensions, and/or renewals, thereof.

LESSEE agrees to maintain sufficient funds in the above-designated bank account(s), to pay EFT Debit Entries when initiated. Nothing in this authorization shall obligate Lessor to withdraw from, or credit LESSEE's account(s) by EFT.

The Authorization supersedes any previously executed authorization regarding Electronic Funds Transfer. All terms and provisions of various agreements between LESSEE and Lessor remains in effect, unaffected hereby.

Signed this_____ day of _____       _____ (LESSEE)

- 26 -

## CORPORATE RESOLUTION AND INCUMBENCY CERTIFICATE

THIS IS TO CERTIFY that at a duly constituted meeting of the directors of **Fayyad Abdallah t/a Felton BP** (the "Corporation"), unanimously attended by all directors, or by action taken in lieu of such meeting which action, under applicable provisions of law, is equally permissible and effective, the following business was transacted, to-wit:

1.    Upon motion made, seconded and unanimously passed, it was resolved that the Corporation is hereby authorized to execute and deliver any and all documents to and in favor of GLeS, Inc. ("Lessor") required by Lessor in connection with the purchase and sale of motor fuel products under that certain Lease dated effective by and between Corporation and Lessor which shall become effective 180 days from the date thereof in accordance with the provisions of the Petroleum Marketing Practices Act, and the president of the Corporation is hereby duly authorized to sign any and all documents required in regard thereto, including, but not limited to all security documents and collateral documents relating thereto, on behalf of the Corporation. The directors of the Corporation hereby ratify any such documents executed prior to the date hereof.

2.    In certification to Lessor, the directors of the Corporation did then certify that the following individuals are the representatives of the Corporation and that the signatures on the lines provided herein below are their genuine signatures, to-wit:

_____
Signature

So certified as of this _____ day of _____

_____
Signature

So certified as of this _____ day of _____

_____
Signature

- 27 -

# GUIDELINES FOR HANDLING OF UNLEADED GASOLINE

For the Lessee and for the wholesaler Lessee-consumer, the Environmental Protection Agency's "REGULATIONS ON FUEL AND FUEL ADDITIVES" pertaining to the storage, handling, and dispensing of leaded and unleaded gasoline are very important, since if they are violated, the Federal Government can impose severe penalties.

Physically, each location must be equipped as follows:

After July 1, 1974, every Lessee shall prominently and conspicuously display in the immediate area of each gasoline pump stand, and after January 31, 1975, every wholesale Lessee-consumer shall prominently and conspicuously display in the immediate area of each pump stand, the following notice:

"Federal law prohibits the introduction of any gasoline containing lead or phosphorus into any motor vehicle labeled
"UNLEADED GASOLINE ONLY". Such notice shall be no smaller than 36-point bold type and shall be located so as to be readily visible to the Lessee's or wholesaler Lessee-consumer's employees and persons operating vehicles into which gasoline is to be dispensed."

This requirement is mandatory at all locations even if they do not market unleaded gasoline.

After July 1, 1974, every Lessee shall affix to each gasoline pump stand a permanent legible label, and after January 31, 1975, every wholesale Lessee-consumer shall affix to each gasoline pump stand a permanent legible label as follows:

(1)    For gasoline pump stands containing pumps for introduction of unleaded gasoline into motor vehicles, the label shall state: "Unleaded Gasoline".

(2)    For gasoline pump stands containing pumps for introduction of leaded gasoline into motor vehicles, the label shall state: "Contains lead anti-knock compounds." Any label required under this paragraph shall be located so as to be readily visible to the Lessee's or wholesale Lessee-consumer's employees and persons operating motor vehicles into which gasoline is to be dispensed.

(3)    This requirement that dispensers used for leaded gasoline be labeled "Contains Lead Anti-Knock Compounds" remains. This decal is to be removed when a dispenser is converted to "Unleaded Gasoline".

(4)    Nozzle spouts used for dispensing "Unleaded Gasoline" must have tips (spouts) whose outside diameter is not greater than .840". (This is slightly less than 27/32".) Each spout must have a straight section at the open end at least 2.5" long. The retaining spring must terminate 3.0 inches from the terminal end of the spout. As a rule, if the open end of the spout is larger than a nickel, it will not meet the diameter requirement for an "Unleaded Gasoline" nozzle spout. Most nozzles can be converted to the above by simply replacing the spout with conversion spouts available from petroleum equipment distributors. This type conversion is inexpensive and can be handled by the Lessee and/or consumer. Nozzles that cannot be converted in this manner can be exchanged through the equipment Lessors for exchange price nozzles.

(5)    Nozzles dispensing leaded gasoline must have spouts with outside diameters of at least .930". A nozzle 15/16" in diameter (.9375") would meet this requirement. Generally speaking, a nozzle with a spout whose outside diameter is larger than a quarter ($.25) will be satisfactory for "Leaded Gasoline" service. In addition to the above, you should note the following sections of the Federal Regulation concerning fuels and fuel additives:

Section 80.2 (Definitions)
(g)    "Unleaded Gasoline" means gasoline, which is produced without the use of any lead additive and contains not more than .05 grams of lead per gallon and not more than .005 grams of phosphorus per gallon.

Section 80.21 (Controls Applicable to Gasoline Distributors):
"After July 1, 1974, no distributor shall sell or transfer to any distributor, Lessee or wholesale Lessee-consumer any gasoline which he represents is unleaded unless such gasoline does, in fact, meet the defined requirements for unleaded gasoline in Section 80.2(g)."

Section 80.22 (a) (Controls Applicable to Gasoline Lessees and Wholesaler Lessee-Consumers):

"After July 1, 1974, no Lessee or his employee or agent and after January 31, 1975, no wholesale Lessee-consumer or his employee or agent shall sell, dispense, or offer for sale gasoline represented to be unleaded unless such gasoline meets the defined requirements for unleaded gasoline in Section 80.2(g) nor shall he introduce or cause or allow the introduction of leaded gasoline into any motor vehicle which is labeled "Unleaded Gasoline Only", or which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded gasoline."

By: _____

By: _____

# INVENTORY CONTROLS ACKNOWLEDGMENT

ADDRESS: 12984 South Dupont Highway, Felton DE 19943

The problem of leaking underground tanks and lines and their contribution to environmental and safety hazards is well known. They are not limited to any special area of the country. Undetected leaking gasoline, diesel or heating oil can find its way into basements of homes, schools or other buildings, or into the sewers or ground waters. You have an obligation to your neighbors to see that hazards such as these are kept to a minimum.

The maintenance of inventory records is the best means you have of determining that your underground tanks or pipelines are not leaking. It is essential that meter readings be compared daily with tank gauge readings, sales and receipts to insure that there is no underground leak. If records are maintained, the chance that a serious hazard situation will be caused are substantially reduced.

It is necessary that you maintain records on a daily basis not only from an environmental viewpoint but also as a possible legal requirement. Federal OSHA regulations, where applicable, require the maintenance of accurate inventory records on all Class I liquid storage tanks for possible indication of leakage from tanks or piping. The National Fire Protection Association includes this requirement in an amendment of their Fire Code requirements.

If your records indicate a leak or unusual disappearance of product, it is essential that you take immediate steps to determine its cause. Leaking tanks must be emptied and the use of the leaking lines must be stopped. Steps must be taken to see that repairs are made immediately.

By: _____

By: _____

-29-

Effective as of __ 12/2/04 __

# Maintenance Responsibilities Addendum

| | Lessee Dealer | | Lessor Sweet Oil | |
|---|---|---|---|---|
| | Pays | Dispatches | Pays | Dispatches |
| **ENVIRONMENTAL COMPLIANCE EQUIPMENT** | | | | |
| Observation wells—maintenance & repair | | | X | X |
| Monitoring wells—Inspection | | | X | X |
| Monitoring well log/file at station | X | X | | |
| Cathodic protection test | | | X | X |
| Cathodic protection test log/file at station | X | X | | |
| Tank, line, Stage II test | | | X | X |
| Tank, line, Stage II test log/file at station | X | X | | |
| Leak detector test | | | X | X |
| Leak detector test log/file at station | X | X | | |
| 36-hour waste oil U/G tank test (if required) | X | X | | |
| Maintain true inventory reconciliation records | X | X | | |
| (to be maintained on site for 3 years) | | | | |
| **EQUIPMENT** | Pays | Dispatches | Pays | Dispatches |
| Air compressor (includes replacement) | X | X | | |
| Air machine (includes replacement) | X | X | | |
| ARSTA equipment: | | | | |
| -Earth station | | | X | X |
| -Satellite dish | | | X | X |
| Car Wash: | | | | |
| -Catch basins, drains, holding tanks, other related accessories, and all utility | X | X | | |
| Closed circuit TV | X | X | | |
| Coolers & refrigeration units (includes replacement) | X | X | | |
| Dispenser: | | | | |
| -Hoses | X | X | | |
| -Stage II hoses | X | X | | |
| -Nozzles | X | X | | |
| -Stage II nozzles | X | X | | |
| -Breakaways | X | X | | |
| -Initial ECD compliance expenditures | | | X | X |
| -ECD repair (includes replacement) | X | X | | |
| -Vapor pump | | | X | X |
| -Valances/doors/endcaps | | | X | X |
| -Dial glass | X | | | X |
| -Displays | | | X | X |
| -Lights | | | X | X |
| -CRIND pad/printer | | | X | X |
| -Internal repairs | | | X | X |
| -Calibrations | X | | | X |
| -Total replacement | | | X | X |
| -Decals | | | X | X |
| -Pump filters | X | | | X |
| -Cash acceptors | | | X | X |
| -Furnishing of only manual type-nozzle per motor fuel hose and all replacement nozzles | X | X | | |
| Exhaust fans | X | X | | |
| Fire extinguishers: | | | | |
| -Portable & hand held | X | X | | |
| -Includes inspections | X | X | | |
| Food handling equipment and food prep areas | X | X | | |
| Intercom systems | X | X | | |
| Lifts (electric & hydraulic): | | | | |
| -Cylinder (includes replacement) | X | X | | |
| -Safety & control systems (includes replacement) | X | X | | |

- 30 -

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| -All associated hardware | X | X | | |
| -Total lift assembly replacement | | | X | X |
| Lessor owned cooler/freezer doors and refrigeration units | X | X | | |
| Lessor owned store/food mart related equipment | X | X | | |
| Lessee owned equipment | X | X | | |
| Point of Sale: | | | | |
| -Credit card imprinter* | X | | | X |
| -Debit equipment* | | | x | X |
| -Dispenser interface* | | | x | X |
| -ESP receipt printers (dealer owned)* | X | | | X |
| -POS device (Ruby, G-site) | | | X | X |
| -Sales authorization device (Pinstripe, ZON, etc. | | | x | x |
| including modems & pinpads)* | | | x | X |
| Safe (includes replacement) | X | X | | |
| Security cash drawer | X | X | | |
| Surveillance mirrors | X | X | | |
| Tanks & lines: | | | | |
| -Cover painting | X | | | X |
| -Fill pipes, caps & covers (includes replacement) | X | | | X |
| -Gauge sticks (includes replacement) | X | X | | |
| -Leak detectors & monitoring systems (includes replacement) | | | x | X |
| -Submersible pumps | | | x | X |
| -Sumps, piping, valves, & fittings | | | X | X |
| -Tank repair | | | X | X |
| -Tank replacement | | | X | X |
| -Used oil removal | X | X | | |
| -Water removal | X | | | X |
| -Tank cleaning | | | X | X |
| Water heaters (includes replacement) | X | X | | |

| **EXTERIOR & YARD FACILITIES** | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| ACM: | | | | |
| -Lamps | X | X | | |
| -Ballasts | X | X | | |
| -Wiring/breakers | X | | | X |
| -Lighted ACM face (includes replacement) | | | X | X |
| -Lighted ACM frame (includes replacement) | | | X | X |
| -ACM decals | | | X | X |
| Building exterior: | | | | |
| -Pedestrian doors/locks | X | X | | |
| -Wood fascia & trim | X | X | | |
| -Bay doors | X | X | | |
| -Gutters & downspouts | X | X | | |
| -Painting | X | X | | |
| -Ambrico | X | X | | |
| -Brick & block walls | | | x | x |
| -Maintenance of overhead doors, excluding replacement | X | X | | |
| Canopy: | | | | |
| -Paint | X | X | x | x |
| -Poles | X | X | x | x |
| -Mode signs | X | X | x | x |
| -Downspouts/gutters | X | X | x | x |
| -POP | X | X | | |
| -Total replacement of canopy | | | X | X |
| Canopy roof*/fascia/decking | | | X | X |
| Cleaning of catwalks, drives, & islands | X | X | | |
| Driveway & curbing: | | | | |
| -Asphalt repair* | X | X | | |
| -Concrete repair* | X | X | | |
| -Curbing repair* | X | X | | |
| Painting of curbs and touch up-lessee provides all paint | X | X | | |
| -Pump island repair | X | X | | |
| -Seal coating | X | X | | |
| -Total asphalt replacement | | | X | X |

- 31 -

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| -Total concrete replacement | | | X | X |
| •Exterior lighting: | | | | |
| –Lenses | X | X | | |
| –Lamps | X | X | | |
| –Ballasts/sockets | X | X | | |
| –Pole | X | X | | |
| –Base | X | X | | |
| –Paint | X | X | | |
| –Wiring/breakers | X | | | X |
| –Total replacement of unit | | | X | X |
| Fence & guard rails | X | X | | |
| General site appearance & cleanliness | X | X | | |
| Landscaping | X | X | | |
| Roof repair* | | | | |
| –Removal of excessive ice, snow, water and debris. | X | X | | |
| –Includes complete reshingling, restoning, or retarring. | X | X | | |
| Snow & ice removal | X | X | | |
| Trash enclosure & trash removal | X | X | | |
| Window & glass: | | | | |
| –All glass | X | X | | |
| –Bullet-resistant glass or acrylic | X | | | X |

*Asphalt, concrete, curbing, and roof repair projects over $3,000 must receive approval from regional engineer; dealer will cover costs up to $3,000

| HEATING AND AIR CONDITIONING | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Air conditioning (includes replacement) | X | X | | |
| Heating plant (includes replacement) | X | X | | |
| Total System Replacements | | | X | X |

| INTERIOR ELECTRICAL | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Circuit breakers & fuses | X | | | X |
| Electrical locks | X | X | | |
| Emergency disconnect switch | X | | | X |
| Lamps & bulbs* (includes replacement) | X | X | | |
| Lamp lenses & covers* (includes replacement) | X | X | | |
| Light ballasts* (includes replacement) | X | X | | |
| Light fixtures & sockets* (includes replacement) | X | X | | |
| Light switches (includes replacement) | X | X | | |
| New circuits (includes replacement) | X | | | X |
| Outlets & plugs (includes replacement) | X | X | | |

*Service may be covered under a National Lighting Agreement.

| INTERIOR STRUCTURE | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Air filters-cleaning and replacement | X | X | | |
| Automatic fire suspension equipment/inspections | X | | | X |
| Automatic openers | X | X | | |
| Doors (includes replacement) | X | X | | |
| Floors & flooring material (includes replacement) | X | X | | |
| Keys & locksets (includes replacement) | X | X | | |
| Painting | X | X | | |
| Shelving & cabinetry (includes replacement) | X | X | | |
| Wall sections (includes replacement) | X | X | | |

| PLUMBING | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Air & water piping: | | | | |
| –Above ground | X | X | | |
| –Underground | | | X | X |
| Backflow devices: | | | | |
| –Installation | X | | | X |
| –Testing | X | X | | |
| Catch basins, cleanouts, grating, drains, etc. | X | | | X |
| Plugged toilets, urinals, waste basins, catch basins, septic tanks, and cesspools. | X | X | | |
| Drinking fountain (includes replacement) | X | X | | |
| Keep all food mart related equipment drain lines clean and clear | X | X | | |
| Protecting all piping and plumbing fixtures from freezing | X | X | | |
| Oil/water separator: | | | | |
| –Cleanout & maintenance | X | X | | |
| –Installation & replacement | X | | | X |
| Pumping of septic tanks or cesspools | X | X | | |

Reclamation system:

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| -Above ground piping & equipment | x | x | | |
| -Cleanout & maintenance | x | x | x | |
| -Underground structure (includes replacement) | | | x | x |
| Repair and replacement of all leaking faucets and hose bibs | x | x | | |
| Septic tanks: | | | | |
| -Cleanout & maintenance | x | x | | |
| -Repair & replacement | | | x | x |
| Sewer lines & sewage systems: | | | | |
| -Cleanout & maintenance | x | x | | |
| -Repair & replacement | | | x | x |
| Sinks, faucet, & piping | x | x | | |
| Repair and replacement of sprinkler heads | x | x | | |
| Sprinkler systems | x | x | | |
| Sump-grease separator (includes replacement) | x | x | | |
| Toilets (includes replacement) | x | x | | |
| Urinals (includes replacement) | x | x | | |
| Water wells & components (includes replacement) | x | x | | |
| Water quality testing (where applicable) | x | | | x |

**REST ROOM FURNISHINGS**
Must be in compliance with all regulations including ADA

| | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Accessories: | | | | |
| -Dispensers for soap, towels, toilets, paper, etc. | x | x | | |
| -Mirrors, shelves, etc. | x | x | | |
| -Wastebasket | x | x | | |
| Privacy partitions (includes replacement) | x | x | | |

| **SIGNS** | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Misc. dealer service, merchandise, emblems, etc. | x | x | | |
| Primary Identification Signs | | | | |
| -Lamps/Ballasts | x | x | | |
| -Poles | | | x | x |
| -Base | | | x | x |
| -Paint | x | x | | |
| -Wiring/breakers | x | | | x |
| -Faces | | | x | x |
| -Frame | | | x | x |
| Price sign: | | | | |
| -Lamps/Ballasts | x | x | | |
| -Paint (frame) | x | x | | |
| -Fonts (#s, words) | x | x | | |
| -Font guide track | x | x | | |
| -Add on signs | x | x | | |
| -Wiring/breakers | x | | | x |
| -Faces | | | x | x |
| -Frame | | | x | x |

| **OTHER** | Pays | Dispatches | Pays | Dispatches |
|---|---|---|---|---|
| Licenses/permits/fees not specifically denoted] | x | x | | |
| Pest control | x | x | | |
| Car wash reclaim tanks | x | x | | |
| Fire extinguishers | x | x | | |
| Disposal of used oil or waste materials | x | x | | |

## Supply Agreement Rider to Lease

**THIS SUPPLY AGREEMENT RIDER** ("Agreement") is made and incorporated as an addendum to the attached Lease. **Hereinafter Lessee may be referred to as either Lessee or Purchaser, and Lessor may be referred to as either Lessor, or Supplier.**

WHEREAS, for and in consideration of the mutual promises and agreements exchanged and contained herein below, the Supplier and Purchaser hereby mutually agree to the following terms and conditions.

