**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FELTON PETROLEUM, INC.,

    Plaintiff,

v.

GPM INVESTMENTS, LLC,

    Defendant.

C.A. No. 07-760-JJF

**REDACTED VERSION**

**FELTON PETROLEUM'S <u>AMENDED</u> OPENING BRIEF IN SUPPORT OF
ITS MOTION FOR A PRELIMINARY INJUNCTION**

**PRICKETT, JONES & ELLIOTT, P.A.**

John W. Paradee  (# 2767)
D. Benjamin Snyder (# 4038)
Kevin M. Baird (# 4219)
11 North State Street
Dover, Delaware 19901
(302) 674-3841
*Attorneys for the Plaintiff*

Date:   December 31, 2007

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................ ii

NATURE AND STAGE OF PROCEEDINGS ............................................................ 1

SUMMARY OF THE ARGUMENT ..................................................................... 2

STATEMENT OF FACTS ............................................................................... 4

    Felton Petroleum and its BP Gas Station Franchise ................................................. 4

    Felton Petroleum's Lease and the Subsequent Change in
    Franchisors ..................................................................................................... 5

    GPM's Proposed Rent Increase and Termination of the Lease ............................... 6

    GPM's Arbitrary and Erratic Rent Increase Formulas ...................................... 11

    GPM's Intent to Convert the Felton BP Station to Company
    Operation ..................................................................................................... 13

    GPM's Conduct as a Franchisor ...................................................................... 14

ARGUMENT: ............................................................................................. 16

    1.    The Applicable Legal Standards .................................................... 16

    2.    The First and Third Requirements for a Preliminary
        Injunction are Indisputably Met by Felton Petroleum ..................... 17

    3.    Undisputed Facts Demonstrate Serious Questions Going
        to the Merits of the Case ............................................................... 18

        A.  GPM's proposed rent increase was not in good
        faith or based on any reasonable objective standards ........................ 19

        B.  GPM's scheme to convert the Felton BP station into a
        company station is explicitly prohibited by the PMPA .................... 21

CONCLUSION ........................................................................................... 21

i

## TABLE OF AUTHORITIES

**CASES:**                                                                          **PAGE:**

*Al's Service Center, Inc. v. BP Products North America*, 2006
WL 1697170, *2 (N.D. Ill. June 9, 2006) ........................................................................16, 18

*Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 306 (4th Cir. 1987) ...................................................17

*Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir. 1982) ..........................................................16

*Eden v. Texaco Refining and Marketing, Inc.,* 644 F.Supp. 1573 (D.Md. 1986) ....................20

*Fink v. Amoco Corp.*, 55 F. Supp. 2d 350 (W.D. Pa. 1999) .....................................................18

*Hilo v. Exxon Corp.*, 997 F.2d 641, 643 (9th Cir. 1993) .....................................................16, 17

*Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3rd Cir. 1987).....................................................16

*Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670, 672
(3d Cir. 1984)..............................................................................................................................16

*Tiller v. Amerada Hess Corp.*, 540 F. Supp. 160 (D.S.C. 1981) ..............................................19


**STATUTES:**

15 U.S.C. §2802......................................................................................................................16

15 U.S.C. §2805(b)(2) .............................................................................................................17

15 U.S.C. §2805(b)(2)(A)(ii)....................................................................................................18

15 U.S.C. §2805(b)(3)(A)..........................................................................................................18

## **Nature and Stage of the Proceedings**

In the absence of a preliminary injunction, Felton Petroleum will go out of business and this case will likely be over.

Felton Petroleum, Inc. is a small company run by Samir Patel. Through the company, he and his partners own and operate a BP gas station on the DuPont Highway in Felton, Delaware. In December 2006, Mr. Patel invested his life savings of more than $300,000 to acquire the BP station franchise. Under the current lease—originally with a company called GLeS, Inc.—Felton Petroleum pays $8,472.71 monthly for rent and nets a profit of approximately $4,000 per month.

In February 2007, the defendant GPM Investments, Inc., acquired 74 gas stations from GLeS, Inc., including Mr. Patel's BP station, ████████████. Now, GPM—the new franchisor—wants to put Felton Petroleum out of business. In September 2007, Felton Petroleum received a letter informing it that starting January 1, 2008, GPM was increasing its rent to $16,666.00 per month. Facing this devastating increase, Mr. Patel pleaded with GPM to reconsider and negotiate a more reasonable rent. GPM refused to compromise, however, and terminated Felton Petroleum's BP franchise effective January 1, 2008.