1.    Sale.

(a)  Supplier agrees to sell, and deliver, or cause to be delivered, and Purchaser agrees to buy, receive, and promptly pay for motor fuel of the kind, grade, brand, and quality sold by Supplier, at the time of delivery, for resale by Purchaser;

(b)  Orders for motor fuels, by Purchaser, must be for quantities equivalent to a full truck transport load;

(c)  Subject to the terms and conditions stated elsewhere herein, or unless otherwise agreed to in writing, Purchaser agrees to purchase no less than the minimum annual quantity set forth below each year of this contract, and Supplier shall not be obligated to sell more than the maximum annual quantity set forth below, (in gallons, unless otherwise indicated):

### Annual Allocations

Fuel Products              967280 **Gallons - Minimum**              1706966 **Gallons - Maximum**

Purchases permitted by Supplier, in excess of the annual maximum quantities, shall not operate as a waiver of Supplier's right to restrict purchases to such maximum quantities during any subsequent period. For any period less than a full calendar year, said annual minimums and maximums shall be reduced on a pro rata basis.

(d)  Purchaser agrees to maintain a sufficient inventory of Sweet Oil authorized motor fuel products, offered to it by Supplier, so that it shall always have a sufficient quantity of Sweet Oil authorized motor fuels to meet the reasonably anticipated needs of Purchaser's customers. Purchaser agrees to avoid product run outs of any grade at all times.

(e)  **Special Legend for Purchasers in Delaware and Maine:**

PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE STATION DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE, WHICH HE OR SHE ALONE MAY DECIDE.

2.    **Point of Delivery.** Purchaser shall have the right to designate the point of delivery, by written notice to Supplier. All points of delivery must have a modem equipped Veederoot TLS-350 system or other compatible device, which is approved by Supplier, with an active phone line hooked up to it to enable automated ordering of motor fuel products. This automated ordering system is mandatory for the duration of this contract.

3.    **Terms of Payment**

(a)       Purchaser shall pay for the Products in accordance with Supplier's payment terms in effect from time to time, any of which may be revoked by Supplier with reasonable notification to Purchaser. If Supplier elects to extend credit to Purchaser, Purchaser shall comply with Supplier's credit terms in effect from time to time, any of which may be altered or revoked by Supplier without prior notification to Purchaser. Purchaser agrees to pay via Electronic Fund Transfer ("EFT") at Suppliers terms and conditions at the time of delivery (or at Supplier's option, cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by Supplier) for all goods delivered to Purchaser by Supplier under the terms of this Agreement. Purchases made and not paid for on delivery shall be payable at Supplier's principal office unless otherwise specified by Supplier. Supplier, in its sole discretion may require Purchaser (i) to pay Supplier via wire transfer prior to time of delivery or at such a time and place or method as Supplier may designate from time to time, (ii) to provide Supplier a cash deposit, or (iii) to provide Supplier an Irrevocable Bank Letter of Credit sufficient to Supplier in form and amount. Purchaser shall provide any written authorizations required for EFT purposes.

(b)       Purchaser shall pay Supplier's price in effect at the time loading commences. Purchaser may ascertain Supplier's

#7061 P.034

current prices on the Web or at such other place designated by Supplier. Prices are subject to change without notice.

(c) Purchaser shall pay a financing charge on any balance not paid when due, at an annual rate of 18%. Supplier's right to collect a financing charge does not operate as a waiver of Supplier's right of termination, for Purchaser's failure to pay for motor fuel when due, and Purchaser's obligation to pay for products delivered shall not be subject to offset for any claims against Supplier.

(d) If Purchaser fails to comply with the terms of this paragraph, all amounts owed to Supplier shall immediately become due and payable, and Supplier shall, have the right, but not the obligation, to setoff or equitably recoup amounts due from Purchaser against any amount then due to Purchaser, up to the total amount outstanding. Supplier may choose to suspend deliveries until all amounts due have been paid, however this shall not grant approval to Purchaser to obtain deliveries from any other source. Purchaser can not purchase fuel from any other supplier for any reason, during the term of this contract. Supplier's pursuit of any one remedy shall not preclude its pursuit of any other remedy provided by law or in equity, nor shall Supplier's pursuit of any remedy constitute a forfeiture or waiver of any amount due Supplier, or any damage accruing to Supplier, by reason of the breach or default of any obligations of Purchaser. In the event of any dispute between the parties hereto, concerning accounting for payment, prices charged, or any other matters, the cost of any proceedings, including reasonable attorney's fees incurred, shall be borne by the non-prevailing party, and reimbursed to the prevailing party.

**(e) If at any time, during the term of this Agreement, the Purchaser disputes the amount payable to Supplier for any of the motor fuel purchased hereunder, or disputes the quantity purchased, Purchaser must pay the amount Supplier believes is due, in accordance with Supplier's terms, as stated on the disputed invoice(s), and notify the Supplier, in writing, of the details of the dispute, within thirty days. Purchaser's failure to do so shall be considered as an admission by Purchaser that Supplier's invoices are correct. Supplier must initiate an investigation to Purchasers written disputes within 30 days. Suppliers failure to initiate an investigation within the 30 days shall be considered as an admission by Supplier that Purchaser's dispute is correct.**

(f) Inventory sold to purchaser will be secured by appropriate UCC-1 filing authorizations executed by Purchaser and incorporated as part of this Sales Agreement and filed in the State and Local government offices where the site is located.

(g) Supplier may proceed to enforce payment and may exercise any and all rights available to it. **In addition, Supplier reserves the right to require a security deposit, letter of credit, or personal guaranty in accordance with Supplier's Security Policy in effect from time to time.**

(h) If, in response to request by Purchaser, Supplier elects in its sole discretion to waive the full transport delivery provision of this Agreement and agrees to deliver to Purchaser in less-than-full transport load, Purchaser will be required to pay a split-load fee, in addition to other charges.

(i) Supplier will assess an administrative fee (in accordance with Supplier's NSF Policy as modified from time to time) upon Lessee for payments that are returned or rejected for any reason. All overdue sums owed to Supplier will bear interest at the maximum lawful rate per annum from the date due until paid. Further, if Lessee fails to make timely payment of any amount due Supplier, in addition to all other rights or remedies available, Supplier may take such action as Supplier deems reasonable under the circumstances. Without limiting the generality of the foregoing, Supplier may (i) set off or equitably recoup against any amount then due Lessee, (ii) defer further deliveries of the Products until payment of all outstanding indebtedness is made, or (iii) demand advance cash payment for further deliveries. Lessee shall comply with the terms of any reclamation notice issued to Lessee by Supplier under applicable Law.

4. **Duration of Agreement**.

(a) This Agreement shall remain in full force and effect for the duration of the attached lease.

5. **Supplier's Trademarks, Brands, and Product Quality Maintenance**.

(a) Purchaser shall sell motor fuel purchased hereunder, only under SUPPLIER brand names, and shall have the right to use the SUPPLIER trademarks, but only for the purpose of properly identifying and advertising SUPPLIER motor fuel handled by Purchaser, and in a manner and form which complies with Supplier's requirements.

(b) Purchaser shall not allow or permit any SUPPLIER motor fuel to be mislabeled, misbranded, or contaminated by mixture, or adulteration with any other motor fuel, or with any other material. This includes contamination with water. Purchaser shall maintain the integrity of underground storage tanks, which Supplier does not own, so as to preclude any water or other infiltration. Supplier shall not be liable, nor shall Supplier reimburse any customer of Purchaser for any damages, repairs or losses that result from water contaminated gasoline, dispensed into a vehicle, by Purchaser or Purchaser's agents, representatives or employees.

- 35 -

Purchaser covenants and agrees **all** petroleum products purchased for resale will be purchased from Supplier, and no fuel will be purchased from another source, even if the other source is an authorized fuel distributor selling the same brand fuel.

(c) Purchaser shall not commingle any substance with SUPPLIER motor fuel, and then sell or distribute it as a SUPPLIER brand motor fuel. Purchaser is responsible for the security of the motor fuel products once delivered. Purchaser will not allow or permit the sale or distribution of any product or motor fuel under an SUPPLIER label or designation, which is not an SUPPLIER brand product or motor fuel, or is a grade of SUPPLIER brand product or motor fuel, other than described by the label, or designation, or any pump dispensing such motor fuel; nor will Purchaser use Supplier's trademarks, trade names, or brand names in a manner which deceives, or causes a likelihood of confusion to the motoring public. Purchaser will allow Supplier, its employees, agents, or designees to enter Purchaser's place of business, at any time, to obtain such samples, or conduct such tests or inspections, or examine such records as may, in Supplier's judgment, be reasonably required to determine that Purchaser is complying with the aforesaid obligations. Purchaser shall cooperate with Supplier in any investigation of any alleged violations of the foregoing obligations.

(d) Use of Marks on Signage. Purchaser shall be permitted to acquire, and display, approved signage bearing Supplier's Marks, in connection with advertising, distribution, and or resale of products under this contract, on the retail site described in this contract. Under no circumstances will Purchaser be permitted to relocate signage, bearing Supplier's marks, to another location, without Supplier's and Supplier's written consent. Purchaser shall provide Supplier and SUPPLIER with a list of all signage, bearing Supplier's marks, in Purchaser's possession and or control, and the location of said signage, upon Supplier's and Supplier's request. In addition to the terms and conditions of this agreement, the use of Supplier's marks on all signage generally shall be governed by Supplier's Policy for Proper Handling of SUPPLIER-Branded Motor Fuels.

(e) Misuse of Marks with Purchaser's name. Purchaser shall not use any of Supplier's Marks as part of Purchaser's corporate name, or as part of Purchaser's own trademarks. If Purchaser has incorporated, using any of Supplier's marks, it will be required to amend its articles of incorporation, so as to delete Supplier's marks from its corporate name.

(f) **SUPPLIER'S MARKETING RIGHTS.** Supplier may, from time to time: (a) change the Identification applicable to any Product and require Alterations in accordance therewith; (b) add, change, or modify the grade, brand name, delivery package, or other distinctive designation of any Product; (c) change or modify the formulations and specifications of any Products; and (d) discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligation with respect to that Product.

(g) **PERMISSION TO USE THE IDENTIFICATIONS.** Purchaser agrees and understands that Supplier is not the licensee of the Identifications, and that Supplier has been granted the right to grant to Purchaser the right to use the Identifications only in connection with the storage, handling, marketing, distribution, and resale of the Products, provided that Purchaser complies with the terms of this Agreement and Supplier's image, appearance, and operating standards and requirements, including, without limitation, the following requirements relating to the marketing, storage, and resale of the Products. Purchaser shall strictly maintain the quality of all Products and shall not adulterate, commingle, or blend with Products with any other products or substances in any manner. Purchaser shall clearly identify and correctly label all Products under their proper brand names, designations, and grades. Purchaser shall not use the brand designation as part of Purchaser's Business' Entity name. Purchaser shall not use the Identifications or the brand designation in Purchaser's trade style if the use is likely to: (i) create the impression that Purchaser's business is owned or operated by Supplier or (ii) deceive or cause a likelihood of confusion to prospective customers. Purchaser understands that Supplier must approve in writing any and all sites to be branded and supplied motor fuel products (other than those sites specifically pre-approved and listed in Exhibit "A" attached) before any deliveries can be made by Purchaser to any proposed sites.

(h) Purchaser agrees that it will defend, indemnify, and hold Supplier harmless from, and against, all present and future claims, demands, suits, actions, proceedings, and litigation, arising out of any alleged liability for Purchaser's storage, transportation, distribution or delivery of petroleum products in, or through any container, tank, pump, pipe, or other element of its storage, or distribution system. Purchaser further agrees that it will, on Supplier's demand, promptly pay all losses, costs, damages, obligations, judgments, fines, penalties, expenses, and fees suffered or incurred by Supplier, by reason of any such claims, demands, suits, actions, proceedings, or litigation, except those which are caused by the sole negligence of Supplier, or its employees;

(i) Supplier warrants that unleaded motor fuel purchased by Purchaser, from Supplier, shall conform to Supplier's specifications for same, at the time of delivery. Purchaser shall notify Supplier, immediately, of any claim for variance in quality, and Supplier shall have an opportunity to inspect and investigate, at any time thereafter. Failure of Purchaser to notify Supplier, or cooperate in any investigation, shall operate as a waiver of any and all claims by the Purchaser hereunder.

6. **Product Grades.** If Supplier determines in its sole discression that it should make available, to Purchaser, a product, or grade(s) of product different from those provided for herein, or should not make available, to Purchaser, a grade(s) of product provided for herein, Supplier reserves the right, at any time, to discontinue supplying any such product, covered by this Agreement,

and or to substitute a different product, or grade(s) of product therefore, at any time during the term of this Agreement. In the event that any such substitution is made, any minimum and maximum quantities provided, for the product substituted for, shall apply to such replacement product, or grade(s) of product, and the price shall be Supplier's applicable Purchaser price for such replacement product. Thereafter, Supplier shall be relieved of any further liability or obligation to furnish the replaced, and or discontinued product, or grade(s) of product. Supplier Reserves the right to at anytime and for any reason at Supplier's sole option to change the "brand" of products covered in this agreement. Purchaser shall then comply with the branding requirements of the new brand. All other terms of this contract will remain in full force, unchanged. Cost associated with rebranding will be the sole responsibility of the Supplier.

7. **Market Withdrawal.** In the event Supplier elects to withdraw from marketing of motor fuels, in the area in which Purchaser's place of business is located, in compliance with the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as may be amended, from time to time, Supplier may terminate this Agreement at any time, without further liability on one hundred eighty, (180), days written notice.

8. **Supplier's Right of First Refusal and Right to purchase assets of Purchaser.** (See attached rider)

9. **Force Majeure.**

(a) Unless otherwise expressly provided for in this Agreement, failure, (in whole or in part), or delay on the part of either party, in the performance of any of the obligations imposed upon such party hereunder shall be excused, and such party shall not be liable for damages or otherwise on account thereof, when such failure or delay is the direct, or indirect, result of any of the following causes, whether or not existing at the date hereof, and whether or not reasonably within the contemplation of the parties at the date hereof, namely: Acts of God, earthquakes, fire, flood, or the elements, malicious mischief, insurrection, riot, strikes, lockouts, boycotts, picketing, labor disturbances, public enemy, war, (declared or undeclared), compliance with any federal, state, or municipal law, or with any regulation, order, rule, recommendation, request, or suggestion, (including, but not limited to, priority rationing, or allocation orders, or regulations), of government agencies, or authorities, or representatives of any government, (foreign or domestic), acting under claim or color of authority; total or partial failure or loss, or shortage of all, or any part, of transportation facilities ordinarily available to, and used by, a party hereto, in the performance of the obligations imposed by this Agreement, whether such facilities are such party's own, or those of others; or, if failure or delay be that of Supplier, total or partial loss, or shortage of raw, or component materials, or products ordinarily required by Supplier, the commandeering or requisitioning by civil or military authorities of any raw or component materials, products or facilities, including, but not limited to producing, manufacturing, transportation, and delivery facilities; perils of navigation, even when occasioned by negligence, malfeasance, default, or errors in judgment of the pilot, master, mariners, or other servants of the ship's owner; or any cause whatsoever beyond the control of either party, whether similar to or dissimilar from the causes enumerated.

(b) If by reason of any of said causes, Supplier is unable to make deliveries to all of its customers, (whether under contract or not), its failure, in whole or in part, to make deliveries to Purchaser, while delivering to others, shall not be a breach of this Agreement, and in such event Supplier may, but shall not be obligated to, prorate its available supply.

(c) Upon cessation of the cause or causes for any such failure or delay, performance hereof, shall be resumed, but such failure or delay shall not operate to extend the term of this Agreement, nor obligate either party to make up deliveries or receipts, as the case may be.

(d) Supplier may suspend deliveries, so long as its cost of performance is increased, and the increased cost cannot be recovered by an equivalent increase in the price, to be paid by Purchaser.

(e) Nothing herein contained shall excuse Purchaser from paying Supplier, when due, any amounts payable hereunder, or pursuant hereto.

10. **Practicality.**

(a) In the event Supplier's capacity to perform as to all or some of its customers, including Purchaser, becomes impractical, in Supplier's sole judgment, for any reason whatsoever, Supplier shall be relieved of its obligation to perform hereunder, and shall not be obligated to Purchaser, by reason of any delay in performance, in whole or in part, except to the extent of providing product to Purchaser, on the same allocation formula, (to be solely determined by Supplier), as other Purchaser's in the same class of trade served from the same shipping point. Supplier shall notify Purchaser, in writing, of its lack of capacity to perform hereunder. In such notice; Supplier shall advise Purchaser the quantities, if any, Supplier will be able to supply Purchaser in the foreseeable future. Within ten, (10), days thereafter, Purchaser shall notify Supplier whether it wishes to purchase such reduced quantities, where Supplier has advised that reduced quantities are available, otherwise this Agreement shall be suspended, until Supplier's capacity to perform, in Supplier's judgment, is restored.

- 37 -

(b) If Supplier determines that it is unable to perform hereunder, by reason of any federal, state, or local law, or regulation, order, rule, recommendation, request, or suggestion, relating to priority, rationing, or allocation of any product covered hereby, Supplier may suspend this Agreement, at any time, on ten, (10), days notice to Purchaser, until such time as Supplier determines its ability to perform is restored. Nothing herein shall be construed to extend the contract period beyond the term of this Agreement, or give rise to any cause of action, by reason of any of the provisions of this Agreement. In the event the Agreement is suspended as herein provided, Supplier shall not be obligated to make up shipments not made as a result of such suspension.

11. **Taxes.** Purchaser shall be responsible for the payment of all federal, state, and local taxes, licenses, fees and/or duties, including, but not limited to: gross receipt taxes, occupation taxes, motor fuel taxes, sales and use taxes, franchise taxes, income taxes, ad valorem taxes, property taxes, inspection fees, license fees, and all other taxes, fees, and licenses arising from the purchase, sale, transfer, or disposition, holding for sale, transfer, or disposition, transportation of, or use of the SUPPLIER motor fuel covered by this Agreement. Should any government authority require Supplier to pay taxes, penalties, or interest which, under this Agreement, are the responsibility of Purchaser, Purchaser agrees to immediately reimburse Supplier for all amounts so paid by Supplier upon demand.

If any federal, state, or local law authorizes Purchaser to purchase the SUPPLIER motor fuel covered by this Agreement, without the payment of federal, state, or local taxes, Purchaser agrees to furnish Supplier evidence, satisfactory to Supplier, of such authority. Until Purchaser presents Supplier with acceptable evidence of such authority, Supplier shall be entitled to bill Purchaser for all applicable taxes.