GPM's tactics violate the Petroleum Marketing Practices Act—a law passed by Congress in 1978 to protect small franchisees from oppressive franchisors. Felton Petroleum, therefore, filed this lawsuit on November 26, 2007. If Felton Petroleum's franchise is terminated, Mr. Patel will lose his company, his job, his life's savings, and his family's sole source of income.

Felton Petroleum now moves for a preliminary injunction and asks this Court to enjoin GPM from terminating Felton Petroleum's franchise until the merits of the case are adjudicated. In the absence of a preliminary injunction, Felton Petroleum will go out of business and will likely be unable to continue this litigation. The PMPA provides a relaxed preliminary injunction standard to prevent precisely such a hardship.

1

This is Felton Petroleum's Opening Brief in Support of its Motion for a Preliminary Injunction.

## Summary of the Argument

1.      The PMPA—15 U.S.C. § 2805—states that a court *shall* grant a preliminary injunction if a franchisee shows:

> (a) the franchise of which he is a party has been terminated;
>
> (b) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (c) on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

In this case, Felton Petroleum meets these three requirements for a preliminary injunction. There is no dispute that the first requirement is met. Felton Petroleum received a Notice of Termination of its franchise on September 28, 2007.

2.      Next, Felton Petroleum can demonstrate the existence of sufficiently serious questions going to the merits of this case making such questions a fair ground for litigation. To prevail on a claim under the PMPA, the *franchisee* has the burden of proving the termination of the franchise—that burden is indisputably met. The burden then shifts to the *franchisor* to come forward with evidence that the termination was proper under the PMPA.

GPM's sole stated reason for terminating Felton Petroleum's franchise was that Felton Petroleum would not agree to the nearly 100% rent increase. At trial, GPM must prove that: 1) its proposed rent increase was made in good faith and in the normal course of business; and 2) the rent increase was not a pretext for GPM to take over the franchise for itself.

2

The facts of this case demonstrate that GPM's proposed rent increase was not in good faith. The proposed rent was not based on any objective or established GPM formula. It was simply an arbitrary percentage of an unsupported and inflated "valuation" of the property the gas station is located on. The fact that GPM has continued to insist upon a rental rate that would cause the gas station to run at a $5,000 per month loss further demonstrates that the increase was proposed in bad faith.

Additionally, GPM's actions demonstrate that forcing Felton Petroleum out of the BP franchise was done to take over the franchise for itself—an act specifically prohibited by the PMPA. GPM had targeted the BP franchise for conversion to company operation and, consistent with its plans, intends to begin operating the store as a company operated store. GPM is also now marketing the franchise on terms that essentially relegate any new "franchisee" to employee status—and retain all of the benefits of franchise ownership in GPM.

3.    Finally, the balance of hardships weighs strongly in favor of granting the injunction. Without an injunction, Felton Petroleum's franchise is terminated and the company goes out of business. Mr. Patel will be out of a job and no longer have the income or means to finance this litigation. The fate of this case is directly tied to the fate of the company.    If an injunction is not granted, GPM will suffer little or no hardship. GPM—an enterprise with over $900 million in annual revenue—will continue to receive $8,472.71 in monthly rent from Felton Petroleum.    This amount was considered fair to Felton Petroleum's original franchisee and GPM's predecessor. The facts of this case, coupled with the intent of the PMPA, tip the scales strongly in favor of granting an injunction and allowing the case to be adjudicated on its merits.

Because Felton Petroleum satisfies the three requirements under the PMPA for a preliminary injunction, the Court should grant its motion.

## Statement of Facts

By agreement, and Order of the Court, the parties took limited expedited discovery in anticipation of this preliminary injunction briefing. These facts, therefore, are marshaled from the plaintiff's complaint, the depositions taken, and the written discovery produced to date.

### Felton Petroleum and its BP Gas Station Franchise

Samir Patel is an entrepreneur and exemplary small businessman. Over the past ten years, he has owned and operated numerous small businesses including three Dunkin' Donuts franchises.[1] In early 2006, Mr. Patel learned of an opportunity to buy a BP gas station franchise located at 12984 South DuPont Highway, Felton, Delaware.[2] The previous franchisee—Fayyad Abdallah—was looking to sell the business after two years of operating it. After doing some due diligence, Mr. Patel decided to buy the franchise from Mr. Abdallah.[3] Mr. Patel then sold his Dunkin' Donuts franchises, gathered together his family's assets, and invested his life's savings into the BP franchise, which he purchased on December 14, 2006.[4]