12. **Customer Complaints.** Purchaser will respond to any customer inquiries or complaints, received by Purchaser or Supplier, in connection with any customer served by Purchaser, and take reasonable action to correct, or satisfactorily resolve, each such inquiry or complaint.

13. **Standards of Appearance**

Purchaser agrees to comply with SUPPLIER Standards of Appearance, including, but not limited to:

- Employees must wear approved SUPPLIER uniforms including name tags, at all times, when on duty.

- All signage must be in SUPPLIER approved colors, as designated by SUPPLIER standards manuals.

- Except for Purchasers in Delaware and the District of Columbia, Purchaser shall keep Purchaser's Station open as an attended station for the sale of Products (unless Purchaser receives Supplier's prior consent to keep open as an unattended station, which consent may be withheld consistent with applicable Law) during the hours and says of operation specified above. Supplier will adjust the hours of operation if required by Law.

- Purchasers in Delaware: Purchaser shall keep Purchaser's Station open during such hours each day and days each week as is necessary to assure that Purchaser diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patterns, customer convenience, availability of Products, and other customary criteria followed by Supplier.

- Purchasers in the District of Columbia: Purchaser shall keep Purchaser's Station open during such hours each day and days each week as is necessary to assure that Purchaser diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patters, customer convenience, availability of Products and other customary criteria followed by Supplier. In no event shall Purchaser allow Purchaser's Station to be closed for more than 18 days during any calendar year.

- Purchaser shall not commit or permit any fraudulent or illegal act or activity at Purchaser's Station or in connection with Purchaser's performance under this Agreement.

- Purchaser shall not permit the consumption of intoxicating beverages or use of illegal drugs at Purchaser's Station.

- Purchaser shall not keep animals at Purchaser's Station.

- Purchaser shall keep Purchaser's Station, and the signs located at Purchaser's Station, fully illuminated during the hours of operation.

- Purchaser shall maintain Purchaser's Station in a clean, sanitary, and safe condition and all property and equipment in good operating condition and repair. Purchaser shall keep the driveways, sidewalks, and other landscaped areas in a

- 38 -

neat and orderly appearance free from weeds, debris, snow, ice and rubbish. Purchaser shall keep the public restrooms cleaned and stocked with necessary supplies and available during operating hours.

- Purchaser shall not use Purchaser's Station for any unlawful, offensive, hazardous, unsightly, or other objectionable purpose, including, but not limited to, the sale or display of materials with dominant themes of sex, nudity, prurient interest, or pornography. Purchaser shall not display or offer for sale merchandise or paraphernalia that is morally offensive or distasteful to the general public.

- Purchaser shall keep Purchaser's Station clear of vehicles, other mobile equipment, and obstructions that restrict traffic flow, endanger customer safety, or detract from appearance. Purchaser may not use Purchaser's Station to sell, lease, park, or store motor vehicles, trailer, boats, or other mobile equipment, without Supplier's prior written consent.

- Purchaser may display signs necessary to identify the products and services offered and their prices provided the signs are displayed in a neat and orderly manner at Purchaser's Station, are not affixed to the exterior of any building or the pole support(s) for the main Identification sign(s), and are briefly worded, professional-looking, and not handwritten. Purchaser shall not display or use any other signs, posters, flags, pennants, or other advertising devices without Supplier's prior written approval.

- Purchaser shall not permit any form of gambling at the Purchaser's Service Station. Purchaser shall not install or replace any vending machine or equipment for merchandising sundry convenience items, or video or other game machine, without Supplier's prior written consent. ~

- Purchaser shall keep Purchaser's Station free from loitering by persons who have no proper business purpose at Purchaser's Station. Purchaser shall operate and maintain Purchaser's Station in a secure manner so that criminal activity is adequately deterred from occurring at Purchaser's Station and all persons at Purchaser's Station are adequately protected from injury, harm or loss.

Purchaser shall be given written notice of any failure to maintain these quality and appearance standards. Upon failure to correct said violations within thirty (30) days, (without prejudice to any other remedy available to Supplier) Purchaser, upon notice from Supplier, will discontinue the use of the Identifications granted to Purchaser by Supplier. The discontinuance of the use of the Identifications shall not terminate or affect other obligations or terms of this Agreement. Upon the failure of Purchaser to cure any violation of quality and appearance standards after notice and opportunity above, Supplier at its sole discretion (without prejudice to any other remedy available to it) may enter and maintain or repair the Purchaser's Station to bring the Purchaser's Station up to the standards of quality and appearance listed herein. If Supplier exercises this option, Purchaser will reimburse Supplier for the repair and maintenance done by Supplier.

### 14. Assignment and Delegation.

(a) Purchaser shall not assign, mortgage, pledge, hypothecate or otherwise encumber the Agreement, or any interest of Purchaser in this Agreement, or sublet or otherwise permit the use of the Premises or any part thereof, by any person or persons or entity other than Purchaser without the prior written consent of purchaser, which consent may be withheld for any reason; Any request by Purchaser to Supplier to permit and authorize any such transaction shall be in writing and shall be considered on a case by case basis with Supplier possessing the absolute and sole discretion to prohibit any such transaction. Any transfer of any kind of this Agreement by Purchaser by (but not limited to) merger, consolidation or liquidation shall constitute an assignment for purposes of this Agreement. Any attempted assignment without the Supplier's prior written consent shall be void and shall, at the option of Supplier, terminate this Agreement.

### 15. Independent Status of Purchaser.

(a) This Agreement shall not be deemed to reserve, give, or grant to Supplier any right to manage or control the day-to-day business of Purchaser, and/or the retail outlet it operates, and neither Purchaser, nor its employees or agents, shall be agents or employees of Supplier, for any reason or for any purpose whatsoever. Purchaser is, and shall, at all times, be an independent business entity that is free to select its customers, purchase, and sell non-petroleum products from sources other than Supplier, set its own selling prices, and terms of sale, and generally conduct its business, as it determines.

(b) Purchaser has the sole right to hire, control, supervise, and discharge its employees and agents, and Purchaser shall have the sole right to control the performance of, and the sole responsibility for, any maintenance or automotive repair work performed at Purchaser's place of business.

### 16. Indemnification.

- 39 -

(a) Purchaser, to the maximum extent permitted by law, shall defend, protect, indemnify, and hold harmless, Supplier, its partners, affiliates, and subsidiary companies, and their respective directors, officers, employees, and agents, ("Indemnified Parties"), against all claims, demands, suits, liabilities, judgments, losses, and expenses, (including, without limitation, attorneys' fees and costs of litigation, whether incurred for an Indemnified Party's primary defense, or for enforcement of its indemnification rights), on account of any personal injury, disease, or death of any person(s), damage to or loss of any property, or money damages, or specific performance owed to any third party, (by contract or operation of law), and any fines, penalties, assessments, environmental response costs, or injunctive obligations imposed upon any Indemnified Party, caused by, arising out of, or in any way incidental to, or in connection with, Purchaser's performance hereunder, or the performance, acts, or omissions, by any resale customer or consumer served by Purchaser, (including employees, agents, Purchasers, and invitees of Purchaser, and Purchaser's resale customers and consumers), or any other person.

(b) It is the intention of the parties that the indemnity obligations of Purchaser are without regard to whether the negligence, fault, or strict liability of an Indemnified Party is a concurrent or contributory factor, and such obligations are intended to protect the Indemnified Parties against the consequences of their own negligence, fault, or strict liability. Only those matters, which are determined by a final nonappealable judgment, to be a result of the sole negligence or fault of an Indemnified Party, or defects in Supplier's products, not caused or contributed to by the negligence or fault of Purchaser or Purchaser's employees, agents, Purchasers, invitees, resale customers or consumers, shall be excluded from Purchaser's duty to indemnify the Indemnified Parties; provided, however, Purchaser shall not be relieved from its duty to defend and protect the Indemnified Parties, under such circumstances. Such duty to defend and protect the Indemnified Parties shall include, without limitation, investigation and costs of defense and settlement, including reasonable attorney's fees up through final appeal of a trial court judgment or arbitration. Supplier expressly reserves the right to participate in its defense, with counsel of its own choosing. Purchaser's indemnity obligations shall survive the expiration, termination, or non-renewal of this Agreement.

(c) Purchaser shall provide, at its sole cost, during the term of the Sales Agreement, a "Standby Bank Letter of Credit" (LOC) in an amount to be determined (and modified from time to time) by Supplier's credit department (herein after referred to as "Credit") based on evaluation of Purchasers credit worthiness as determined in Credit's sole discretion, as collateral guarantee of performance of Sales and payments of sums due under this agreement. The LOC shall bind Purchaser to GLeS, Inc., t/a Sweet Oil Company a Delaware corporation, its successors and/or assigns (Supplier), provide a waiver of subrogation in favor of Supplier, and provide for written notice of cancellation or material change. Notice of cancellation or change shall not affect coverage afforded Supplier until 120 days after written notice is received. The LOC shall be delivered to Supplier prior to commencement of the agreement.

(d) Purchaser warrants that the entity that Purchaser represents (proprietorship, partnership, or corporation) is authorized to grant the rights and assume the obligations it is undertaking under this Agreement.

(e) Purchaser warrants that Purchaser has the authority to sign the Agreement on behalf of the proprietorship, partnership, or corporation, whichever is applicable.

(f) Purchaser will on request allow Supplier to inspect such documents that verify the authorizations in subparagraphs (d) and (e) of this Article.

(g) Purchaser warrants and agrees that Purchaser is personally liable, bound to meet all obligations under this Agreement undertaken by Purchaser, and is also personally liable for any breach of one or more of such obligations. The entity, if any, that Purchaser represents, also remains so bound and so liable, jointly and severally with Purchaser.

(h) **WAIVER.** Supplier's right to require strict performance of the terms of this Agreement shall not be affected by any course of dealing or usage of trade. Nor shall such course of dealing or usage of trade be relevant to, consulted, or used to interpret the Parties' intent or construction of the terms of this Agreement, nor to negate the words of this Agreement. No waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

(i) TO THE EXTENT PERMITTED BY LAW, PURCHASER SHALL NOT HOLD SUPPLIER, ITS SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS ("INDEMNIFIED PARTY") LIABLE FOR, AND SHALL INDEMNIFY AND DEFEND INDEMNIFIED PARTY AGAINST, ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, JUDGMENTS, LIENS, PENAL TIES, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND LITIGATION COSTS, WHETHER INCURRED FOR AN INDEMNIFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS (COLLECTIVELY, "CLAIM"), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR HARM, INJURY, OR DEATH TO ANY PERSON, OR DAMAGE TO PROPERTY OR TO THE ENVIRONMENT ARISING OUT OF OR IN

CONNECTION WITH ANY OF THE FOLLOWING MATTERS:

(1)    PURCHASER'S PERFORMANCE **OR** NONPERFORMANCE UNDER THIS AGREEMENT;

(2)    ANY ACTION OR OMISSION OF PURCHASER OR PURCHASER'S EMPLOYEES, AGENTS, PURCHASERS, ASSIGNS, OR THIRD PARTIES; AND

(3)    THE OPERATION OF PURCHASER'S BUSINESS.

(4)    PURCHASER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF ANY INDEMNIFIED PARTY BUT NOT TO ANY CLAIM SHOWN BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR ANY DEFECT IN THE PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE.

(5)    WITHIN 24 HOURS AFTER THE OCCURRENCE OF WHICH MAY RESULT IN A CLAIM, PURCHASER SHALL REPORT THE SAME TO SUPPLIER BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY WRITTEN NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOW TO PURCHASER AND PURCHASER'S EMPLOYEES.

(6)    PROMPTLY AFTER RECEIVING NOTICE, AT PURCHASER'S EXPENSE, PURCHASER SHALL INVESTIGATE, RESPOND TO, AND DEFEND ANY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE. THE INDEMNIFIED PARTYMA Y PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THE INDEMNIFIED PARTY'S SELECTION WITHOUT RELIEVING PURCHASER OF ANY OBLIGATIONS UNDER THIS ARTICLE; PROVIDED, HOWEVER, THE INDEMNIFIED PARTY SHALL BE RESPONSIBLE FOR ITS OWN ATTORNEYS' FEES. SUPPLIER SHALL REIMBURSE PURCHASER FOR THE AMOUNT OF ANY JUDGMENT AND REASONABLE DEFENSE COSTS PAID BY PURCHASER WHICH REPRESENTS THE INDEMNIFIED PARTY'S TOTAL LIABILITY FOUND BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR PRODUCT DEFECT AS SPECIFIED ABOVE.

(7)    ANY INDEMNITY OBLIGATION CONTAINED IN THIS AGREEMENT SHALL NOT LIMIT OR RESTRICT IN ANY WAY PURCHASER'S OBLIGATIONS UNDER THIS ARTICLE.

(8)    PURCHASER'S OBLIGATIONS UNDER THIS ARTICLE SHALL SURVIVE TERMINATION OR NONRENEWAL OF THIS AGREEMENT. ASSIGNMENT SUCCESSORS AND ASSIGNEE.

17.    **Credit Cards.**

(a) Pursuant to the SUPPLIER Credit Card Agreement (attached), Supplier has authorized Purchaser to accept SUPPLIER Credit Cards. Purchaser shall accept SUPPLIER Credit Cards only in compliance with, and for sales authorized by the SUPPLIER Purchaser Credit Card Agreement, between Supplier and Purchaser.

(b) Purchaser acknowledges that Supplier imposes a service charge and or processing charge, for the privilege of honoring SUPPLIER Credit Cards or other credit cards, authorized by Supplier, if any, and Purchaser acknowledges that Supplier reserves the right to discontinue the extension of credit, (including the acceptance of SUPPLIER Credit Cards), or to change the terms of such service charge and/or processing charge, upon giving Purchaser at least thirty, (30), days written notice.

(c) Purchaser shall accept Suppliers Proprietary Fleet credit card for sales authorized by the Proprietary Credit Card system. It is understood acceptance of Supplier's Proprietary credit card for motor fuel purchases is mandatory for the duration of this Lease Agreement. Purchaser acknowledges that Supplier imposes a service charge and processing charge, for the privilege of honoring Suppliers Proprietary Credit Cards, and Purchaser acknowledges that Supplier reserves the right to discontinue the extension of credit, (including the acceptance of Suppliers Proprietary Credit Cards), or to change the terms of such service charge and/or processing charge, upon giving Purchaser at least thirty, (30), days written notice.

(d) Purchaser understands and accepts that Supplier reserves the right in its sole discretion to prohibit acceptance of any Fleet Credit Card which Supplier determines is in direct competition with Suppliers Proprietary Credit Card. Supplier reserves the right to

- 41 -

allow acceptance of any Fleet Credit Cards if required under the SUPPLIER Credit Card Agreement.

    (c) Credit Cards processed will be credited to Purchaser in accordance with the attached Supplier Credit Card Agreement.

### 18. Termination by Supplier.

In addition to any other rights of termination, which Supplier may have, upon the occurrence of any of the following events, under circumstances where such events are of reasonable, and of material significance, to the relationship hereunder, or upon such other grounds as are allowed under the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as amended from time to time, Supplier may terminate this Agreement and any or all other Agreements including but not limited to the attached Lease:

    (a) If Purchaser fails to observe Supplier's rules, regulations, and requirements in effect, at the delivery point at which delivery is made;

    (b) Upon default in the payment of any sum overdue;

    (c) If Supplier elects to withdraw from marketing of motor fuels, in the area supplied by Purchaser, as set forth in Paragraph labeled, Market Withdrawal;

    (d) If Purchaser violates, or fails to comply with, the minimum standards as required by the provisions of Paragraph labeled, Minimum Standards;

    (e) If Purchaser sells or distributes non-SUPPLIER brand products, or any mixture, or adulteration of SUPPLIER brand products, with each other, or with any other product or material, under the trademarks or brand names of Supplier, if Purchaser sells or distributes SUPPLIER brand products under brand names or trademarks other than those of Supplier, or if Purchaser uses Supplier's identifications in a manner which deceives or causes a likelihood of confusion to the motoring public;

    (f) If Purchaser fails to take reasonable action to satisfy customer complaints, as set forth in Paragraph labeled, Customer Complaints;

    (g) If Purchaser violates the covenants of, or fails to comply with, any of the provisions of Paragraph labeled, Credit Cards, or any provisions of the SUPPLIER Credit Card Agreement;

    (h) If Purchaser fails to comply with any applicable laws, ordinances, regulations, judicial or administrative orders, or other legal requirements, of all governmental authorities, federal, state, municipal, or other authority, pertaining to this Agreement and the loading, unloading, storage, transportation, distribution and sale of petroleum products;

    (i) If Purchaser fails to maintain the quality integrity of SUPPLIER motor fuel, as set forth in Paragraph labeled, Trademarks, Brands, and Product Quality Maintenance;

    (j) If Purchaser attempts to sell, assign, give, grant, devise, or otherwise dispose of, Purchaser's interests in this Agreement without the prior written consent of Supplier, as set forth in Paragraph labeled, Assignment and Delegation;

    (k) If bankruptcy or insolvency proceedings are begun, by or against Purchaser, under the Bankruptcy Code, or if Purchaser becomes insolvent;

    (l) If Purchaser makes or furnishes any false or misleading statement, or if Purchaser fails to disclose information to Supplier, its agents, or employees, concerning any material fact for the purpose of inducing Supplier to make any payment, to deliver product, to extend, or continue to extend, or increase credit, or to issue any credit memorandum to Purchaser, or to any other party acting in concert with Purchaser;

    (m) If Purchaser fails to comply with the provisions of Paragraph labeled, Sale;

    (n) If the premises are vacant, unattended, or not operated for the retail sale of motor fuels, for seven, (7), consecutive days, or such lesser period, which, under the fact and circumstances, constitutes an unreasonable period of time;

    (o) If the Purchaser fails to comply with the provisions of Paragraph labeled, Health and Safety Information; or,

    (p) If Purchaser dies, or becomes severely physically or mentally disabled.

    (q) If Purchaser breaches any other covenant or fails to perform any other obligation or duty under this Agreement.

(r) Failure of Purchaser to maintain required insurance coverage as described above.

(s) If Purchaser fails to cure any breach or fails to pay the liquidated damages within ten (10) days after receiving written notice from Supplier, Supplier may terminate this Agreement.

(t) Purchaser agrees that the minimum quantities of products set forth in the Agreement are subject to change by Supplier, in its own discretion, on an annual basis, provided however that the minimum quantity for any year may not be set at less than eighty five percent (85%) of the actual number of gallons purchased by Purchaser during the previous year and the maximum quantity for any year.

Purchaser shall not suffer, permit, or allow the occurrence of any of the events enumerated in Sub-paragraphs (a) through (u), above. Supplier's rights of termination, or non-renewal for good cause, as defined above, shall not, in any way, be affected by any previous waiver, forbearance, except to the extent such activity has become an acknowledgment, and established course of performance, within the meaning of the Uniform Commercial Code.