Felton Petroleum, Inc. is a Delaware Corporation created by Mr. Patel on December 12, 2006, to own and operate the BP gas station.[5] Felton Petroleum's BP station is a truck stop that presently has six fuel pumps, a convenience store, and an Uncle Willie's restaurant on the premises. Mr. Patel is the day-to-day manager and operator of the Felton BP station, where he employees eight or nine people.[6] Felton Petroleum purchased Mr. Abdallah's franchise for $333,445.00 and paid an additional $66,299.05 for the inventory of fuel and merchandise at the

---

[1] Deposition of Samir Patel at pages 11-13. Further references to depositions are abbreviated as "[Name] depo. at [page]." The cited sections of each witnesses' deposition are attached in the Appendix.
[2] Patel depo. at 18-20.
[3] Patel depo. at 20-28.
[4] Patel depo. at 27-28; 38-40.
[5] Patel depo. at 38.
[6] Patel depo. at 42.

premises.[7]  Mr. Patel also spent approximately $20,000.00 to clean and fix up the station after he took it over.[8]

Samir Patel and his wife Amita are the majority shareholders of Felton Petroleum and own 70% of the company.[9]  There are four additional minority shareholders—friends and family of the Patels—who also invested in the company.[10]  The Felton BP station provides Mr. Patel's sole source of income and health insurance.[11]

### Felton Petroleum's Lease and the Subsequent Change in Franchisors

The lease that Felton Petroleum assumed was originally between Mr. Abdallah and GLeS, Inc. ("the Lease Agreement").[12]  The term of the lease was from December 1, 2004 through December 31, 2007.  The monthly rent for the first two years was $7,331.71, after which a 7% escalator applied, resulting in a year three rent of $7,881.59, and a year four (current) rent of $8,472.71.  Felton Petroleum assumed Mr. Abdallah's lease on December 15, 2006, and has since paid $8,472.71 monthly.[13]  Before acquiring the lease from Mr. Abdallah, Mr. Patel asked the franchisor—then GleS, Inc., d/b/a "Sweet Oil"—about his rent when his lease renewed on December 31, 2007.  He was told that rent usually goes up by the Consumer Price Index plus two or three percent.[14]  This level of rent increase was acceptable to Mr. Patel so he closed on the franchise.

---

[7] Complaint at ¶14; Patel depo. at 133.
[8] Patel depo. at 45; 133.
[9] Patel depo. at 39.
[10] Patel depo. at 39-41.
[11] Patel depo. at 130-131.
[12] Complaint, Ex. "A".  The production documents cited in the brief are attached in the Appendix and are presented in numerical order by Bates stamp.
[13] Complaint, Ex. "C".
[14] Patel depo. at 36; Deposition of Darin Buono at 38; Deposition of William Heinz at 85-86; Deposition of Adam Gray at 54-55.



The defendant—GPM Investments, Inc.—is a wholly owned subsidiary of the Petro Group, Limited, an Israeli investment firm.[17]  GPM operates and/or supplies about 343 gas station and convenience store outlets in Connecticut, Delaware, Maryland, New Jersey, North Carolina, Pennsylvania, Rhode Island, and Virginia.[18]  GPM has approximately 1,800 employees and a projected 2007 revenue of approximately $900,000,000.00.[19]  GPM started its business operating its own retail motor fuel and convenience store outlets.[20]  The majority of GPM's outlets are company operated and GPM has established a substantial presence as an operator of retail outlets.[21]  To date, GPM has had only four franchisee leases come up for renewal.[22]

### GPM's Proposed Rent Increase and Termination of the Lease

On September 6, 2007, only nine months after Mr. Patel purchased the business, GPM sent him a letter stating that:

GPM would like to extend the term of the Lease with you for an additional three

---

[15] GPM0141-177
[16] Deposition of Max Loper at 32-33; Deposition of Donald Bassell at 28.
[17] Deposition of David McComas at 10.
[18] Bassell depo. at 45-46.
[19] Bassell depo. at 43-44;-142.
[20] Gray depo. at 26.
[21] Loper depo. at 24-25, 49-50; McComas depo. at 29.
[22] Loper depo. at 38-41.

year term, from January 1, 2008 until December 31, 2010; however, GPM has found it necessary to increase the annual rent under the Lease to $200,000, or $16,666 per month. I have included a draft of a First Amendment to the Lease with this letter for your review. It will be important that we enter into the First Amendment on or prior to September 21, 2007.[23]

The letter included no justification or explanation for the 97% rent increase. It simply advised Mr. Patel that his current monthly rent of $8,472.71 ($101,672.52 annually) was being raised to $16,666.00 per month ($200,000.00 annually). GPM's proposed rent would instantly turn Felton Petroleum's modest $48,660.00 annual profit into a $49,659.48 loss—putting the company out of business.[24]