19. **Training**: Purchaser's Key Management Person (herein after "Purchaser") shall attend and successfully complete any and all training courses that Supplier or Supplier's Branded Oil Company may require for the operation of an automobile service station, motor fuel dispensing station, and convenience store. Purchaser may be required to pay the costs associated with the initial training, including costs for instructors, training materials, and the facility. Purchaser shall arrange and pay for Purchaser's own transportation, lodging and food. After the initial training, Purchaser shall attend a minimum of 3 days (24 hours) of Supplier approved advanced or refresher training courses or courses deemed appropriate by local management for each year of the term of this Agreement. Purchaser may be required to pay the costs associated with the additional training, including costs for instructors, training materials, and the facility. Purchaser shall arrange and pay for Purchaser's own transportation, lodging, and food. Purchaser shall execute Supplier's or Supplier's training agreement prior to attending any training course. Upon Supplier's or Supplier's request, Purchaser shall furnish proof of Purchaser's orientation and training for automobile service station, motor fuel dispensing station, and convenience store employees. Purchaser shall have available and utilize training equipment, materials, and programs made available by Supplier from time to time for training purposes. To enhance the expeditious meeting of safety, health, operational and customer needs, Purchaser understands that all of the courses, programs, and tests offered by Supplier will be given only in the English language.

20. **Deidentification**. If Purchaser's place of business is abandoned, unoccupied, or not operated by Purchaser, for a period of seven, (7), consecutive days, or such shorter time, as under the circumstances are reasonable, Supplier may, at its discretion, give Purchaser a written notice to remove all the SUPPLIER identification, including identifying SUPPLIER colors, from Purchaser's place of business, within five, (5), days of said notice. Should Purchaser fail to comply with said notice, Supplier is authorized to enter upon Purchaser's place of business for the express purpose of removing all the SUPPLIER identification, including painting over, or covering all the SUPPLIER identifying colors. At this time Purchaser will be invoiced for the full amount of the improvement sum advanced by Supplier and/or SUPPLIER under the amortization and loan agreement. Purchaser will have 30 days to reimburse Supplier in full for this advance.

21. **Governmental Price Control**. If Supplier's right to charge or receive any price payable, pursuant hereto, or to revise any such price as herein provided, is restricted or prohibited by law, regulation, or order of any governmental authority, Supplier may, from time to time, and upon thirty, (30), days prior, written notice to Purchaser, terminate the provisions of this Agreement, insofar as they apply to the products(s), the price(s) for which are so restricted or prohibited. Upon the expiration of the thirty, (30), days, it is understood that any such product(s) shall be deemed deleted from this Agreement, but that this Agreement shall otherwise continue to remain in full force and effect.

22. **NON-EXCLUSIVE TERRITORY**    Nothing in this Agreement grants Purchaser an exclusive territory to market and resell any Products. Supplier reserves the right to market and sell, and authorize others in any manner Supplier chooses including through its own retail stations or through designated wholesalers or other Purchasers.

23. **Health and Safety Information**.

(a) Purchaser shall distribute all health and safety information, in accordance with all applicable federal, state, and local laws, regulations and ordinances.

(b) Purchaser shall cooperate with Supplier to facilitate the dissemination of any health and safety information from Supplier, concerning the products sold hereunder. In that regard, upon request of Supplier, Purchaser shall promptly provide, to Supplier, an accurate listing of the types of uses made of products sold hereunder by Purchaser, and to provide accurate information, in response to such requests, Purchaser shall make reasonable efforts to determine the uses of products sold hereunder by Purchaser's customers.

- 43 -

Purchaser shall also disseminate, to all persons who Purchaser can reasonably foresee may be exposed to possible hazards from the products sold hereunder, any health and safety information from Supplier, promptly, after such information is furnished to Purchaser, by Supplier, and in the manner prescribed by Supplier, including, but not limited to, dispenser decals, portable container labels, fueling area signs, and information leaflets.

24. **Notice**. Notices from Supplier to Purchaser shall be considered as properly given if personally delivered, in writing, to Purchaser or its place of business stated herein, or if placed in the United States mail, postage prepaid, addressed to Purchaser's place of business stated herein. Notices from Purchaser to Supplier shall be considered properly given if placed in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Supplier's place of business stated herein. The postmark date shall be the date of any notice sent by United States mail. Either Supplier or Purchaser may change their respective addresses for notice purposes by providing a notice of such change in address in the manner provided above.

25. **Waiver**. The right of either party to require strict performance by the other, of any obligations imposed upon the other, by this Agreement, shall not, in any way, be affected by any previous waiver, forbearance, or course of dealing.

26. **Severability**. If, for any reason, any provision contained in this Agreement is held to be invalid, illegal, or otherwise void by a court of competent jurisdiction, the remaining provisions of this Agreement shall not be affected, and shall continue in full force and effect; provided, however, that in the event Supplier loses the right to grant the use of the SUPPLIER trademarks and brand names to Purchaser, this Agreement shall terminate, upon written notice with no further recourse by either Purchaser or Supplier

27. **Approval and Signing by Supplier**. This Agreement shall not be binding on Supplier until approved and signed, on its behalf, by a duly authorized officer or employee. Commencement of performance hereunder, prior to such approval and signing, shall, in no case, be construed as a waiver by Supplier of the foregoing requirement.

28. **Entirety of Agreement**. This Agreement is intended by the parties to be the final, complete, and exclusive embodiment of their agreement about the matters covered herein. This Agreement may not be altered, amended, or changed, in any way, except by a written instrument executed by both parties, or as otherwise provided for herein.

29. **Successors and Assigns**. All rights, obligations and liabilities herein given to, or imposed upon, the respective parties hereto, shall extend to and bind the heirs, executors, administrators, successors, and assigns of the parties, except as otherwise expressly provided herein.

30. **Definition of Supplier**. The term "Supplier" as used in this Agreement, so far as covenants or obligations on the part of Supplier are concerned, shall be limited to mean and include only Supplier or the successor-in-interest of Supplier under this Agreement at the time in question. In the event of any transfer, assignment or other conveyance of Supplier's rights, title or interests in this Agreement, the Supplier herein named (and in case of any subsequent transfers or conveyances, the then Supplier) shall be automatically freed and relieved from and after the date of such transfer, assignment or conveyance of all liability for the performance of any covenants or obligations contained in this Agreement thereafter to be performed by Supplier only if the assignee or transferee of such rights, title and interests shall agree to assume and observe and perform any and all obligations of Supplier, during the term of this Agreement. Supplier may transfer, assign and/or convey all or any part of its rights, title and interest in this Agreement without the consent of Purchaser and such transfer, assignment and/or conveyance shall not be deemed a violation on the part of Supplier or the then Supplier of any of the terms or conditions of this Agreement.

31. **Review by Legal Counsel**. Purchaser hereby acknowledges, understands and agrees that it has entered into this Agreement freely and voluntarily with the understanding that it has had the opportunity to obtain the advice of independent legal counsel.

32. **Interpretation**. This Agreement shall be governed by and construed in accordance with Delaware law. Each party accepts equal responsibility for the language herein.

33. **MARYLAND DEALER DISCLOSURES**. Where Purchaser is the owner / operator of the Purchaser's Station in the State of Maryland, Purchaser acknowledges and states that the applicable disclosures pursuant to *Maryland Code, Commercial Law,* § 11-303 set forth more fully in the Maryland Disclosure Addendum attached hereto and incorporated herein were made by Supplier prior to the execution of this Agreement.

IN WITNESS WHEREOF, Supplier and Purchaser have hereunto subscribed their names and their respective Seals.

**GLeS, Inc. d.b.a. Sweet Oil Company**

By: _____
        Officer

By: _____
        - President

By: _____
        - Secretary

### Maryland Disclosure Addendum

#### Disclosures Required under Maryland Code, Commercial Law, § 11-303

With Respect to Maryland Purchasers only, the following disclosures are made, as applicable, under Maryland Code, Commercial Law, § 11-303:

1)    Any gallonage history of the Purchasers Station for the shorter of

- The three (3) year period immediately past; or

- The entire period which the location has been supplied by Supplier;

2)    The name, last known address, and reason for the termination of the marketing agreement of each person who was a dealer at the Purchasers Station during:

- The five (5) year period immediately past; or

- The entire period which Purchasers Station has been supplied by Supplier

3)    Any commitment for the sale, demolition, or other disposition of the Purchasers Station;

4)    Any Training Program and any specific goods and services that the Supplier will provide for and to Purchaser;

5)    Any obligation that will be required of the Purchaser;

6)    Any restriction on the sale, transfer, and termination of the agreement; and

7)    The total amount of any cash deposit required, any amount of interest to be paid on the deposit, and the conditions for the return of the deposit.

# RIGHT OF FIRST REFUSAL AGREEMENT

This Agreement is made as of this __1__ day of __December__ 2004, by and between __Fayyad Abdallah t/a Felton BP__, (the "Grantor"), and **GLeS, INC., T/A SWEET OIL COMPANY**, a Delaware corporation, its successors and/or assigns (the "Grantee").

## WITNESSETH:

The background of this Agreement is as follows:

WHEREAS Grantor is the owner of the property with the improvements erected thereon known as **Felton BP** and being more particularly bounded and described in Exhibit "A" (hereinafter referred to as the "Property"); and

(a) WHEREAS in connection with that certain Lease Agreement by and between Grantor and Grantee dated effective of even date herein, Grantor has agreed to grant to Grantee a right of first refusal to purchase all or any portion of the Property, together with all present and future improvements erected thereon, in whole or as subdivided as more fully set forth herein below; and

(b) WHEREAS the parties desire to memorialize the terms and conditions of the grant of such right of first refusal by entering into this Agreement.

NOW THEREFORE, for and in consideration of the premises and the sum of Ten Dollars ($10.00) paid by Grantee to Grantor, the receipt and sufficiency of which is hereby acknowledged, together with other good and valuable consideration and intending to be legally bound hereby, the parties mutually covenant and agree as follows:

1. **Right of First Refusal**. In the event Grantor or its, successors or assigns in title to the Property receives a bona fide offer or counteroffer from any person, party or entity to purchase, exchange, trade or otherwise acquire all or a portion of the Property and if such offer or counteroffer shall be acceptable to Grantor or its, successors or assigns in title to the Property, then Grantor shall first give Grantee the right and privilege to purchase, exchange, trade or otherwise acquire the Property or any portion thereof that shall be included in the offer or counteroffer on the same terms, conditions and provisions, and for the same consideration as contained in such offer or counteroffer.

Grantor shall require that any offer or counteroffer received by Grantor for the Property or any portion thereof be in the form of a written contract, agreement or other instrument containing all the terms and conditions of such offer or counteroffer, and that such contract, agreement or other instrument be valid and binding upon the party making such offer or counteroffer, provided, however, that any said contract, agreement or instrument shall be expressly contingent upon Grantee's exercise of this right of first refusal (the "Right") under the terms and conditions contained herein.

2. **Notice to Grantee**. Before accepting such offer or counteroffer from such person or party, Grantor shall within ten (10) business days give written notice of the receipt of such offer or counteroffer to Grantee in the manner and at the address set forth as follows:

    GLeS, Inc. t/a Sweet Oil Company
    2604 Eastburn Center
    Newark, DE 19711

The original or a true, full and complete photo static copy of any contract, agreement, letter, writing or other instrument or communication and all exhibits, amendments and side agreement thereto received by Grantor from such person or party, which contains all the terms and conditions of such bona fide offer or counteroffer shall be included with the notice.

3. **Exercise of Right of First Refusal**. Grantee shall have until 5:00 p.m. on the sixtieth (60th) day after actual receipt of such notice within which to exercise the Right by giving written notice to Grantor in the manner and at the address set forth herein. Grantee shall include with such written notice a fully-executed document in the same form and content as any contract, agreement or other instrument submitted by Grantor to Grantee with the notice of Grantor (except for the name of the purchaser, lessee or optionee), together with any deposits, payments or other matters of performance required under such contract, agreement or other instrument upon the execution by

- 47 -

the purchaser, or optionee; provided, however, Grantee may extend the date of settlement provided in the Notice by a period not to exceed thirty (30) days. Upon receipt of such notice, Grantor shall execute such contract, agreement, or other instrument and deliver a fully-executed copy thereof to Grantee as provided herein. During the sixty (60) day election period, Grantor shall not enter into any agreement, contract or other instrument containing such bona fide offer unless Grantee shall give notice to Grantor in writing that Grantee does not desire to exercise the Right.

4.    **Failure of Grantee to Exercise Its Right of First Refusal.** If Grantee fails to exercise the Right within such sixty (60) day period, Grantor may enter into such agreement, contract, letter, writing or other instrument containing such bona fide offer on the same terms and conditions as contained in such offer at a consideration equal to or in excess of that contained in the bona fide offer. If Grantee does not exercise the Right and Grantor enters into such agreement, contract, letter, writing or other instrument, the Grantee shall furnish to Grantor a written statement to the effect that Grantee has elected not to exercise the Right, and the Right shall be deemed terminated as to all or part of the Property which is the subject of such agreement, contract, letter, writing or other instrument containing such bona fide offer provided closing is completed on such agreement, contract, letter, writing or other instrument. If Grantor does not enter into such agreement, contract, letter, writing or other instrument or if closing of such transaction is not completed, the Right shall continue in effect notwithstanding that Grantee did not exercise the Right.

5.    **Term of the Right of First Refusal.** The term of the Right shall commence on the date of this Agreement and shall terminate upon the expiration of the Agreement plus 120 days. If any of the privileges, covenants or rights created by this Agreement shall be unlawful or void for violation of (a) the rule against perpetuities or some analogous statutory provision, (b) the rules restricting restraints on alienation, or (c) any other statutory or common law rule imposing time limits, then the term of the Right shall continue only until such time as will render the privileges, covenants or rights created by this Agreement lawful and enforceable.

6.    **Binding Effect and Assignment.** This Agreement shall be binding upon Grantor and its successors and assigns in title to the Property, and in favor of the Grantees, its successors and assigns, subject to the limitation set forth in paragraph labeled Term of Right of First Refusal. The terms of this Agreement shall run with title to the Property and bind the Property during the term of this Agreement.

7.    **Notices.** All notices provided for herein shall be given personally or by certified mail, return receipt requested, postage prepaid, addressed to the appropriate party at the address designated for such party at the address set forth herein, or such other address as the party who is to receive such notice may designate in writing as provided herein.

If to Grantor:                                   If to Grantee:

                                                GLeS, Inc. t/a Sweet Oil Company
                                                2604 Eastburn Center
                                                Newark, DE 19711

Att:

With a copy to:                                  With a copy to:

                                                Daniel P. Johnson, Esquire
                                                Young Conaway Stargatt & Taylor, LLP
                                                P.O. Box 391
                                                Wilmington, DE 19899-0391

8.    **Miscellaneous.**

(a)    This Agreement may not be revised, amended or revoked except by in writing signed by all parties hereto.

(b)    This Agreement shall be governed and construed in accordance with Delaware law.

(c)    **Costs and Attorneys' Fees.** In the event either party shall incur any costs and expenses in enforcing any obligations or duties imposed on the other party under this Agreement or in pursuing their respective rights and remedies under this Agreement, then the prevailing party as determined by a court of competent jurisdiction shall be entitled to recover from the other party as part of any judgment or award all of the prevailing party's reasonable

- 48 -

costs, charges and expenses including the reasonable fees and out-of-pocket expenses of legal counsel, agents and others retained by the prevailing party.

IN WITNESS WHEREOF, the Grantor has executed and sealed this Agreement as of the day and year first above written.

SEALED AND DELIVERED IN
THE PRESENCE OF:

By: _____

STATE OF _____

COUNTY of _____

    The foregoing instrument was acknowledged before me this _____ day of _____ 2004, by
_____ a _____ Resident.

    GIVEN under my Hand and Seal of office the day and year aforesaid.

_____ _____(Seal)
Notary Public/Attorney-At-Law

Name (Please Print)_____ _____

Title _____ _____.

My Commission Expires: _____

-49-

## SUPPLIER CREDIT CARD AGREEMENT

On this **1st** day of **December, 2004**, GLeS, Incorporated, having offices at 2604 Eastburn Center, Newark Delaware, 19711, hereinafter called Sweet Oil Company, and **Fayyad Abdallah t/a Felton BP,** hereinafter called Purchaser, made the following SUPPLIER CREDIT CARD AGREEMENT, hereinafter called the Agreement.

(1) **Authorized Credit Card Transactions** Purchaser and/or the Retail Outlets Purchaser operates, shall honor valid **BP** Credit Cards, or other valid Credit Cards, if any, authorized by **BP,** at the time of sale, for goods and services authorized by Sweet Oil. The following goods and services are authorized for sale on **BP** Credit Cards or other authorized Credit Cards.

   (a) All **BP** brand products for motor vehicles, and watercraft, but sales of Motor Fuel may not exceed the capacity of the vehicle's, or craft's Fuel Tank, plus an additional twenty-five (25) gallons of Motor Fuel or two cases of Motor Oil.
   (b) Other merchandise sold by **BP** or Sweet Oil to Purchaser, or sold by **BP** or Sweet Oil to Purchaser's suppliers for resale.
   (c) Car washing and polishing services, and other goods or services, as authorized by Sweet Oil, from time to time.
   (d) Credit Cards other than **BP,** may be honored, only in accordance with special written authorization, issued to Purchaser by Sweet Oil, from time to time.

(2) **Requirements of a Valid Credit Card Transaction** – When a Credit Card, bearing an expiration date, is presented, Purchaser must check the date to be sure the Card is currently valid. Purchaser must seek approval of Credit Sales, of a certain dollar amount, as designated by special written notification, by telephoning Sweet Oil's Authorization Center, and if Credit is approved, Purchaser will record, on the Invoice, in the space marked "Authorization Code," the Authorization Code Number furnished. If the Credit is disapproved, Purchaser will be advised, either:

### "CREDIT IS DECLINED," OR "PICK UP CARD."

Since Purchasers are independent businessmen, Sweet Oil does not have the right to tell them how to conduct their private business affairs. However, this Agreement will serve to confirm that Sweet Oil has not, will not request, does not request, and does not authorize any Purchaser to accuse any person of a crime, or to file any complaint, civil or criminal, against any person for, or in Sweet Oil's name, arising out of any Credit Card or other transaction. Furthermore, Sweet Oil does not authorize or condone any action, by a Purchaser, which is not peaceable. The instructions furnished by Sweet Oil's Authorization Center, in connection with Credit Card Transactions, are not intended, in any way, to represent that any person has violated a Law or Ordinance. It is suggested that a Purchaser not take steps to make any accusations, file a complaint, or otherwise cause the arrest of a customer, without first consulting his attorney.