In fact, Bill Heinz, the Dealer Operations Representative at GPM, had never seen a rent increase of more than five percent upon renewal, and Adam Gray, the Wholesale Operations Manager at GPM, had never seen such a large rent increase prior to GPM's increase for the Felton BP station.[25]

When Mr. Heinz delivered the letter to Mr. Patel, he told him that he did not like the rent increase and advised Mr. Patel "off the record" that he should consult with legal counsel "to protect yourself."[26] Mr. Heinz also found it unusual that GPM provided no rationale for the rent increase.[27] Mr. Gray, who was responsible for approving Mr. Patel's purchase of the franchise, testified that, if he would have known of the rent increase, he would never have approved Mr. Patel's purchase of the station.[28]

Stunned and panicked by GPM's letter, Mr. Patel began trying to make sense of the situation and come to some reasonable resolution. He immediately called Max Loper at GPM,

---

[23] Complaint, Ex. "D".

[24] Patel depo. at 47; Buono depo. at 20-22.

[25] Heinz depo. at 36; Gray depo. at 56.

[26] FEL0351; Heinz depo. at 40-45.

[27] Heinz depo. at 92.

[28] Gray depo. at 59; 101.

and left him a message asking for an explanation of what was happening.[29]  Mr. Loper returned

the call the next day and Mr. Patel explained that he desperately needed Mr. Loper's assistance

with finding a compromise because the business could not survive under the proposed increase.[30]

Mr. Loper simply stated that the rent increase was based upon the current market value of

the real estate, ████████████████.[31]  Mr. Patel explained that he had invested his entire

life's savings into the business and that he could show that the Felton BP Station could not

support a 97% rent increase.[32]  Mr. Loper suggested that he might be able to get Mr. Patel

another GPM gas station for him to operate, and that he would get back to him regarding the rent

increase.[33]

Mr. Patel subsequently left messages for Mr. Loper on September 10th, September 11th,

September 12th, and September 13th.[34]  Mr. Loper returned the calls on September 13, 2007 and

told Mr. Patel there was nothing he could do about the rent increase, which was allegedly based

upon the market value of the real estate, ███████████████.[35]  Mr. Loper then asked Mr.

Patel what rent the station could support, and Mr. Patel said he could survive an increase to

$120,000 to $125,000 per year—still a 20-25% increase.[36]  Mr. Loper said he would pass this

information on to the company and see what he could offer.

Mr. Patel followed up with a call to Mr. Loper on September 17, 2007.  The call was

returned on September 18, 2007, but all Mr. Loper said was that GPM needed a written decision

on whether Felton Petroleum was going to accept the rent increase.  Mr. Patel asked for copies of

---

[29] Complaint at ¶20.

[30] Patel depo. at 50.

[31] Patel depo. at 49; Loper depo. at 41.

[32] Patel depo. at 50.

[33] Patel depo. at 50.

[34] Patel depo. at 52.

[35] Patel depo. at 49-50.

[36] Complaint at ¶25.

the appraisals or comparables that GPM was using to value the real estate, but Mr. Loper said he could not provide him with that information. At the conclusion of the call, Mr. Loper said that he would try to get Mr. Patel another week to decide and would try to set up a meeting with a GPM official to discuss the issue.[37]

On September 27, 2007, Mr. Patel again spoke with Mr. Loper, who stated that GPM was unwilling to compromise on the rent increase or offer any compensation to Mr. Patel.[38] Mr. Loper again proposed that Mr. Patel take over another GPM gas station. However, the location offered by GPM was worth, at most, less than a quarter of the value of Mr. Patel's Felton BP station. Mr. Loper then gave Mr. Patel until 5:00 p.m. on September 28, 2007 to decide whether to accept the rent increase or the new location.[39]

Still hoping for a compromise—or at least good faith negotiations—Mr. Patel sent a letter to GPM reiterating his conversations with Mr. Loper and asking that a representative from GPM meet with him to reach an amicable resolution.[40]

On September 28, 2007, Mr. Patel's offers for compromise and pleas for help were met with a Notice of Termination. In a letter dated September 27, 2007 and delivered on September 28, 2007 at 3:30 p.m., GPM informed Mr. Patel that it was terminating his Lease Agreement under the PMPA for:

> failure of the GPM and you to agree to changes or additions to the provisions of the Lease, namely the proposed changes in rental rates, which proposed changes were the result of GPM's good faith determinations made in the normal course of business.[41]

After the termination letter, and at the demand of his legal counsel, Mr. Patel finally got a