After filling in the details of the Transaction, legibly, with a ball-point pen or pencil, Purchaser must insert the Invoice and the purchaser's Credit Card, in the Imprinter, and Imprint the Credit Card account number, the purchaser's name, the total amount of the transaction, the date, and the Purchaser Identification Plate, on the Invoice. (The written and imprinted totals must agree. If they do not, the imprinted amount shall prevail. The customer must then sign the Invoice for the goods and services, to confirm the accuracy of the completed Invoice. The **BP** Credit Card Imprinter Plates, Plastics, and Credit Card Invoice Forms are the property of Sweet Oil, which shall be accounted for, by Purchaser, at all times, shall never be used at any premises not selling Branded Fuels, nor shall they be used for the sale of any product or service not an authorized Credit Card Transaction, as defined in Clause (1). The aforesaid equipment shall be used, by Purchaser, only to imprint Sweet Oil Invoices with Credit Cards, and any other Credit Cards authorized by Sweet Oil.

(3) **Sweet Oil's Chargeback Rights** - Sweet Oil may charge back to Purchaser's account, within six (6) months of date of sales, the face value, or any portion thereof, of Invoices:

   (a) Bearing an illegible account number, or other omitted, incomplete, or inaccurate entries;
   (b) Imprinted, with an expired Credit Card;
   (c) With missing entries or notations, where entries or notations are required by this Agreement;
   (d) Received by Sweet Oil more than thirty (30) days after the date of purchase;
   (e) In amounts requiring Credit Authorization, and which do not bear a valid Authorization Code Number, or where two or more Invoices are prepared to avoid obtaining required Credit Authorization for a single sale;
   (f) Covering any produce or service not an authorized Credit Card Transaction, as defined in Clause (1);
   (g) Covering sales, which are, or subsequently become, the subject of disputes between Purchaser and his customers, or Purchaser and Sweet Oil customers, except disputes solely involving the quality or performance of **BP** products;
   (h) With a customer's name, signed by Purchaser, or one of his employees, without the authority of the Credit Card

- 50 -

Holder;
 (i) Covering fraudulent sales or other activities, by Purchaser, or his employees, whether done alone or in concert with others, (the six (6) month limitation of Chargebacks shall not apply to any such sales or activities);
 (j) That do not represent true consummated sales, at Sweet Oil Facilities, operated by Purchaser, pursuant to the Purchaser Agreement between Sweet Oil and Purchaser;
 (k) Covering sales made contrary to special written instructions, from Sweet Oil to Purchaser;
 (l) Bearing incorrect, illegible, of missing License Number or State of Issue entries, (a valid Operator's License Number and State of Issue must be obtained, when vehicles have no license plate, or carry dealer tags, or temporary plates);
 (m) Which are executed or submitted in any other manner not authorized by the terms of this Agreement;
 (n) Covering sales made contrary to embossed, or printed restrictions on the card;
 (o) Which includes a Surcharge, or any other means of increasing the regular price, to a Cardholder, which is imposed by the Purchaser, at the time and point of sale, and which is not imposed upon customers paying by cash, check, or similar means.

From time to time, new styled Credit Card Invoices are furnished by Sweet Oil, to Purchasers. Upon receipt of the new Forms, all obsolete Credit Card Invoices should not be used. Any Credit Card sale, made on an obsolete Invoice, will be subject to a Chargeback, within three (3) months, after Sweet Oil has notified Purchaser to discontinue use of the obsolete Invoice.

Sweet Oil will return to, or furnish the Purchaser, with photocopies of unauthorized, illegible, improperly prepared, and disputed Invoices, which are charged back.

(4) **No Waiver or Chargeback, and Termination Rights** – It is understood that failure, by Sweet Oil, to charge back to Purchaser, any such Invoices, from time to time, shall not operate as a Waiver of its right, thereafter, to charge back Invoices, within six (6) months of date of sale, which may, thereafter, be prepared in Violation of the provisions of this Agreement, and shall not operate as a Waiver, by Sweet Oil, of its right to terminate this Agreement, or any other contractual arrangements between Sweet Oil and Purchaser, relating to the operation of Sweet Oil Retail Facilities.

(5) **Other Agreements Between the Parties** – Purchaser understands, and agrees, that any material violation of the provisions of this Agreement shall give Sweet Oil the right, in addition to all other rights, it may have hereunder, to terminate, forthwith, any or all other contractual arrangements between Sweet Oil and Purchaser, relating to the operation of Sweet Oil Retail Facilities.

(6) **Modification and Termination** – Sweet Oil reserves the right to modify this Agreement, at any time, by written notice to Purchaser. This Agreement shall terminate automatically upon the termination, non-renewal, or expiration of the Purchaser Agreement between Sweet Oil and Purchaser.

(7) **Invoice Submission** – Purchaser will submit Credit Card Invoices in the manner prescribed by Sweet Oil.

(8) **No Franchise** Purchaser acknowledges that this Agreement does not create, extend, or renew a Franchise, under any Local, State, or Federal Law, including the Federal Petroleum Marketing Practices Act.

_____
**Fayyad Abdallah t/a Felton BP ("Purchaser")**

By: _____

Title: _____

Date: _____

_____
GLeS, Inc. d.b.a. Sweet Oil Company ("Company")

By:     Mark L. Greco

Title:    Vice President

Date: _____

- 51 -

**ADDENDUM TO**
**SUPPLIER CREDIT CARD AGREEMENT**


The SUPPLIER Credit Card Agreement, (Agreement), between Sweet Oil Company, and **Fayyad Abdallah t/a Felton BP**, (Purchaser), dated **December 1, 2004** and any Addendums, thereto, are hereby modified, pursuant to Paragraph 7 of the Agreement, so that Purchaser may accept Authorized Credit Cards for FOOD MART ITEMS, under the following terms and conditions:

(A) This Addendum shall become effective on **December 1, 2004,** and shall remain in effect until the expiration, non-renewal, or termination of the Agreement: however, that Sweet Oil may terminate this Addendum, at any time, if the Purchaser shall Breach any of its material terms, fails to follow any of the instructions issued by Sweet Oil, from time to time, or upon giving Purchaser thirty (30) days, written notice.

(B) Except, as specifically modified, herein, all terms and conditions of the Agreement remain in full force and effect.

(C) FOOD MART ITEMS shall be defined, for purposes of this Agreement, as those items and services which are customarily offered for sale in Convenience Stores, and/or such other items Purchaser may choose, except items that may be offensive to the community, (as may be determined by Sweet Oil, in sole discretion).

(D) Purchaser agrees that, in consideration for Purchaser's right to accept the **BP** Credit Card and/or the Authorized Credit Cards for FOOD MART ITEMS, Purchaser agrees to pay, a fee, based upon the published rates as may be amended, from time to time.

(E) Purchaser agrees to accept and promote Company's proprietary Fleet Credit Card at all times and agrees to comply with all terms and conditions which Company may impose regarding its proper handling and acceptance. Purchaser agrees not to accept any competitors Fleet Credit Card for any purchases unless such acceptance is specifically provided for in writing by Company.


_____
Fayyad Abdallah t/a Felton BP("Purchaser")

By: _____  _____  _____  ___

Title: _____  _____  _____  .

Date: . _____  _____  _____


_____
GLeS, Inc. d.b.a. Sweet Oil Company ("Company")

By:   Mark L. Greco

Title:  Vice President

Date: _  _____  _____  _____  ___


- 52 -

## 2ⁿᵈ ADDENDUM TO SUPPLIER CREDIT CARD AGREEMENT

The Supplier Credit Card Agreement, (Agreement), between Sweet Oil Company, and __Fayyad Abdallah t/a Felton BP__ (Purchaser), is hereby modified, pursuant to Paragraph 7 of the Agreement, for participants in the Point of Sale Program, under the following terms and conditions:

    (A) This Addendum shall become effective on __December 1, 2004,__ and shall remain in effect until the expiration, non-renewal, or termination of the Agreement; provided, however, the Sweet Oil may terminate this Addendum, at any time, if Purchaser breached any of its material terms, or upon giving thirty (30) days, written notice.

    (B) Except, as specifically modified, herein, for Electronically Processed Transactions, all terms and conditions of the Agreement remain in full force and effect.

    (C) The Sweet Oil Point of Sale, (POS), Equipment is to be used, exclusively, for the authorization, capture recording, confirmation, and transmission of information related to the Transactions defined in Clause (1) of the Agreement. POS Equipment includes any terminal device, printer, card reader, electronic cash register, hardware/software, cables, other communication equipment, and other related devices, and equipment.

The POS Equipment is the property of Sweet Oil, and shall be used only at locations selling Sweet Oil Provided Fuels, and only for products and services defined in Clause (1), of the Agreement, as referred to above. Usage of the aforesaid equipment, inconsistent with this Addendum, may result in Sweet Oil's exercise of rights, detailed in Clause (7), of the Agreement. Any tampering, or willful attempt to distort, alter, or otherwise manipulate the POS Equipment or Network, may result in prosecution or termination.

    (D) All Sales must be Electronically Processed, through the POS Equipment, except in the following instances:

        (i) A Debit or Credit Card which cannot be Electronically Processed because of physical defect, including a defective or missing magnetic stripe;

        (ii) Transactions during a temporary "down-time" of the POS Equipment due to hardware or software problems, loss of communications, power outages, etc.

        (iii) Selective Cards, "Information on the Handling of __BP__ Credit Card Transactions," which require special billing; or

        (iv) When instructed, by the Terminal, to use the Manual Imprinter.

In these instances, the Credit Card must be Manually Processed, following all procedures required in the Agreement. Invoices, which have been Manually Imprinted, should be submitted to Sweet Oil, for payment, in the manner prescribed by Sweet Oil.

All Debit Cards, if any authorized by Sweet Oil, must be Electronically Processed.

    (E) When indicated, by the POS Equipment, or if the POS Equipment is unable to process authorizations, and the sales amount exceeds an amount designated in writing by Sweet Oil, the sale must be authorized by telephoning the proper Authorization Center. The Authorization Number, so obtained, must be recorded on the Invoice.

    (F) A Credit Entry is to be made on the POS Equipment, only to adjust for or void an incorrect sales entry, made on the POS Equipment. Any misuse of this adjusting entry may result in a Chargeback of the Credit, and/or Sweet Oil's termination of this Agreement.

    (G) Items (a), (b), (c), (d), (f), and (n) of Clause (3), do not apply to Electronically Processed Charges. Purchaser shall retain all Electronically Generated Sales Reports and Records, for a period of not less than six (6) months. This latter provision does not apply to Credit Card Sales generated from Island Card Readers. Sweet Oil may, from time to time, request Purchaser to provide necessary data to satisfy Cardholder inquires, or to verify Electronic Transactions. Failure to furnish requested date, may result in a Chargeback.

_(signature)_

__Fayyad Abdallah t/a Felton BP ("Purchaser")__           GLeS, Inc. d.b.a. Sweet Oil Company ("Company")

By: _____                 By: Mark L. Greco

Title: _____              Title: Vice President

Date: _____              Date: _____

## STANDARD OF APPEARANCE CHECKLIST

**Minimum Acceptable Score; 200 Points Total**

DATE: _____  _____  _____  _____

ADDRESS: _____  _____  _____  _____

SCORER: _____  _____  _____  _____

SCORE: _____  _____  _____  _____

**RATE EACH ITEM ON A SCALE OF 0-5
DOUBLE THESE SCORES**

| | |
|---|---|
| 5-EXCELLENT | 2-MEDIOCRE |
| 4-GOOD | 1-POOR |
| 3-AVERAGE | 0-UNACCEPTABLE |

### I.  PERSONNEL/EMPLOYEE ON DUTY
1. PROMPT CUSTOMER SERVICE ___
2. CUSTOMER SERVICE ___
3. (No Phone or Visitors) ___
4. CLEAN UNIFORM (Name Tag) ___
5. FRIENDLY/COURTEOUS SERVICE ___
6. NO SMOKING ___
7. NO EATING OR DRINKING ___
8. SPEED, PRODUCTIVITY, ACCURACY ___
9. CAR WASH OFFERED ___
10. GREETS, SMILES, & THANKS CUSTOMER ___
11. NO PERSONAL TELEPHONE CALLS ___

TOTAL ___

### IV.  INTERIOR
1. GENERAL APPEARANCE ___
2. CUSTOMER COUNTER SPACE ___
3. CASHIER'S VIEW ___
4. CASHIER'S AREA (Clean) ___
5. FLOOR CLEAN ___
6. SHELVES CLEAN ___
7. WINDOWS (Clean & Uncluttered) ___
8. COOLERS LIGHTED & CLEAN ___
9. STOREROOM & OFFICE ___
   (Clean and Orderly)
10. COOLERS CLEAN ___

TOTAL ___

### II. EXTERIOR
1. GENERAL APPEARANCE ___
2. DRIVEWAYS CLEAN (No Debris) ___
3. LANDSCAPED AREAS-GRASS ___
4. DISPENSERS & ISLANDS ___
   (Clean and Supplied)
5. VEHICLES PROPERTY PARKED ___
   (No Junkers)
6. CAR WASH INTERIOR (Clean) ___
7. VACUUM & AIR/WATER STANDS ___
8. TRASH CANS & TRASH BINS ___

TOTAL ___

### V.  MERCHANDISE
1. GENERAL APPEARANCE ___
2. BEVERAGE DISPLAYS ___
3. MERCHANDISE PRICES ___
4. SHELVES (Fronted & Stocked) ___
5. COOLERS (Priced & Stocked) ___
6. CREDIT CARD APPLICATIONS ___
7. HANDI WIPES OR TOWELS ___

TOTAL ___

### III.  RESTROOMS
1. GENERAL APPEARANCE - CLEANLINESS ___
2. CLEAN WALLS, FLOORS, & CEILINGS ___
3. PLEASANT AROMA ___
4. CLEAN FIXTURES - MIRROR ___
5. DOOR UNLOCKED & LOCKS SECURED ___
6. IDENTIFIED PROPERTY – LIGHTS ___
7. SOAP DISPENSER – LIQUID SOAP ___
8. TOILET TISSUE ___
9. WASTEBASKET & COAT HOOK ___
10. HAND TOWELS OR DRYER ___

TOTAL ___

**NSF Addendum**

## NON SUFFICIENT FUNDS (NSF) POLICY

Please be advised that "Non Sufficient Funds" (NSF) for payment of petroleum products is a breach of contractual obligations and subsequent default. The following are fee's for nonpayment when due:

**First Offense** $100 FEE

**Second Offense** $200 FEE

**Third Offense** $300 FEE AND PAYMENTS WILL BE SWITCHED TO COD-Prepay UNTIL FURTHER NOTICE

This notice does not operate as a waiver of Landlord's rights of termination under the attached Lease and Supply Rider for failure to pay for Rent and Motor Fuel when due.

# EXHIBIT B

# Supply Agreement Rider to Lease

**THIS SUPPLY AGREEMENT RIDER** ("Agreement") is made and incorporated as an addendum to the attached Lease. Hereinafter Lessee may be referred to as either Lessee or Purchaser, and Lessor may be referred to as either Lessor, or Supplier.

WHEREAS, for and in consideration of the mutual promises and agreements exchanged and contained herein below, the Supplier and Purchaser hereby mutually agree to the following terms and conditions.

1. Sale.

(a) Supplier agrees to sell, and deliver, or cause to be delivered, and Purchaser agrees to buy, receive, and promptly pay for motor fuel of the kind, grade, brand, and quality sold by Supplier, at the time of delivery, for resale by Purchaser;

(b) Orders for motor fuels, by Purchaser, must be for quantities equivalent to a full truck transport load;

(c) Subject to the terms and conditions stated elsewhere herein, or unless otherwise agreed to in writing, Purchaser agrees to purchase no less than the minimum annual quantity set forth below each year of this contract, and Supplier shall not be obligated to sell more than the maximum annual quantity set forth below, (in gallons, unless otherwise indicated):

### Annual Allocations

Fuel Products      **967280**  Gallons - Minimum          **1706966**  Gallons - Maximum

Purchases permitted by Supplier, in excess of the annual maximum quantities, shall not operate as a waiver of Supplier's right to restrict purchases to such maximum quantities during any subsequent period. For any period less than a full calendar year, said annual minimums and maximums shall be reduced on a pro rata basis.

(d) Purchaser agrees to maintain a sufficient inventory of Sweet Oil authorized motor fuel products, offered to it by Supplier, so that it shall always have a sufficient quantity of Sweet Oil authorized motor fuels to meet the reasonably anticipated needs of Purchaser's customers. Purchaser agrees to avoid product run outs of any grade at all times.

### (e) Special Legend for Purchasers in Delaware and Maine:

PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE STATION DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE, WHICH HE OR SHE ALONE MAY DECIDE.

2. **Point of Delivery.** Purchaser shall have the right to designate the point of delivery, by written notice to Supplier. All points of delivery must have a modem equipped Veederoot TLS-350 system or other compatible device, which is approved by Supplier, with an active phone line hooked up to it to enable automated ordering of motor fuel products. This automated ordering system is mandatory for the duration of this contract.

3. **Terms of Payment**

(a)          Purchaser shall pay for the Products in accordance with Supplier's payment terms in effect from time to time, any of which may be revoked by Supplier with reasonable notification to Purchaser. If Supplier elects to extend credit to Purchaser, Purchaser shall comply with Supplier's credit terms in effect from time to time, any of which may be altered or revoked by Supplier without prior notification to Purchaser. Purchaser agrees to pay via Electronic Fund Transfer ("EFT") at Suppliers terms and conditions at the time of delivery (or at Supplier's option, cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by Supplier) for all goods delivered to Purchaser by Supplier under the terms of this Agreement. Purchases made and not paid for on delivery shall be payable at Supplier's principal office unless otherwise specified by Supplier. Supplier, in its sole discretion may require Purchaser (i) to pay Supplier via wire transfer prior to time of delivery or at such a time and place or method as Supplier may designate from time to time, (ii) to provide Supplier a cash deposit, or (iii) to provide Supplier an Irrevocable Bank Letter of Credit sufficient to Supplier in form and amount. Purchaser shall provide any written authorizations required for EFT purposes.

(b)          Purchaser shall pay Supplier's price in effect at the time loading commences. Purchaser may ascertain Supplier's current prices on the Web or at such other place designated by Supplier. Prices are subject to change without notice.

(c) Purchaser shall pay a financing charge on any balance not paid when due, at an annual rate of 18%. Supplier's right to collect a financing charge does not operate as a waiver of Supplier's right of termination, for Purchaser's failure to pay for motor fuel when due, and Purchaser's obligation to pay for products delivered shall not be subject to offset for any claims against Supplier.