---

[37] Complaint at ¶27.
[38] Complaint at ¶28.
[39] Patel depo. at 53-54.
[40] Complaint, Ex. "F".
[41] Complaint, Ex. "G"; Patel depo. at 54-55.

face-to-face meeting with GPM executives at GPM's corporate headquarters in Mechanicsville, Virginia on November 2, 2007.[42]  At the meeting, GPM's representatives reiterated that the rent increase was calculated by ███████████████████████

████████████████████████████████████████

████████████████████████████████████

Mr. Patel showed the GPM representatives his financials and explained that his station could not support an annual rent of $200,000.00.[44]  In response to the suggestion that no franchisee could operate the Felton BP station at that rent, GPM's CEO responded that GPM could double the sales at the store if GPM took it over and operated the store itself.[45]  GPM again proposed that Mr. Patel consider taking over two other gas stations in Delaware that GPM suggested would equal the income from the Felton BP station.[46]  Amenable to this suggestion, Mr. Patel investigated the proposed stations.[47]

After reviewing the financials for the proposed gas stations, Mr. Patel quickly recognized that GPM has misrepresented the actual sales numbers for the proposed stations, and their combined income would actually only generate one-tenth of the annual profit of his BP station in Felton.[48]  On November 16, 2007, Mr. Patel sent a letter to GPM explaining this and, shortly thereafter, filed this lawsuit.[49]

---

[42] Patel depo. at 56.
[43] Complaint at ¶33.
[44] Complaint at ¶34.
[45] Complaint at ¶34.
[46] Patel depo. at 57-59.
[47] Patel depo. at 58-67.
[48] Patel depo. at 66-67; Buono depo. at 27-28.
[49] Complaint, Ex. "H".

### GPM's Arbitrary and Erratic Rent Increase Formulas

GPM's rationale for the rent increase at the Felton BP station was that it based the new rent on a 10% return on the value of the property—set forth in the Master Lease between GPM, GleS, Inc. and Primo Properties.[50]



GleS, Inc. just arbitrarily "assigned" this value during its negotiations with GPM.[53] GPM's sole due diligence in approving GleS's valuation of the property consisted of a single visit to the station.[54] GPM did not have an appraisal done, nor did it contact Mr. Patel to find out his sales figures.[55]

According to the deed to the Felton BP station property, the entire station—property and facilities—was bought by GleS, Inc. for only

---

[50] Loper depo. at 41.
[51] GPM0176
[52] Bassell depo. at 85-87; GPM7327 (emphasis added).
[53] Loper depo. at 46-47; McComas depo. at 31.
[54] McComas depo. at 31-36.
[55] McComas depo. at 31-36; Bassell depo. at 105, 111.
[56] McComas depo. at 42-43; Bassell depo. at 106-107.

$1,043,000.00 in October of 2003.[57]  GPM has given no explanation as to how the property has more than doubled in value in the past four years.

Yet, GPM now claims to have relied in good faith and in the ordinary course of business upon these valuations in setting Felton Petroleum's rent.  GPM's rent increases, however, have been anything but uniform. ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████

GPM has also offered Mr. Patel any two of four other sites, as essentially a swap, for the Felton BP station. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  When asked why Mr. Patel was not offered these alternative rent calculations, Mr. Loper responded simply that he did not "have a good reason."[63]

---

[57] FEL0382-386.

[58] Interestingly, the Berlin station has also complained about its rent increase and was granted a three month extension of its current rent to await the outcome of the present proceedings.  GPM00114-116; Bassell depo at 77-78.

[59] Bassell depo. at 30-34; GPM0176.

[60] Bassell depo. at 30-34.

[61] Loper depo. at 90-93; FEL0380; GPM0176-177.

[62] Loper depo. at 92-93.

[63] Loper depo. at 93.

### GPM's Intent to Convert the Felton BP Station to Company Operation

The reason for GPM's insistence upon a nearly 100% rent increase for the Felton BP station is explained by internal GPM documents. ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

GPM's CEO testified that this document did not "target" the Felton BP station for company conversion, but merely that "[the Felton BP station] was predicted to be [converted to company operation]."[67]  This was because GPM "believed that the rent increases were going to be too great for the dealer to sustain, and we thought we were going to have to operate it, at least for a short time."[68] ████████████████████████

████████████████████████████████████



In response to the suggestion that Mr. Patel (or any other dealer for that matter) could not afford the $200,000.00 per year rent, Mr. McComas explained that GPM could double sales if it