(d) If Purchaser fails to comply with the terms of this paragraph, all amounts owed to Supplier shall immediately become due and payable, and Supplier shall, have the right, but not the obligation, to setoff or equitably recoup amounts due from Purchaser against any amount then due to Purchaser, up to the total amount outstanding. Supplier may choose to suspend deliveries until all amounts due have been paid, however this shall not grant approval to Purchaser to obtain deliveries from any other source. Purchaser can not purchase fuel from any other supplier for any reason, during the term of this contract. Supplier's pursuit of any one remedy shall not preclude its pursuit of any other remedy provided by law or in equity, nor shall Supplier's pursuit of any remedy constitute a forfeiture or waiver of any amount due Supplier, or any damage accruing to Supplier, by reason of the breach or default of any obligations of Purchaser. In the event of any dispute between the parties hereto, concerning accounting for payment, prices charged, or any other matters, the cost of any proceedings, including reasonable attorney's fees incurred, shall be borne by the non-prevailing party, and reimbursed to the prevailing party.

**(e) If at any time, during the term of this Agreement, the Purchaser disputes the amount payable to Supplier for any of the motor fuel purchased hereunder, or disputes the quantity purchased, Purchaser must pay the amount Supplier believes is due, in accordance with Supplier's terms, as stated on the disputed invoice(s), and notify the Supplier, in writing, of the details of the dispute, within thirty days. Purchaser's failure to do so shall be considered as an admission by Purchaser that Supplier's invoices are correct. Supplier must initiate an investigation to Purchasers written disputes within 30 days. Suppliers failure to initiate an investigation within the 30 days shall be considered as an admission by Supplier that Purchaser's dispute is correct.**

(f) Inventory sold to purchaser will be secured by appropriate UCC-1 filing authorizations executed by Purchaser and incorporated as part of this Sales Agreement and filed in the State and Local government offices where the site is located.

**(g) Supplier may proceed to enforce payment and may exercise any and all rights available to it. In addition, Supplier reserves the right to require a security deposit, letter of credit, or personal guaranty in accordance with Supplier's Security Policy in effect from time to time.**

(h) If, in response to request by Purchaser, Supplier elects in its sole discretion to waive the full transport delivery provision of this Agreement and agrees to deliver to Purchaser in less-than-full transport load, Purchaser will be required to pay a split-load fee, in addition to other charges.

(i) Supplier will assess an administrative fee (in accordance with Supplier's NSF Policy as modified from time to time) upon Lessee for payments that are returned or rejected for any reason. All overdue sums owed to Supplier will bear interest at the maximum lawful rate per annum from the date due until paid. Further, if Lessee fails to make timely payment of any amount due Supplier, in addition to all other rights or remedies available, Supplier may take such action as Supplier deems reasonable under the circumstances. Without limiting the generality of the foregoing, Supplier may (i) set off or equitably recoup against any amount then due Lessee, (ii) defer further deliveries of the Products until payment of all outstanding indebtedness is made, or (iii) demand advance cash payment for further deliveries. Lessee shall comply with the terms of any reclamation notice issued to Lessee by Supplier under applicable Law.

4.  **Duration of Agreement.**

(a) This Agreement shall remain in full force and effect for the duration of the attached lease.

5.  **Supplier's Trademarks, Brands, and Product Quality Maintenance.**

(a) Purchaser shall sell motor fuel purchased hereunder, only under SUPPLIER brand names, and shall have the right to use the SUPPLIER trademarks, but only for the purpose of properly identifying and advertising SUPPLIER motor fuel handled by Purchaser, and in a manner and form which complies with Supplier's requirements.

(b) Purchaser shall not allow or permit any SUPPLIER motor fuel to be mislabeled, misbranded, or contaminated by mixture, or adulteration with any other motor fuel, or with any other material. This includes contamination with water. Purchaser shall maintain the integrity of underground storage tanks, which Supplier does not own, so as to preclude any water or other infiltration. Supplier shall not be liable, nor shall Supplier reimburse any customer of Purchaser for any damages, repairs or losses that result from water contaminated gasoline, dispensed into a vehicle, by Purchaser or Purchaser's agents, representatives or employees. Purchaser covenants and agrees all petroleum products purchased for resale will be purchased from Supplier, and no fuel will be purchased from another source, even if the other source is an authorized fuel distributor selling the same brand fuel.

(c) Purchaser shall not commingle any substance with SUPPLIER motor fuel, and then sell or distribute it as a SUPPLIER brand

motor fuel. Purchaser is responsible for the security of the motor fuel products once delivered. Purchaser will not allow or permit the sale or distribution of any product or motor fuel under an SUPPLIER label or designation, which is not an SUPPLIER brand product or motor fuel, or is a grade of SUPPLIER brand product or motor fuel, other than described by the label, or designation, or any pump dispensing such motor fuel; nor will Purchaser use Supplier's trademarks, trade names, or brand names in a manner which deceives, or causes a likelihood of confusion to the motoring public. Purchaser will allow Supplier, its employees, agents, or designees to enter Purchaser's place of business, at any time, to obtain such samples, or conduct such tests or inspections, or examine such records as may, in Supplier's judgment, be reasonably required to determine that Purchaser is complying with the aforesaid obligations. Purchaser shall cooperate with Supplier in any investigation of any alleged violations of the foregoing obligations.

(d) Use of Marks on Signage. Purchaser shall be permitted to acquire, and display, approved signage bearing Supplier's Marks, in connection with advertising, distribution, and or resale of products under this contract, on the retail site described in this contract. Under no circumstances will Purchaser be permitted to relocate signage, bearing Supplier's marks, to another location, without Supplier's and Supplier's written consent. Purchaser shall provide Supplier and SUPPLIER with a list of all signage, bearing Supplier's marks, in Purchaser's possession and or control, and the location of said signage, upon Supplier's and Supplier's request. In addition to the terms and conditions of this agreement, the use of Supplier's marks on all signage generally shall be governed by Supplier's Policy for Proper Handling of SUPPLIER-Branded Motor Fuels.

(e) Misuse of Marks with Purchaser's name. Purchaser shall not use any of Supplier's Marks as part of Purchaser's corporate name, or as part of Purchaser's own trademarks. If Purchaser has incorporated, using any of Supplier's marks, it will be required to amend its articles of incorporation, so as to delete Supplier's marks from its corporate name.

(f) SUPPLIER'S MARKETING RIGHTS. Supplier may, from time to time: (a) change the Identification applicable to any Product and require Alterations in accordance therewith; (b) add, change, or modify the grade, brand name, delivery package, or other distinctive designation of any Product; (c) change or modify the formulations and specifications of any Products; and (d) discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligation with respect to that Product.

(g) PERMISSION TO USE THE IDENTIFICATIONS. Purchaser agrees and understands that Supplier is not the licensee of the Identifications, and that Supplier has been granted the right to grant to Purchaser the right to use the Identifications only in connection with the storage, handling, marketing, distribution, and resale of the Products, provided that Purchaser complies with the terms of this Agreement and Supplier's image, appearance, and operating standards and requirements, including, without limitation, the following requirements relating to the marketing, storage, and resale of the Products. Purchaser shall strictly maintain the quality of all Products and shall not adulterate, commingle, or blend with Products with any other products or substances in any manner. Purchaser shall clearly identify and correctly label all Products under their proper brand names, designations, and grades. Purchaser shall not use the brand designation as part of Purchaser's Business' Entity name. Purchaser shall not use the Identifications or the brand designation in Purchaser's trade style if the use is likely to: (i) create the impression that Purchaser's business is owned or operated by Supplier or (ii) deceive or cause a likelihood of confusion to prospective customers. Purchaser understands that Supplier must approve in writing any and all sites to be branded and supplied motor fuel products (other than those sites specifically pre-approved and listed in Exhibit "A" attached) before any deliveries can be made by Purchaser to any proposed sites.

(h) Purchaser agrees that it will defend, indemnify, and hold Supplier harmless from, and against, all present and future claims, demands, suits, actions, proceedings, and litigation, arising out of any alleged liability for Purchaser's storage, transportation, distribution or delivery of petroleum products in, or through any container, tank, pump, pipe, or other element of its storage, or distribution system. Purchaser further agrees that it will, on Supplier's demand, promptly pay all losses, costs, damages, obligations, judgments, fines, penalties, expenses, and fees suffered or incurred by Supplier, by reason of any such claims, demands, suits, actions, proceedings, or litigation, except those which are caused by the sole negligence of Supplier, or its employees;

(i) Supplier warrants that unleaded motor fuel purchased by Purchaser, from Supplier, shall conform to Supplier's specifications for same, at the time of delivery. Purchaser shall notify Supplier, immediately, of any claim for variance in quality, and Supplier shall have an opportunity to inspect and investigate, at any time thereafter. Failure of Purchaser to notify Supplier, or cooperate in any investigation, shall operate as a waiver of any and all claims by the Purchaser hereunder.

6.   Product Grades. If Supplier determines in its sole discression that it should make available, to Purchaser, a product, or grade(s) of product different from those provided for herein, or should not make available, to Purchaser, a grade(s) of product provided for herein, Supplier reserves the right, at any time, to discontinue supplying any such product, covered by this Agreement, and or to substitute a different product, or grade(s) of product therefore, at any time during the term of this Agreement. In the event that any such substitution is made, any minimum and maximum quantities provided, for the product substituted for, shall apply to such replacement product, or grade(s) of product, and the price shall be Supplier's applicable Purchaser price for such replacement product. Thereafter, Supplier shall be relieved of any further liability or obligation to furnish the replaced, and or discontinued product, or grade(s) of product. Supplier Reserves the right to at anytime and for any reason at Supplier's sole option to change the "brand" of products covered in this agreement. Purchaser shall then comply with the branding requirements of the new brand. All other terms of this contract will remain in full force, unchanged. Cost associated with rebranding will be the sole responsibility of the Supplier.

7. **Market Withdrawal.** In the event Supplier elects to withdraw from marketing of motor fuels, in the area in which Purchaser's place of business is located, in compliance with the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as may be amended, from time to time, Supplier may terminate this Agreement at any time, without further liability on one hundred eighty, (180), days written notice.

8. **Supplier's Right of First Refusal and Right to purchase assets of Purchaser.** (See attached rider)

9. **Force Majeure.**

(a) Unless otherwise expressly provided for in this Agreement, failure, (in whole or in part), or delay on the part of either party, in the performance of any of the obligations imposed upon such party hereunder shall be excused, and such party shall not be liable for damages or otherwise on account thereof, when such failure or delay is the direct, or indirect, result of any of the following causes, whether or not existing at the date hereof, and whether or not reasonably within the contemplation of the parties at the date hereof, namely: Acts of God, earthquakes, fire, flood, or the elements, malicious mischief, insurrection, riot, strikes, lockouts, boycotts, picketing, labor disturbances, public enemy, war, (declared or undeclared), compliance with any federal, state, or municipal law, or with any regulation, order, rule, recommendation, request, or suggestion, (including, but not limited to, priority rationing, or allocation orders, or regulations), of government agencies, or authorities, or representatives of any government, (foreign or domestic), acting under claim or color of authority; total or partial failure or loss, or shortage of all, or any part, of transportation facilities ordinarily available to, and used by, a party hereto, in the performance of the obligations imposed by this Agreement, whether such facilities are such party's own, or those of others; or, if failure or delay be that of Supplier, total or partial loss, or shortage of raw, or component materials, or products ordinarily required by Supplier, the commandeering or requisitioning by civil or military authorities of any raw or component materials, products or facilities, including, but not limited to producing, manufacturing, transportation, and delivery facilities; perils of navigation, even when occasioned by negligence, malfeasance, default, or errors in judgment of the pilot, master, mariners, or other servants of the ship's owner; or any cause whatsoever beyond the control of either party, whether similar to or dissimilar from the causes enumerated.

(b) If by reason of any of said causes, Supplier is unable to make deliveries to all of its customers, (whether under contract or not), its failure, in whole or in part, to make deliveries to Purchaser, while delivering to others, shall not be a breach of this Agreement, and in such event Supplier may, but shall not be obligated to, prorate its available supply.

(c) Upon cessation of the cause or causes for any such failure or delay, performance hereof, shall be resumed, but such failure or delay shall not operate to extend the term of this Agreement, nor obligate either party to make up deliveries or receipts, as the case may be.

(d) Supplier may suspend deliveries, so long as its cost of performance is increased, and the increased cost cannot be recovered by an equivalent increase in the price, to be paid by Purchaser.

(e) Nothing herein contained shall excuse Purchaser from paying Supplier, when due, any amounts payable hereunder, or pursuant hereto.

10. **Practicality.**

(a) In the event Supplier's capacity to perform as to all or some of its customers, including Purchaser, becomes impractical, in Supplier's sole judgment, for any reason whatsoever, Supplier shall be relieved of its obligation to perform hereunder, and shall not be obligated to Purchaser, by reason of any delay in performance, in whole or in part, except to the extent of providing product to Purchaser, on the same allocation formula, (to be solely determined by Supplier), as other Purchaser's in the same class of trade served from the same shipping point. Supplier shall notify Purchaser, in writing, of its lack of capacity to perform hereunder. In such notice, Supplier shall advise Purchaser the quantities, if any, Supplier will be able to supply Purchaser in the foreseeable future. Within ten, (10), days thereafter, Purchaser shall notify Supplier whether it wishes to purchase such reduced quantities, where Supplier has advised that reduced quantities are available, otherwise this Agreement shall be suspended, until Supplier's capacity to perform, in Supplier's judgment, is restored.

(b) If Supplier determines that it is unable to perform hereunder, by reason of any federal, state, or local law, or regulation, order, rule, recommendation, request, or suggestion, relating to priority, rationing, or allocation of any product covered hereby, Supplier may suspend this Agreement, at any time, on ten, (10), days notice to Purchaser, until such time as Supplier determines its ability to perform is restored. Nothing herein shall be construed to extend the contract period beyond the term of this Agreement, or give rise to any cause of action, by reason of any of the provisions of this Agreement. In the event the Agreement is suspended as herein provided, Supplier shall not be obligated to make up shipments not made as a result of such suspension.

11. **Taxes.** Purchaser shall be responsible for the payment of all federal, state, and local taxes, licenses, fees and/or duties, including, but not limited to: gross receipt taxes, occupation taxes, motor fuel taxes, sales and use taxes, franchise taxes, income taxes,

ad valorem taxes, property taxes, inspection fees, license fees, and all other taxes, fees, and licenses arising from the purchase, sale, transfer, or disposition, holding for sale, transfer, or disposition, transportation of, or use of the SUPPLIER motor fuel covered by this Agreement. Should any government authority require Supplier to pay taxes, penalties, or interest which, under this Agreement, are the responsibility of Purchaser, Purchaser agrees to immediately reimburse Supplier for all amounts so paid by Supplier upon demand.

If any federal, state, or local law authorizes Purchaser to purchase the SUPPLIER motor fuel covered by this Agreement, without the payment of federal, state, or local taxes, Purchaser agrees to furnish Supplier evidence, satisfactory to Supplier, of such authority. Until Purchaser presents Supplier with acceptable evidence of such authority, Supplier shall be entitled to bill Purchaser for all applicable taxes.

12. **Customer Complaints**. Purchaser will respond to any customer inquiries or complaints, received by Purchaser or Supplier, in connection with any customer served by Purchaser, and take reasonable action to correct, or satisfactorily resolve, each such inquiry or complaint.

### 13. Standards of Appearance

Purchaser agrees to comply with SUPPLIER Standards of Appearance, including, but not limited to:

- Employees must wear approved SUPPLIER uniforms including name tags, at all times, when on duty.

- All signage must be in SUPPLIER approved colors, as designated by SUPPLIER standards manuals.

- Except for Purchasers in Delaware and the District of Columbia, Purchaser shall keep Purchaser's Station open as an attended station for the sale of Products (unless Purchaser receives Supplier's prior consent to keep open as an unattended station, which consent may be withheld consistent with applicable Law) during the hours and says of operation specified above. Supplier will adjust the hours of operation if required by Law.

- Purchasers in Delaware: Purchaser shall keep Purchaser's Station open during such hours each day and days each week as is necessary to assure that Purchaser diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patterns, customer convenience, availability of Products, and other customary criteria followed by Supplier.

- Purchasers in the District of Columbia: Purchaser shall keep Purchaser's Station open during such hours each day and days each week as is necessary to assure that Purchaser diligently and efficiently merchandises and promotes the sale of the Products, having due regard to prior practice, competitors' current practice, vehicular traffic patters, customer convenience, availability of Products and other customary criteria followed by Supplier. In no event shall Purchaser allow Purchaser's Station to be closed for more than 18 days during any calendar year.

- Purchaser shall not commit or permit any fraudulent or illegal act or activity at Purchaser's Station or in connection with Purchaser's performance under this Agreement.

- Purchaser shall not permit the consumption of intoxicating beverages or use of illegal drugs at Purchaser's Station.

- Purchaser shall not keep animals at Purchaser's Station.

- Purchaser shall keep Purchaser's Station, and the signs located at Purchaser's Station, fully illuminated during the hours of operation.

- Purchaser shall maintain Purchaser's Station in a clean, sanitary, and safe condition and all property and equipment in good operating condition and repair. Purchaser shall keep the driveways, sidewalks, and other landscaped areas in a neat and orderly appearance free from weeds, debris, snow, ice and rubbish. Purchaser shall keep the public restrooms cleaned and stocked with necessary supplies and available during operating hours.

- Purchaser shall not use Purchaser's Station for any unlawful, offensive, hazardous, unsightly, or other objectionable purpose, including, but not limited to, the sale or display of materials with dominant themes of sex, nudity, prurient interest, or pornography. Purchaser shall not display or offer for sale merchandise or paraphernalia that is morally offensive or distasteful to the general public.

- Purchaser shall keep Purchaser's Station clear of vehicles, other mobile equipment, and obstructions that restrict traffic flow, endanger customer safety, or detract from appearance. Purchaser may not use Purchaser's Station to sell, lease, park, or store motor vehicles, trailer, boats, or other mobile equipment, without Supplier's prior written consent.

- Purchaser may display signs necessary to identify the products and services offered and their prices provided the signs are displayed in a neat and orderly manner at Purchaser's Station, are not affixed to the exterior of any building or the pole support(s) for the main Identification sign(s), and are briefly worded, professional-looking, and not handwritten. Purchaser shall not display or use any other signs, posters, flags, pennants, or other advertising devices without Supplier's prior written approval.

- Purchaser shall not permit any form of gambling at the Purchaser's Service Station. Purchaser shall not install or replace any vending machine or equipment for merchandising sundry convenience items, or video or other game machine, without Supplier's prior written consent. ~

- Purchaser shall keep Purchaser's Station free from loitering by persons who have no proper business purpose at Purchaser's Station. Purchaser shall operate and maintain Purchaser's Station in a secure manner so that criminal activity is adequately deterred from occurring at Purchaser's Station and all persons at Purchaser's Station are adequately protected from injury, harm or loss.