---

[64] GPM1541-1543; McComas depo. at 37-39.
[65] McComas depo. at 37-39; Bassell depo. at 133-134; GPM1541-1543.
[66] Loper depo. at 29.
[67] McComas depo. at 41.
[68] McComas depo. at 39-40.
[69] GPM0132 (emphasis added).

took over operation of the Felton BP store.[70]  This was not a spontaneous or random comment. GPM's CFO admitted that GPM's current plan is to operate the store if the increased rent is not accepted.[71]

Wanting to keep the Felton BP station for its own, GPM has not circulated the Felton BP station among its dealer network or otherwise offered the station to any dealers.[72]  Instead, in November, GPM listed the Felton BP station for sale with a broker.[73]  The listing proposes the sale of Felton BP station with the buyer leasing the property back to GPM under a 20-year lease.[74]  The listing states that the Felton BP station was "recently acquired by the operator," and identifies GPM as the potential tenant of the Felton BP station.  GPM claims that the reference to GPM as "the operator" was a mere error.[75]  The listing also identifies the Felton BP station "will soon be rebranded to Valero."  According to GPM, this was an error as well.[76]

### GPM's Conduct as a Franchisor

Since December 2006, Mr. Patel has worked diligently to clean the station and increase sales.[77]  He has timely paid his rent and is in good standing as an operator.[78]  Mr. Patel's hard work, loyalty, and productivity have not been reciprocated.

GPM's actions have made it clear from the beginning that GPM had no intention of dealing with Felton Petroleum in a fair and equitable manner.  For example, when Mr. Patel purchased the Felton BP Station, he was assured that the restrooms, which were in severe

---

[70] Loper depo. at 89; McComas depo. at 65; 68.
[71] Bassell depo. at 65-66.
[72] Loper depo. at 61-62.
[73] Bassell depo. at 132-133.
[74] McComas depo. at 62.
[75] Bassell depo. at 142.
[76] Bassell depo. at 143.
[77] Heinz depo. at 45-48.
[78] Heinz depo. at 90; 109.

disrepair, would be renovated.[79]  According to Mr. Heinz, these renovations are "desperately needed."[80]  Although GPM recognizes this, it has still not provided the promised renovations causing Felton Petroleum to lose business at its Uncle Willie's restaurant, where customers are reluctant to eat given the dilapidated condition of the nearby restrooms.

GPM has also not been competitively pricing its motor fuel for sale to Felton Petroleum. Mr. Patel's buying price is often equal to its surrounding competitor's retail price.[81]  The GPM station located in Bridgeville, Delaware has been selling its motor fuel at retail at the same price that Mr. Patel is buying his fuel.[82]  Yet, for some time, GPM actually increased its margins (and therefore Mr. Patel's purchase price) on the motor fuel it sold to the Felton BP station.[83]  This is all despite the fact that a competing Royal Farms truck stop was recently opened thirteen miles down the road from the Felton BP station.[84]  GPM's actions have therefore made the Felton BP station less competitive.

GPM has also failed to pay money it admittedly owes to Mr. Patel.  GPM improperly swept approximately $4,356.68 out of Mr. Patel's bank account for the cost of replacing the air conditioning unit and $529.23 for cash register repairs, which were both the responsibility of GPM.[85]  To date, and despite repeated requests, GPM has not returned Mr. Patel's money.[86]

---

[79] Patel depo. at 45.

[80] Heinz depo. at 110.

[81] Patel depo. at 43-44; Heinz depo. at 79-80.

[82] Heinz depo. at 80.

[83] Loper depo. at 110-111.

[84] Patel depo. at 92-93; Heinz depo. at 114-115.

[85] Heinz depo. at 56-62; 82.

[86] Heinz depo. at 56-62, 107.

## **Argument**

1.   **The Applicable Legal Standards**

The PMPA was enacted because of "the disparity of bargaining power which exists between the franchisor and the franchisee" in the gasoline industry.[87]   Courts have noted that "the overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship."[88]   Congress "enacted the PMPA in an effort to protect franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises."[89]   "Most important, the one thing the Act is clearly intended to prevent is the appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a successful going concern."[90]   Consistent with its general goals, the PMPA makes it difficult, but not impossible, for a franchisor to terminate or not renew a franchise by generally prohibiting these actions.[91]

The PMPA creates the presumption that any termination or nonrenewal of a franchise is unlawful by allowing franchisors to terminate a franchise only for certain grounds and by requiring franchisors to give adequate notice of their intent to terminate the franchise.[92]   As remedial legislation, the PMPA "must be given a liberal construction consistent with its goal of protecting franchisees."[93]

---

[87] S.Rep No. 95-731, 95th Cong., 2d Sess. 15 ("Senate Report") 1, 17.