Purchaser shall be given written notice of any failure to maintain these quality and appearance standards. Upon failure to correct said violations within thirty (30) days, (without prejudice to any other remedy available to Supplier) Purchaser, upon notice from Supplier, will discontinue the use of the Identifications granted to Purchaser by Supplier. The discontinuance of the use of the Identifications shall not terminate or affect other obligations or terms of this Agreement. Upon the failure of Purchaser to cure any violation of quality and appearance standards after notice and opportunity above, Supplier at its sole discretion (without prejudice to any other remedy available to it) may enter and maintain or repair the Purchaser's Station to bring the Purchaser's Station up to the standards of quality and appearance listed herein. If Supplier exercises this option, Purchaser will reimburse Supplier for the repair and maintenance done by Supplier.

### 14. Assignment and Delegation.

(a) Purchaser shall not assign, mortgage, pledge, hypothecate or otherwise encumber the Agreement, or any interest of Purchaser in this Agreement, or sublet or otherwise permit the use of the Premises or any part thereof, by any person or persons or entity other than Purchaser without the prior written consent of purchaser, which consent may be withheld for any reason; Any request by Purchaser to Supplier to permit and authorize any such transaction shall be in writing and shall be considered on a case by case basis with Supplier possessing the absolute and sole discretion to prohibit any such transaction. Any transfer of any kind of this Agreement by Purchaser by (but not limited to) merger, consolidation or liquidation shall constitute an assignment for purposes of this Agreement. Any attempted assignment without the Supplier's prior written consent shall be void and shall, at the option of Supplier, terminate this Agreement.

### 15. Independent Status of Purchaser.

(a) This Agreement shall not be deemed to reserve, give, or grant to Supplier any right to manage or control the day-to-day business of Purchaser, and/or the retail outlet it operates, and neither Purchaser, nor its employees or agents, shall be agents or employees of Supplier, for any reason or for any purpose whatsoever. Purchaser is, and shall, at all times, be an independent business entity that is free to select its customers, purchase, and sell non-petroleum products from sources other than Supplier, set its own selling prices, and terms of sale, and generally conduct its business, as it determines.

(b) Purchaser has the sole right to hire, control, supervise, and discharge its employees and agents, and Purchaser shall have the sole right to control the performance of, and the sole responsibility for, any maintenance or automotive repair work performed at Purchaser's place of business.

### 16. Indemnification.

(a) Purchaser, to the maximum extent permitted by law, shall defend, protect, indemnify, and hold harmless, Supplier, its partners, affiliates, and subsidiary companies, and their respective directors, officers, employees, and agents, ("Indemnified Parties"), against all claims, demands, suits, liabilities, judgments, losses, and expenses, (including, without limitation, attorneys' fees and costs of litigation, whether incurred for an Indemnified Party's primary defense, or for enforcement of its indemnification rights), on account of any personal injury, disease, or death of any person(s), damage to or loss of any property, or money damages, or specific performance owed to any third party, (by contract or operation of law), and any fines, penalties, assessments, environmental response costs, or injunctive obligations imposed upon any Indemnified Party, caused by, arising out of, or in any way incidental to, or in connection with, Purchaser's performance hereunder, or the performance, acts, or omissions, by any resale customer or consumer served by Purchaser, (including employees, agents, Purchasers, and invitees of Purchaser, and Purchaser's resale customers and consumers), or any other person.

(b) It is the intention of the parties that the indemnity obligations of Purchaser are without regard to whether the negligence, fault,

or strict liability of an Indemnified Party is a concurrent or contributory factor, and such obligations are intended to protect the Indemnified Parties against the consequences of their own negligence, fault, or strict liability. Only those matters, which are determined by a final nonappealable judgment, to be a result of the sole negligence or fault of an Indemnified Party, or defects in Supplier's products, not caused or contributed to by the negligence or fault of Purchaser or Purchaser's employees, agents, Purchasers, invitees, resale customers or consumers, shall be excluded from Purchaser's duty to indemnify the Indemnified Parties; provided, however, Purchaser shall not be relieved from its duty to defend and protect the Indemnified Parties, under such circumstances. Such duty to defend and protect the Indemnified Parties shall include, without limitation, investigation and costs of defense and settlement, including reasonable attorney's fees up through final appeal of a trial court judgment or arbitration. Supplier expressly reserves the right to participate in its defense, with counsel of its own choosing. Purchaser's indemnity obligations shall survive the expiration, termination, or non-renewal of this Agreement.

(c) Purchaser shall provide, at its sole cost, during the term of the Sales Agreement, a "Standby Bank Letter of Credit" (LOC) in an amount to be determined (and modified from time to time) by Supplier's credit department (herein after referred to as "Credit") based on evaluation of Purchasers credit worthiness as determined in Credit's sole discression, as collateral guarantee of performance of Sales and payments of sums due under this agreement. The LOC shall bind Purchaser to GLeS, Inc., t/a Sweet Oil Company a Delaware corporation, its successors and/or assigns (Supplier), provide a waiver of subrogation in favor of Supplier, and provide for written notice of cancellation or material change. Notice of cancellation or change shall not affect coverage afforded Supplier until 120 days after written notice is received. The LOC shall be delivered to Supplier prior to commencement of the agreement.

(d) Purchaser warrants that the entity that Purchaser represents (proprietorship, partnership, or corporation) is authorized to grant the rights and assume the obligations it is undertaking under this Agreement.

(e) Purchaser warrants that Purchaser has the authority to sign the Agreement on behalf of the proprietorship, partnership, or corporation, whichever is applicable.

(f) Purchaser will on request allow Supplier to inspect such documents that verify the authorizations in subparagraphs (d) and (e) of this Article.

(g) Purchaser warrants and agrees that Purchaser is personally liable, bound to meet all obligations under this Agreement undertaken by Purchaser, and is also personally liable for any breach of one or more of such obligations. The entity, if any, that Purchaser represents, also remains so bound and so liable, jointly and severally with Purchaser.

(h) **WAIVER.** Supplier's right to require strict performance of the terms of this Agreement shall not be affected by any course of dealing or usage of trade. Nor shall such course of dealing or usage of trade be relevant to, consulted, or used to interpret the Parties' intent or construction of the terms of this Agreement, nor to negate the words of this Agreement. No waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

(i) TO THE EXTENT PERMITTED BY LAW, PURCHASER SHALL NOT HOLD SUPPLIER, ITS SUBSIDIARIES, AFFILIATES AND JOINT VENTURE PARTNERS, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS ("INDEMNIFIED PARTY") LIABLE FOR, AND SHALL INDEMNIFY AND DEFEND INDEMNIFIED PARTY AGAINST, ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, JUDGMENTS, LIENS, PENAL TIES, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND LITIGATION COSTS, WHETHER INCURRED FOR AN INDEMNIFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS (COLLECTIVELY, "CLAIM"), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR HARM, INJURY, OR DEATH TO ANY PERSON, OR DAMAGE TO PROPERTY OR TO THE ENVIRONMENT ARISING OUT OF OR IN CONNECTION WITH ANY OF THE FOLLOWING MATTERS:

(1)    PURCHASER'S PERFORMANCE **OR** NONPERFORMANCE UNDER THIS AGREEMENT;

(2)    ANY ACTION OR OMISSION OF PURCHASER OR PURCHASER'S EMPLOYEES, AGENTS, PURCHASERS, ASSIGNS, OR THIRD PARTIES; AND

(3)    THE OPERATION OF PURCHASER'S BUSINESS.

(4)    PURCHASER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF ANY INDEMNIFIED PARTY BUT NOT TO ANY CLAIM SHOWN BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR ANY DEFECT IN THE PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE.

(5)    WITHIN 24 HOURS AFTER THE OCCURRENCE OF WHICH MAY RESULT IN A CLAIM, PURCHASER SHALL REPORT THE SAME TO SUPPLIER BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY WRITTEN NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOW TO PURCHASER AND PURCHASER'S EMPLOYEES.

(6)    PROMPTLY AFTER RECEIVING NOTICE, AT PURCHASER'S EXPENSE, PURCHASER SHALL INVESTIGATE, RESPOND TO, AND DEFEND ANY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE. THE INDEMNIFIED PARTYMA Y PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THE INDEMNIFIED PARTY'S SELECTION WITHOUT RELIEVING PURCHASER OF ANY OBLIGATIONS UNDER THIS ARTICLE; PROVIDED, HOWEVER, THE INDEMNIFIED PARTY SHALL BE RESPONSIBLE FOR ITS OWN ATTORNEYS' FEES. SUPPLIER SHALL REIMBURSE PURCHASER FOR THE AMOUNT OF ANY JUDGMENT AND REASONABLE DEFENSE COSTS PAID BY PURCHASER WHICH REPRESENTS THE INDEMNIFIED PARTY'S TOTAL LIABILITY FOUND BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR PRODUCT DEFECT AS SPECIFIED ABOVE.

(7)    ANY INDEMNITY OBLIGATION CONTAINED IN THIS AGREEMENT SHALL NOT LIMIT OR RESTRICT IN ANY WAY PURCHASER'S OBLIGATIONS UNDER THIS ARTICLE.

(8)    PURCHASER'S OBLIGATIONS UNDER THIS ARTICLE SHALL SURVIVE TERMINATION OR NONRENEWAL OF THIS AGREEMENT. ASSIGNMENT SUCCESSORS AND ASSIGNEE.

### 17. Credit Cards.

(a) Pursuant to the SUPPLIER Credit Card Agreement (attached), Supplier has authorized Purchaser to accept SUPPLIER Credit Cards. Purchaser shall accept SUPPLIER Credit Cards only in compliance with, and for sales authorized by the SUPPLIER Purchaser Credit Card Agreement, between Supplier and Purchaser.

(b) Purchaser acknowledges that Supplier imposes a service charge and or processing charge, for the privilege of honoring SUPPLIER Credit Cards or other credit cards, authorized by Supplier, if any, and Purchaser acknowledges that Supplier reserves the right to discontinue the extension of credit, (including the acceptance of SUPPLIER Credit Cards), or to change the terms of such service charge and/or processing charge, upon giving Purchaser at least thirty, (30), days written notice.

(c) Purchaser shall accept Suppliers Proprietary Fleet credit card for sales authorized by the Proprietary Credit Card system. It is understood acceptance of Supplier's Proprietary credit card for motor fuel purchases is mandatory for the duration of this Lease Agreement. Purchaser acknowledges that Supplier imposes a service charge and processing charge, for the privilege of honoring Suppliers Proprietary Credit Cards, and Purchaser acknowledges that Supplier reserves the right to discontinue the extension of credit, (including the acceptance of Suppliers Proprietary Credit Cards), or to change the terms of such service charge and/or processing charge, upon giving Purchaser at least thirty, (30), days written notice.

(d) Purchaser understands and accepts that Supplier reserves the right in its sole discretion to prohibit acceptance of any Fleet Credit Card which Supplier determines is in direct competition with Suppliers Proprietary Credit Card. Supplier reserves the right to allow acceptance of any Fleet Credit Cards if required under the SUPPLIER Credit Card Agreement.

(e) Credit Cards processed will be credited to Purchaser in accordance with the attached Supplier Credit Card Agreement.

### 18. Termination by Supplier.

In addition to any other rights of termination, which Supplier may have, upon the occurrence of any of the following events, under circumstances where such events are of reasonable, and of material significance, to the relationship hereunder, or upon such other grounds as are allowed under the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq., as amended from time to time, Supplier may terminate this Agreement and any or all other Agreements including but not limited to the attached Lease:

(a) If Purchaser fails to observe Supplier's rules, regulations, and requirements in effect, at the delivery point at which delivery is made;

(b) Upon default in the payment of any sum overdue;

(c) If Supplier elects to withdraw from marketing of motor fuels, in the area supplied by Purchaser, as set forth in Paragraph labeled,

Market Withdrawal;

(d) If Purchaser violates, or fails to comply with, the minimum standards as required by the provisions of Paragraph labeled, Minimum Standards;

(e) If Purchaser sells or distributes non-SUPPLIER brand products, or any mixture, or adulteration of SUPPLIER brand products, with each other, or with any other product or material, under the trademarks or brand names of Supplier, if Purchaser sells or distributes SUPPLIER brand products under brand names or trademarks other than those of Supplier, or if Purchaser uses Supplier's identifications in a manner which deceives or causes a likelihood of confusion to the motoring public;

(f) If Purchaser fails to take reasonable action to satisfy customer complaints, as set forth in Paragraph labeled, Customer Complaints;

(g) If Purchaser violates the covenants of, or fails to comply with, any of the provisions of Paragraph labeled, Credit Cards, or any provisions of the SUPPLIER Credit Card Agreement;

(h) If Purchaser fails to comply with any applicable laws, ordinances, regulations, judicial or administrative orders, or other legal requirements, of all governmental authorities, federal, state, municipal, or other authority, pertaining to this Agreement and the loading, unloading, storage, transportation, distribution and sale of petroleum products;

(i) If Purchaser fails to maintain the quality integrity of SUPPLIER motor fuel, as set forth in Paragraph labeled, Trademarks, Brands, and Product Quality Maintenance;

(j) If Purchaser attempts to sell, assign, give, grant, devise, or otherwise dispose of, Purchaser's interests in this Agreement, without the prior written consent of Supplier, as set forth in Paragraph labeled, Assignment and Delegation;

(k) If bankruptcy or insolvency proceedings are begun, by or against Purchaser, under the Bankruptcy Code, or if Purchaser becomes insolvent;

(l) If Purchaser makes or furnishes any false or misleading statement, or if Purchaser fails to disclose information to Supplier, its agents, or employees, concerning any material fact for the purpose of inducing Supplier to make any payment, to deliver product, to extend, or continue to extend, or increase credit, or to issue any credit memorandum to Purchaser, or to any other party acting in concert with Purchaser;

(m) If Purchaser fails to comply with the provisions of Paragraph labeled, Sale;

(n) If the premises are vacant, unattended, or not operated for the retail sale of motor fuels, for seven, (7), consecutive days, or such lesser period, which, under the fact and circumstances, constitutes an unreasonable period of time;

(o) If the Purchaser fails to comply with the provisions of Paragraph labeled, Health and Safety Information; or,

(p) If Purchaser dies, or becomes severely physically or mentally disabled.

(q) If Purchaser breaches any other covenant or fails to perform any other obligation or duty under this Agreement.

(r) Failure of Purchaser to maintain required insurance coverage as described above.

(s) If Purchaser fails to cure any breach or fails to pay the liquidated damages within ten (10) days after receiving written notice from Supplier, Supplier may terminate this Agreement.

(t) Purchaser agrees that the minimum quantities of products set forth in the Agreement are subject to change by Supplier, in its own discretion, on an annual basis, provided however that the minimum quantity for any year may not be set at less than eighty five percent (85%) of the actual number of gallons purchased by Purchaser during the previous year and the maximum quantity for any year.

Purchaser shall not suffer, permit, or allow the occurrence of any of the events enumerated in Sub-paragraphs (a) through (u), above. Supplier's rights of termination, or non-renewal for good cause, as defined above, shall not, in any way, be affected by any previous waiver, forbearance, except to the extent such activity has become an acknowledgment, and established course of performance, within the meaning of the Uniform Commercial Code.

19. **Training:** Purchaser's Key Management Person (herein after "Purchaser") shall attend and successfully complete any and all

training courses that Supplier or Supplier's Branded Oil Company may require for the operation of an automobile service station, motor fuel dispensing station, and convenience store. Purchaser may be required to pay the costs associated with the initial training, including costs for instructors, training materials, and the facility. Purchaser shall arrange and pay for Purchaser's own transportation, lodging and food. After the initial training, Purchaser shall attend a minimum of 3 days (24 hours) of Supplier approved advanced or refresher training courses or courses deemed appropriate by local management for each year of the term of this Agreement. Purchaser may be required to pay the costs associated with the additional training, including costs for instructors, training materials, and the facility. Purchaser shall arrange and pay for Purchaser's own transportation, lodging, and food. Purchaser shall execute Supplier's or Supplier's training agreement prior to attending any training course. Upon Supplier's or Supplier's request, Purchaser shall furnish proof of Purchaser's orientation and training for automobile service station, motor fuel dispensing station, and convenience store employees. Purchaser shall have available and utilize training equipment, materials, and programs made available by Supplier from time to time for training purposes. To enhance the expeditious meeting of safety, health, operational and customer needs, Purchaser understands that all of the courses, programs, and tests offered by Supplier will be given only in the English language.

20. **Deidentification.** If Purchaser's place of business is abandoned, unoccupied, or not operated by Purchaser, for a period of seven, (7), consecutive days, or such shorter time, as under the circumstances are reasonable, Supplier may, at its discretion, give Purchaser a written notice to remove all the SUPPLIER identification, including identifying SUPPLIER colors, from Purchaser's place of business, within five, (5), days of said notice. Should Purchaser fail to comply with said notice, Supplier is authorized to enter upon Purchaser's place of business for the express purpose of removing all the SUPPLIER identification, including painting over, or covering all the SUPPLIER identifying colors. At this time Purchaser will be invoiced for the full amount of the improvement sum advanced by Supplier and/or SUPPLIER under the amortization and loan agreement. Purchaser will have 30 days to reimburse Supplier in full for this advance.

21. **Governmental Price Control.** If Supplier's right to charge or receive any price payable, pursuant hereto, or to revise any such price as herein provided, is restricted or prohibited by law, regulation, or order of any governmental authority, Supplier may, from time to time, and upon thirty, (30), days prior, written notice to Purchaser, terminate the provisions of this Agreement, insofar as they apply to the products(s), the price(s) for which are so restricted or prohibited. Upon the expiration of the thirty, (30), days, it is understood that any such product(s) shall be deemed deleted from this Agreement, but that this Agreement shall otherwise continue to remain in full force and effect.

22. **NON-EXCLUSIVE TERRITORY** – Nothing in this Agreement grants Purchaser an exclusive territory to market and resell any Products. Supplier reserves the right to market and sell, and authorize others in any manner Supplier chooses including through its own retail stations or through designated wholesalers or other Purchasers.

23. **Health and Safety Information.**

(a) Purchaser shall distribute all health and safety information, in accordance with all applicable federal, state, and local laws, regulations and ordinances.

(b) Purchaser shall cooperate with Supplier to facilitate the dissemination of any health and safety information from Supplier, concerning the products sold hereunder. In that regard, upon request of Supplier, Purchaser shall promptly provide, to Supplier, an accurate listing of the types of uses made of products sold hereunder by Purchaser, and to provide accurate information, in response to such requests, Purchaser shall make reasonable efforts to determine the uses of products sold hereunder by Purchaser's customers. Purchaser shall also disseminate, to all persons who Purchaser can reasonably foresee may be exposed to possible hazards from the products sold hereunder, any health and safety information from Supplier, promptly, after such information is furnished to Purchaser, by Supplier, and in the manner prescribed by Supplier, including, but not limited to, dispenser decals, portable container labels, fueling area signs, and information leaflets.