[88] *Hilo v. Exxon Corp.*, 997 F.2d 641, 643 (9th Cir. 1993) (quoting *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987)).

[89] *Al's Service Center, Inc. v. BP Products North America*, 2006 WL 1697170, *2 (N.D. Ill. June 9, 2006) (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir. 1982)).

[90] *Id.*

[91] *Id.*

[92] *Id. See also*, 15 U.S.C. § 2802; *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670, 672 (3d Cir. 1984).

[93] *Hilo*, 997 F.2d at 643.

At the preliminary injunction stage, "[t]he test for the issuance of a preliminary injunction under the PMPA is more liberal than that in the general run of cases."[94]   Section 2805(b)(2) of the PMPA makes the grant of a preliminary injunction *mandatory* if:

> (A) the franchisee shows-
>
> > (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
> >
> > (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.[95]

Thus, the PMPA's requirements stand in marked contrast to the usual standard, under which the moving party must demonstrate a likelihood of success on the merits and irreparable harm to its interests from the denial of relief before a preliminary injunction may be granted.[96]

## 2.   The First and Third Requirements for a Preliminary Injunction are Indisputably Met by Felton Petroleum

GPM does not dispute that Felton Petroleum's franchise was terminated.   It's September 27, 2007 "Notice of Termination" makes that fact clear.[97]

It is also beyond reasonable dispute that the balance of hardships strongly tips in Felton Petroleum's favor.   A preliminary injunction will have virtually no effect on GPM.   GPM is a multi-million dollar organization with almost a billion dollars in annual revenue.   Mr. Patel will

---

[94] *Id. See also, Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 306 (4th Cir. 1987) (statute "was designed to benefit the small retailer, and its standard for preliminary injunctions was intentionally drawn to facilitate the grant of injunctive relief.").

[95] 15 U.S.C. § 2805(b)(2).

[96] *Hilo*, 997 F.2d at 643.

[97] FEL0338.

continue to competently run the Felton BP station and GPM will continue to receive its $8,472.71 monthly rent during the injunction period.

In the absence of an injunction however, Felton Petroleum and Mr. Patel will lose everything. Once the franchise is terminated, Felton Petroleum will be out of business. Mr. Patel will lose his life's savings, health insurance, and his family's sole source of income. Additionally, Mr. Patel's employees will likely lose their jobs as well. In cases with similar facts, courts have concluded that where a small franchisee will be put out of business by a large corporate enterprise, the balance of hardships weighs in favor of the franchisee.[98]

The only issue for purposes of this motion, therefore, is whether "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation."[99]

### 3.    Undisputed Facts Demonstrate Serious Questions Going to the Merits of the Case

Under the PMPA, a franchisor is required to renew a franchisee's contract unless certain statutory requirements are met. In this case, GPM's only stated statutory grounds for termination of Felton Petroleum's franchise is 15 U.S.C. § 2802(b)(3)(A).[100] Under this provision, a franchisor may terminate a franchise only if the following conditions are met:

> The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if –
>
> (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

---

[98] *See Al's Service Center, Inc. v. BP Products North America*, 2006 WL 1697170, *3 (N.D. Ill. June 9, 2006); *Fink v. Amoco Corp.*, 55 F. Supp. 2d 350 (W.D. Pa. 1999).
[99] 15 U.S.C. § 2805(b)(2)(A)(ii).
[100] FEL0338.

GPM's termination of Felton Petroleum's franchise does not meet either of these requirements. The facts at this stage demonstrate that there exists sufficiently serious questions going to the merits of each of these requirements to make such questions a fair ground for litigation. Felton Petroleum's motion, therefore, must be granted.

### A.    GPM's proposed rent increase was not in good faith or based on any reasonable objective standards.

First, a substantial question exists about whether GPM's proposed 97% rent increase was the result of determinations made by the franchisor in good faith and in the normal course of business. Under this section of the PMPA, the test for good faith focuses on the franchisor's "subjective good faith" and not an objective reasonableness of the franchisor's act.[101] This test is meant to "preclude sham determinations from being used as an artifice for termination or non-renewal."[102] GPM's rent increase was neither in good faith nor in the normal course of business.

The justification given by GPM for the rent increase is that it is based upon ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████

GPM's steadfast refusal to compromise—or even negotiate—combined with a proposed rent increase that it felt only a GPM-run station could meet, demonstrates that the proposed rent increase was not in good faith. In fact, it shows that the increase is nothing more than a pretext for GPM to take over the station for itself—precisely what the PMPA prohibits.