24. **Notice.** Notices from Supplier to Purchaser shall be considered as properly given if personally delivered, in writing, to Purchaser or its place of business stated herein, or if placed in the United States mail, postage prepaid, addressed to Purchaser's place of business stated herein. Notices from Purchaser to Supplier shall be considered properly given if placed in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to Supplier's place of business stated herein. The postmark date shall be the date of any notice sent by United States mail. Either Supplier or Purchaser may change their respective addresses for notice purposes by providing a notice of such change in address in the manner provided above.

25. **Waiver.** The right of either party to require strict performance by the other, of any obligations imposed upon the other, by this Agreement, shall not, in any way, be affected by any previous waiver, forbearance, or course of dealing.

26. **Severability.** If, for any reason, any provision contained in this Agreement is held to be invalid, illegal, or otherwise void by a court of competent jurisdiction, the remaining provisions of this Agreement shall not be affected, and shall continue in full force and effect; provided, however, that in the event Supplier loses the right to grant the use of the SUPPLIER trademarks and brand names to Purchaser, this Agreement shall terminate, upon written notice with no further recourse by either Purchaser or Supplier

27. **Approval and Signing by Supplier.** This Agreement shall not be binding on Supplier until approved and signed, on its behalf, by a duly authorized officer or employee. Commencement of performance hereunder, prior to such approval and signing, shall, in no case, be construed as a waiver by Supplier of the foregoing requirement.

28. **Entirety of Agreement.** This Agreement is intended by the parties to be the final, complete, and exclusive embodiment of their agreement about the matters covered herein. This Agreement may not be altered, amended, or changed, in any way, except by a written instrument executed by both parties, or as otherwise provided for herein.

29. **Successors and Assigns.** All rights, obligations and liabilities herein given to, or imposed upon, the respective parties hereto, shall extend to and bind the heirs, executors, administrators, successors, and assigns of the parties, except as otherwise expressly provided herein.

30. **Definition of Supplier.** The term "Supplier" as used in this Agreement, so far as covenants or obligations on the part of Supplier are concerned, shall be limited to mean and include only Supplier or the successor-in-interest of Supplier under this Agreement at the time in question. In the event of any transfer, assignment or other conveyance of Supplier's rights, title or interests in this Agreement, the Supplier herein named (and in case of any subsequent transfers or conveyances, the then Supplier) shall be automatically freed and relieved from and after the date of such transfer, assignment or conveyance of all liability for the performance of any covenants or obligations contained in this Agreement thereafter to be performed by Supplier only if the assignee or transferee of such rights, title and interests shall agree to assume and observe and perform any and all obligations of Supplier, during the term of this Agreement. Supplier may transfer, assign and/or convey all or any part of its rights, title and interest in this Agreement without the consent of Purchaser and such transfer, assignment and/or conveyance shall not be deemed a violation on the part of Supplier or the then Supplier of any of the terms or conditions of this Agreement.

31. **Review by Legal Counsel.** Purchaser hereby acknowledges, understands and agrees that it has entered into this Agreement freely and voluntarily with the understanding that it has had the opportunity to obtain the advice of independent legal counsel.

32. **Interpretation.** This Agreement shall be governed by and construed in accordance with Delaware law. Each party accepts equal responsibility for the language herein.

33. **MARYLAND DEALER DISCLOSURES.** Where Purchaser is the owner / operator of the Purchaser's Station in the State of Maryland, Purchaser acknowledges and states that the applicable disclosures pursuant to *Maryland Code, Commercial Law,* § 11-303 set forth more fully in the Maryland Disclosure Addendum attached hereto and incorporated herein were made by Supplier prior to the execution of this Agreement.

IN WITNESS WHEREOF, Supplier and Purchaser have hereunto subscribed their names and their respective Seals.

**GLeS, Inc. d.b.a. Sweet Oil Company**

By: _____
        Officer

By: _____
        - President

By: _____
        - Secretary



## ASSIGNMENT

This Assignment is entered into this **14th day of December, 2006,** ("Assignment") by and among **GLeS Inc. t/a Sweet Oil Company,** a Delaware corporation ("Landlord"), and **Fayyad Abdallah T/A Felton BP** with offices at 12984 South Dupont Highway, Felton, DE 19943 ("Assignor"), and **Felton Petroleum, Inc.** with offices at 12984 South Dupont Highway, Felton, DE 19943 ("Assignee").

### WITNESSETH:

WHEREAS, Assignor and Landlord entered into a Lease Agreement dated **December 1, 2004** ("Lease"), in regard to the retail facility, located at **12984 South Dupont Highway, Felton, DE 19943** ("Marketing Premises");

WHEREAS, Assignor desires to assign his rights, and delegate his duties under the Lease to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree to the following:

1. Assignor shall assign, convey, delegate, and transfer Assignor's rights, duties, and obligations under the Lease, as of the date of this Assignment, to the Assignee.

2. Assignee agrees to be obligated under the terms of the Lease, and Assignee shall perform all the duties associated with the Lease.

3. Assignor agrees to be obligated to train and/or support Assignee for a period no less than forty five (45) days and until Landlord agrees Assignee has received sufficient training to meet branded dealer standards, for all operational and regulatory compliance and reporting issues including but not limited to: register and store training, inventory reconciliation, record keeping and reporting, billing and payment procedures, environmental and safety training, insurance requirements, government licensing, reporting and on site record keeping requirements and all other applicable matters with regard to the on going operation of this location

4. Assignee agrees to be obligated to direct all inquiry regarding the operation of the station to the assignor for a period of no less than forty five (45) days and until Landlord agrees Assignee has received sufficient training to meet branded dealer standards.

5. Landlord reserves the right to obligate Assignee to seek additional training at the branded training school, at Assignee's expense.

6. Landlord consents to such assignment, conveyance, delegation, and transfer with the acknowledgement of the parties hereto that the Assignor shall remain obligated and liable for the full and prompt performance of all under the terms and conditions of the Lease. In the event the Assignee defaults under any, or all, of the terms and conditions of the Lease terms, Landlord agrees to make an initial demand on Assignee before proceeding against Assignor.

IN WITNESS WHEREOF, the parties have executed this Assignment.

**ASSIGNOR: Fayyad Abdallah T/A Felton BP**

Signed: _____

By: Fayyad Abdallah _____

Title: _____

**ASSIGNEE: Felton Petroleum, Inc.**

Signed: _____

By: Samir Patel _____

Title: President _____

**LANDLORD: GLeS Inc. t/a Sweet Oil Company**

Signed: _____

By: WILLIAM N SWEET _____

Title: PRESIDENT _____



  

7443 Lee Davis Road, Suite 301, Mechanicsville, Virginia 23111  Phone: (804) 730-1568  Fax: (804) 746-1669

DIRECT DIAL EXTENSION 1141
FAX NO. (804) 417.1041
MLOPER@FASMART.COM

September 5, 2007

Felton Petroleum, Inc.
12984 South Dupont Highway
Felton, Delaware 19943

Gentlemen:

As you are aware, GPM Investments, LLC ("GPM") is the assignee of Sweet Oil's rights under the Lease Agreement dated December 1, 2004 (the "Lease"), relating to the premises at 12984 South Dupont Highway, Felton, Delaware 19943.

The term of the Lease will expire under its terms on December 31, 2007. GPM would like to extend the term of the Lease with you for additional three year term, from January 1, 2008 until December 31, 2010; however, GPM has found it necessary to increase the annual rent under the Lease to $200,000, or $16,666 per month. I have included a draft of a First Amendment to the Lease with this letter for your review. It will be important that we enter into the First Amendment on or prior to September 21, 2007.

I would like to meet with you in the near future to discuss this proposal with you, and to that end, I ask that you call me at 804.730.1568 x 1141 at your earliest convenience.

Thank you for your prompt attention to this matter.

Sincerely,

Max Loper
GPM Investments, LLC

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is made and entered into this __ day of September, 2007, by and between GPM INVESTMENTS, LLC, a Delaware limited liability company ("GPM") and FELTON PETROLEUM, INC. ("Lessee").

A.    Pursuant to a Lease Agreement dated December 1, 2004 (the "Lease"), by and between GLeS, Inc. and Fayyad Abdallah t/a Felton BP, and an Assignment dated December 14, 2006, Lessee leases the premises known as 12984 South Dupont Highway, Felton, Delaware 19943, as more particularly described in the Lease (the "Premises").

B.    Pursuant to a Master Lease Agreement dated February 23, 2007 (the "Master Lease"), by and between Gles, Inc. and Primo Properties, LLC, as landlord, and GPM, as tenant, GPM assumed all of the obligations of the landlord under the Lease, and all obligations of Lessee under the Lease are now to be made to GPM.

C.    The parties desire to amend the Lease to extend the term thereof and to provide for rental payments to be made thereunder, all on the terms and conditions herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereby agree as follows:

1.    Extension of Term.  The term of the Lease is hereby extended from January 1, 2008, through December 31, 2010.

2.    Rental Amounts.  The Lease is hereby amended to provide the following rental amounts for the term extended by this Amendment:

| YEAR | MONTHLY | ANNUAL |
|---|---|---|
| 01.01.08 – 12.31.08 | $ 16,667 | $ 200,000 |
| 01.01.09 – 12.31.09 | 17,167 | 206,000 |
| 01.01.10 – 12.31.10 | 17,682 | 212,180 |

3.    Underlying Lease.  Lessee acknowledges and agrees that this Lease is subject to all of the terms, provisions and conditions of the Master Lease, and any other arrangement under which GPM holds the Premises, and if such Master Lease shall be canceled or terminated, this Lease may be terminated or canceled without any liability on the part of GPM to Lessee.

4.    Ratification of Original Agreement.  Except as amended hereby, the Lease is hereby confirmed and ratified in its entirety.



# EXHIBIT E

## AVG. MONTHLY P & L  FOR FELTON BP STATION

| | 2007 | | |
|---|---|---|---|
| **Total Fuel Sold** | **$68,300** | | |
| Pool Mrgin | 0.15 | | |
| **Total Fuel Profit $** | **$10,245.00** | | |
| **C-Store Sales $** | **$71,500.00** | | |
| Mark-Up | 0.33 | | |
| **C-Store Gross Profit $** | **$23,595.00** | | |
| | | | |
| **Total Gross Profit $** | **$33,840.00** | | |
| | | | |
| **Expenses ( Approx.)** | | | |
| Payroll | 8,500 | | |
| Payroll Taxes | 900 | | |
| Rent Exp. | 8,840 | | |
| Credit Card Fees (2 %) | 1,995 | | |
| Fuel Card Fee (comdata/fuelman) (3.3 %) | 1675 | | |
| Equipment Lease | 50 | | |
| Auto & Truck Exp. | 650 | | |
| Gen. Op. Supplies Exp. | 150 | | |
| Advertising Exp. | 100 | | |
| Tele/Cable/Security System Exp. | 350 | | |
| Utilities/Propane/Heating Oil | 4,800 | | |
| Water/Sewer/Trash Exp. | 350 | | |
| License/Permits | 75 | | |
| Taxes | 100 | | |
| Repair/Maintenance | 500 | | |
| Insurances | 1000 | | |
| Acconting/Legal Exp. | 400 | | |
| Office/Supply Exp. | 100 | | |
| Depreciation | 0 | | |
| Interest | 0 | | |
| Misc. Exp. | 100 | | |
| | | | |
| **Operating Expenses** | **$30,635** | | |
| | | | |
| **Operating Profit** | **$3,205** | | |
| **Misc. Income** | **$850** | | |
| **(ATM/Vaccum/M.O/Lottery)** | | | |
| | | | |
| **Net Cash Flow** | **$4,055** | | |

# EXHIBIT F

September 28, 2007

TO: Max Lopar
     GPM Investment LLC

From: Samir Patel
       Felton Petroleum Inc.

RE: Fleton BP gas station and Uncle Willies

Dear Mr. Lopar,

As per our phone conversation on September 18, 2007, and your letter delivered on September 6, 2007, you're a requesting written commitment on the proposed lease amendment.  Over the past ten days, I have contacted you numerous times by phone requesting a meeting to discuss your proposal but to no avail.  Both times that I have spoken to you on the phone, I have tried to convey to you that doubling the rent (from 100k to 200K) at this location would cause me to loose money if I signed the lease and according to you I could loose my investment (approx. $450K) if I didn't sign the lease.  All of my life's savings has been put into this business, plus nine months of my time and hard work has been devoted to this business.  Just review the sales increases to confirm that what I'm saying is true.

I have to provide you a financial break down of how much rent this store can support, and have countered your offer with an offer of One hundred and twenty thousand dollars rent per year.  With one hundred and twenty thousand dollar rent everyone would be a winner.  Rent at GPM proposed two hundred thousand dollars, no franchisee would be able to survive the first year.  I understand GPM's analysis of the rent is based on "Market Value."  While I am sure the property has increased in value, I find it hard to believe it's value has doubled in three years.

Yesterday, you offered me another station in exchange for this station.  While I am agreeable to this kind of solution, I can not accept the terms of this offer.  The value and profit potential of the offered station is less then a quarter of the Felton Station.  By accepting this offer I would lose nearly all of my hard earned investment, and with such low sales and profits, I would lose even more money per year just to operate the station.

I again I'm asking you to sit down with me to come to an agreement that is suitable for each party.   I am open to discussing my proposal and any reasonable proposal you may offer.

Sincerely,

Samir Patel

# EXHIBIT G

  

7443 Lee Davis Road, Suite 301, Mechanicsville, Virginia 23111 Phone: (804) 730-1568 Fax: (804) 746-1669

DIRECT DIAL EXTENSION 1235
FAX NO. 804.417.1059
DBASSELLS@FASMART.COM

September 27, 2007

CERTIFIED MAIL &
HAND DELIVERY

Felton Petroleum, Inc.
12984 South Dupont Highway
Felton, Delaware 19943

### Notice of Termination of Franchise
### Pursuant to the Petroleum Marketing Practices Act ("PMPA")

Gentlemen:

This letter is to formally give notice pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §2801 *et seq.* that GPM Investments, LLC ("GPM") will terminate the Lease Agreement dated December 1, 2004 (the "Lease"), relating to the premises at 12984 South Dupont Highway, Felton, Delaware 19943., effective close of business on December 31, 2007.   This constitutes a termination of a franchise under the PMPA.

The grounds for termination are the failure of the GPM and you to agree to changes or additions to the provisions of the Lease, namely the proposed changes in rental rates, which proposed changes were the result of GPM's good faith determinations made in the normal course of business.

This termination is without prejudice to GPM's accrued rights.   A copy of the summary statement described in Section 104(d) of the Petroleum Marketing Practices Act [15 U.S.C. Section 2804 (d)] is enclosed herewith.

GPM Investments, LLC

By:   _____
       Donald P. Bassell, CFO

### Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Secs. 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

1.  **Reasons for Termination**

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A.  **Non-Compliance with Franchise Agreement**

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B.  **Lack of Good Faith Efforts**

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C.  **Mutual Agreement To Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D.  **Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E.  **Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1)  Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)    You declare bankruptcy or a court determines that you are insolvent.

(3)    You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)    Expiration of your supplier's underlying lease to the leased marketing premises, if:

    (a)    your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise;

    (b)    your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and

    (c)    in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)    Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)    Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)    Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)    Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)    Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)    Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)    Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)    Your conviction of any felony involving moral turpitude.

(13)    Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II.    Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A.    Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B.    Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C.    Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D.    Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III.    Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A.    How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or

nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.    Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1)    A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2)    The date the termination or non-renewal takes effect; and

(3)    A copy of this summary.

**IV.    Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.    Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B.    Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V.    Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Secs. 2801-2806.

## VI.    Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

### Further Discussion of Title I--Definitions and Legal Remedies

## I.    Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A.    Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B.    Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C.    Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D.    Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E.    Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F.    Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G.    Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II.    Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A.    Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B.    Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would

suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C.    Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D.    Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E.    Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)    To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2)    To materially alter, add to, or replace such premises;

(3)    To sell such premises;

(4)    To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)    That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

# EXHIBIT H

Dave McComas
GPM Investments

    Dear Dave,

    When we met, I thought we were on a new path to come to a compromise that both parties could agree to. Unfortunately, once again, I was the only one willing to work towards this goal.  In fact, everything you promised at the meeting was just empty promises.

**To list the promises:**
1) We were promised a list of stations that we could choose up to two stations from.  The reason you had given the two-station option was for us to have the ability to earn the same amount of profit that we would in our present location. This list was to be forwarded to us by Max Loper by e-mail ASAP.
**It took nearly 6 days for us to receive this list. (See number 4)**

2) One of the stations was Miller Road, where all new equipment was being installed and should be available soon.
**On Wednesday, we found out the Miller Road store was given to another operator, and the equipment wasn't new but used.**

3) Due to a tight timeline we were promised that a meeting would take place with Max Loper and Adam on the following Monday (11/5/07).
**Of course the meeting didn't occur until Wednesday (11/7/07).**

4) At this meeting we were promised a list of stations again, with financials by Friday (11/9/07), so we could visit the stations before next week.
**Once again, we have received nothing until we made another phone call to Max on Monday.  We received the information late Monday (11/12/07) afternoon.**

5) The list of stores and the numbers were supposed to be "real" numbers so we could make our projections.
**The numbers given shocked us.  Most of the stores had inflated C-Stores sales just to make the location look more attractive. The Bellefonte store listed sales of thirty five thousand dollars a month; in reality, the store's best month was only seven thousand dollars. Was it your hope we would not verify the numbers?  In the end all of the stores listed were money losing sites.**

Based on your actions or lack of action, we have come to the conclusion that you and GPM are not interesting in finding a solution.  As a result, we will take appropriate legal action. Legal action can be avoided if GPM agrees to pay us the purchased price of the Felton store for plus the inventory.

Sincerely,

Samir Patel

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

FELTON PETROLEUM, INC.

**DEFENDANTS**

GPM INVESTMENTS, L.L.C.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

D. Benjamin Snyder, Esq., Prickett, Jones & Elliott, P.A.
11 North State St., Dover, DE 19901, 302-674-3841

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 2801 et seq.; 28 U.S.C. 2201

Brief description of cause:
Declaratory judgment action under the Petroleum Marketing Practices Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____    DOCKET NUMBER _____

DATE  11/26/2007

SIGNATURE OF ATTORNEY OF RECORD   D. Benjamin Snyder   (DE Bar #4038)

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _ 0 7 − 7 6 0 −

# **ACKNOWLEDGMENT**
# **OF  RECEIPT  FOR AO FORM  85**

# *NOTICE OF AVAILABILITY OF A*
# *UNITED STATES MAGISTRATE JUDGE*
# *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____|_____ COPIES OF AO FORM 85.

_11/26/07_
(Date forms issued)

_Mike Bobish_
(Signature of Party or their Representative)

_Mike Bobish_
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action