GPM's offers to give Mr. Patel other stations in exchange for his Felton BP station also evidence bad faith and a motive to usurp operation of the Felton BP station. Mr. Patel was given sales numbers that were entirely inaccurate and inflated, in an attempt to convince him to trade

---

[101] *See Tiller v. Amerada Hess Corp.*, 540 F. Supp. 160 (D.S.C. 1981) (granting preliminary injunction enjoining franchisor's rent increase).

[102] *Id.* (quoting Senate Report, pp. 873, 895-96).

his franchise for two other franchises that were almost worthless. GPM's representations that Mr. Patel was getting an equivalent trade were demonstrably false.

Additionally, there is no evidence that GPM's proposed rent increase was done in the normal course of business. In fact, GPM has used at least four other formulas in calculating rent for other outlets, all of which involved rent increases that were less than a ten percent return upon the value set forth in the Master Lease. None of these formulas were applied or offered to the Felton BP station.

GPM's bad faith is also demonstrated by at least the following facts:

(1)    GPM did not consider the financial records for the Felton BP Station in calculating the rent;

(2)    GPM did not even consider the competitive market, including the recent opening of a nearby Royal Farms Truck Stop, in calculating the rent;

(3)    GPM did not have an appraisal done to determine the actual value of the Felton BP Station's real estate;

(6)    GPM gave the Plaintiff only fifteen days to consent to a doubling of its rent; and

(7)    GPM then terminated the franchise prior to the September 28, 2007 deadline, to which it had consented, only agreeing to meet with Mr. Patel after it terminated the franchise.[103]

The facts demonstrate that GPM's rent increase was not the product of a good faith determination or made in the ordinary course of business. At the least, the facts demonstrate that there exists sufficiently serious questions going to the merits to make such questions a fair

---

[103] *See Eden v. Texaco Refining and Marketing, Inc.,* 644 F.Supp. 1573 (D.Md. 1986) (noting that, at the time a non-renewal notice is sent, the reason upon which it is based must exist) (opinion withdrawn by consent of parties).

ground for litigation.    Felton Petroleum, therefore, satisfies the requirement for a preliminary injunction.

**B.**    **GPM's scheme to convert the Felton BP station into a company station is explicitly prohibited by the PMPA.**

As GPM's internal documents reveal, the Felton BP station was targeted long before the rent increase was calculated for conversion to company operation by GPM.    Indeed, if Felton Petroleum's franchise is terminated, the facts show GPM, through its agents, will take it over for itself.    Thus, even if GPM's proposed rent increase was in good faith, the PMPA explicitly prohibits termination for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor.    GPM's conduct demonstrates that is exactly what it plans to do.

## Conclusion

The PMPA was enacted by Congress to address the exact circumstances of this case. GPM—a party with superior leverage and resources—wants to put Felton Petroleum and Mr. Patel out of business.    Seeing the profitability of Felton's BP station—largely due to Mr. Patel's hard work and diligence—GPM now wants to take the station, and its profits, over for itself without the costs inherent in a buyout of the franchisee.    This is exactly the type of conduct the PMPA was created to prevent.

Felton Petroleum meets the statutory requirements for a preliminary injunction.    There is no dispute that its franchise was terminated by GPM.    It is also beyond reasonable dispute that the balance of hardships strongly weighs in favor of the injunction.    Under an injunction it is simply business as usual for GPM.    Without an injunction, Felton Petroleum goes out of business and this litigation likely ends.

Additionally, the facts demonstrate that GPM's proposed 97% rent increase was not based on any good faith measures. Instead, it was part of GPM's broader plan to take over high volume, profitable franchisee-run stations and turn them into company operations. Even at this early stage, Felton Petroleum has shown that a sufficiently serious question going to the merits exists to make such questions a fair ground for litigation.

Under the PMPA's relaxed preliminary injunction standard, and in the interest of justice, Felton Petroleum's motion must be granted.

**PRICKETT, JONES & ELLIOTT, P.A.**

/s/ D. Benjamin Snyder
John W. Paradee  (# 2767)
D. Benjamin Snyder (# 4038)
Kevin M. Baird (# 4219)
11 North State Street
Dover, Delaware 19901
(302) 674-3841
*Attorneys for the Plaintiff*

22

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2008, a true and correct copy of the **REDACTED VERSION OF FELTON PETROLEUM'S AMENDED OPENING BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** was served on the following parties in the manner indicated:

### BY HAND-DELIVERY

Michael R. Robinson, Esquire
MRobinson@saul.com
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266

/s/ D. Benjamin Snyder
D. Benjamin Snyder (# 4038)
dbsnyder@prickett.com