# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FELTON PETROLEUM, INC., a
Delaware corporation,

        Plaintiff,

      v.

GPM INVESTMENTS, LLC, a Delaware
limited liability company,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:

C.A. No.  07-00760-JJF

**REDACTED VERSION**

---

## DEFENDANT GPM INVESTMENT, LLC'S
## ANSWERING BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

OF COUNSEL

Brian T. Guthrie
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7777 (phone)
(215) 972-7725 (fax)
bguthrie@saul.com
mhill@saul.com

Dated:  January 14, 2008

Michael R. Robinson (DE Bar No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware  19801-1611
(302) 421-6800 (phone)
(302) 421-6813 (fax)
mrobinson@saul.com

*Counsel for Defendant*
*GPM Investments, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................iii

NATURE AND STAGE OF THE PROCEEDINGS .......................................................1

SUMMARY OF ARGUMENT ..........................................................................................2

STATEMENT OF FACTS ..................................................................................................3

    A.    The Parties. .................................................................................................3

    B.    Mr. Patel Purchases the Felton Franchise. ..........................................4

    C.    GPM's Efforts to Acquire GLeS's Assets. ...........................................6

    D.    The Master Lease Agreement. .................................................................8

    E.    GPM Creates Its Rent Calculation and Offers Mr. Patel a New Lease. ........10

    F.    GPM Offers Mr. Patel Alternatives to Running the Felton Franchise.............12

    G.    GPM Anticipates Severe Losses if Its Rental Plan Is Not Accepted.............14

ARGUMENT..........................................................................................................................16

    I.    STANDARD OF PRELIMINARY INJUNCTION UNDER THE PMPA ...............16

    II.    PLAINTIFF HAS FAILED TO SHOW THE EXISTENCE OF SERIOUS QUESTIONS GOING TO THE MERITS SUFFICIENT TO JUSTIFY THE EXTRAORDINARY REMEDY OF COMPELLING THE CONTINUATION OF THE LEASE. ................................................................................................................17

    A.    The Calculation for the New Rents Was Determined in Good Faith and in GPM's Normal Course of Business.............................................................18

    B.    The Reasonableness of GPM's Business Judgment Is Not at Issue. .............19

    C.    A Rent Increase of 97% Is Not Evidence of Bad Faith. ...............................20

    D.    GPM's Acceptance of GLeS's Valuation of Property Was Proper. ..............22

    E.    Adverse Effect on Felton Petroleum Is Not Relevant to the Court's Inquiry of GPM's Good Faith or Its Acting in the Normal Course of Business. .......24

    F.    GPM Gave Adequate Notice and Complied with the Terms of the PMPA...26

III.    THE BALANCE OF THE HARDSHIPS WEIGHS IN GPM'S FAVOR. ...............27

IV.    IN THE ALTERNATIVE, SHOULD THE COURT ISSUE A PRELIMINARY INJUNCTION, IT SHOULD REQUIRE PLAINTIFF TO POST A BOND SUFFICIENT TO MAKE GPM WHOLE..................................................................29

CONCLUSION ...........................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353 (D. Conn. 1989) .................................................. *passim*

*Baldauf v. Amoco Oil Co.*, 553 F. Supp. 408 (W.D. Mich. 1981), *aff'd*, 700 F.2d 326 (6th Cir. 1983) .......................................................................................................................................24

*Beirne v. Getty Petroleum Corp.*, 707 F. Supp. 632 (E.D.N.Y. 1988) ..............................21, 24, 27

*Bellmore v. Mobil Oil Corp.*, 524 F. Supp. 850 (D. Conn. 1981), *aff'd*, 672 F.2d 899 (2d Cir. 1981) ........................................................................................................................................20

*Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 788 F. Supp. 616 (D. Mass. 1992) ..... *passim*

*Darling v. Mobil Oil Corp.*, 864 F.2d 981 (2d Cir. 1989) ...............................................................19

*Dass v. Tosco Corp.*, 136 Fed.Appx. 21 (9th Cir. 2005) .................................................................29

*Duff v. Marathon Petroleum Co.*, 51 F.3d 741 (7th Cir. 1995) ....................................17, 18, 20, 22

*Duff v. Marathon Petroleum Co.*, 863 F. Supp. 622 (N.D. Ill. 1994) .......................................19, 24

*Esso Standard Oil Co. v. Dept. of Consumer Affairs*, 793 F.2d 431 (1st Cir. 1986)...............18, 20

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13 (1st Cir. 2006) ..................................18, 19

*Ferriola v. Gulf Oil Corp.*, 496 F. Supp. 158 (E.D. Pa. 1980) .........................................20, 21, 25

*Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3d Cir.1990).....................................29

*Lippo v. Mobil Oil Corp.*, 802 F.2d 975 (7th Cir. 1986) .........................................................18, 22

*Meyer v. Amerada Hess Corp.*, 541 F. Supp. 321 (D.N.J. 1982) .......................................... *passim*

*Mobil Oil Corp. v. Vachon*, 580 F. Supp. 153 (D. Mass. 1983) ....................................................17

*Munno v. Amoco Oil Co.*, 488 F. Supp. 1114 (D. Conn. 1980).............................................18, 20

*N.I. Petroleum Ventures Corp. v. GLeS, Inc.*, 333 F. Supp.2d 251 (D.Del. 2004)............16, 17, 27

*O'Shea v. Amoco Oil Co.*, 886 F.2d 584 (3d Cir. 1989).................................................................19

*Palmieri v. Mobil Oil Corp.*, 529 F. Supp. 506 (D. Conn. 1982) .................................19, 20, 24, 25

*Palmieri v. Mobil Oil Corp.*, 682 F.2d 295 (2d Cir. 1982)............................................................19

*Sexe v. Husky Oil Co.*, 475 F. Supp. 135 (D. Mont. 1979) ...................................................25

*Wesley v. Mobil Oil Corp.*, 513 F. Supp. 227 (E.D. Pa. 1981) .............................................25

### RULES AND STATUTES

Fed. R. Civ. P. 65(c) ...........................................................................................................29

15 U.S.C. § 2801, *et seq.*....................................................................................................17

5 U.S.C. § 2804(c)(3)(A) ...................................................................................................26

5 U.S.C. § 2805(b)(2) ...................................................................................................16, 27

15 U.S.C. 2805(b)(3) .........................................................................................................29

## NATURE AND STAGE OF THE PROCEEDINGS

GPM Investments, LLC ("GPM") assumed 28 leases as part of a transaction it completed with GLeS, Inc. (or "GLeS") in March 2007. One of the leases was for a gasoline and convenience store franchise in Felton, Delaware being leased by Felton Petroleum. The lease for the Felton station was set to expire on December 31, 2007. In September 2007, GPM submitted to Felton Petroleum a proposed renewal lease with rental rates different than it was paying under its existing lease. Felton Petroleum refused to agree to such terms. After attempts to negotiate failed, Felton Petroleum brought this lawsuit challenging GPM's actions under the 15 U.S.C. § 2801, *et seq.* (the "PMPA"). Subsequent to bringing this action, Felton Petroleum filed a motion seeking the preliminary injunctive relief of maintaining the 2007 rent levels for Felton Petroleum until this Court can adjudicate its claim. This is GPM's Answering Brief in Opposition to Plaintiff's motion for preliminary injunction.

GPM opposes Felton Petroleum's request to maintain the status quo between the parties. If such status quo is ordered, however, GPM respectfully requests that the Court requires Felton Petroleum to post a bond sufficient to protect GPM from the losses it is incurring as well as the losses it will continue to incur pending trial on the merits – if that trial occurs at all. If the Court were able to hold trial in this matter before the end of 2008, for instance, such bond would not need to be any more than $93,199.81. Summary judgment disposition in early summer would require less.

## SUMMARY OF ARGUMENT

1.      Plaintiff is requesting that this Court issue an injunction to keep the status quo between the parties pending resolution of this action at trial on the merits or otherwise.  GPM objects to keeping the status quo between the parties pending such resolution, but requests that if such status quo is ordered that an appropriate bond be required sufficient to compensate it for the losses it is incurring due to the difference in rent Felton Petroleum is currently paying and the rent that GPM requires that it pay under a new lease.

2.      Felton Petroleum cannot meet its burden of proof that serious questions going to the merits exist in order to issue the extraordinary relief of the continuation of an expired lease. There is no evidence that GPM acted in bad faith or outside of the normal course of its business when it calculated the new rent for the Felton franchise.  The rent calculation is ███████ ██████████████████████████████████ and was offered to the two lessee dealer stations that had leases set to expire on December 31, 2007.  ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

4.      Balancing the hardships tips in GPM's favor.  Mr. Patel made a very risky business investment when he put together an investment group to purchase a gasoline and convenience store franchise with only one year left on its lease and with knowledge that a new landlord was going to take over the property.  GPM has endeavored to help Felton Petroleum take over other stations.  ██████████████████████████████████████ █████████████████████████████████████████

## STATEMENT OF FACTS

A.    **The Parties.**

Samir Patel, the principal of Felton Petroleum, is a mechanical engineer by training who since coming to the United States has made his living by investing in franchise businesses.[1]  He has had more than 10 years experience in the Dunkin' Donuts franchise business,[2] but had no experience in running a gas station or convenience store prior to purchasing the Felton franchise business.  Mr. Patel created plaintiff Felton Petroleum, Inc. in order to purchase the Felton franchise from Fayad Abdallah T/A Felton BP (the "Felton franchise") in mid-December 2006.[3]  Mr. Patel currently controls and operates plaintiff Felton Petroleum, Inc.[4]

GPM Investments, LLC ("GPM") is a Delaware limited liability company with principal place of business in Mechanicsville, Virginia.[5]  GPM has traditionally had a business model of operating its own gasoline stations and convenience stores.[6]  After its acquisition of the Sweet Oil assets (as described below), GPM's business model expanded to include several channels through which it operates – company-operated sites, dealer-operated sites, company-owned, retailer-operated ("CORO") sites, and commission and/or consignment supply arrangements, and

---

[1]    Deposition of Samir Patel at 5-7.  Hereafter references to deposition transcripts will be as "Deponent Dep. at [___]".  True and correct copies of the referenced deposition transcripts are included in Defendant's Appendix submitted herewith.

[2]    Patel Dep. at 6.

[3]    Patel Dep. at 26.

[4]    Darrin Buono Dep. at 44-45.

[5]    GPM has two officers – its CEO, David McComas, and its CFO, Don Bassell.  Mr. McComas has over 30 years of experience in the management and operation in the service station and convenience store industry, David McComas Dep. at 20-23, and Mr. Bassell has over 20 years running the financial aspects of companies in the same industry.  Don Bassell Dep. at 20-21, 33-36.

[6]    Max Loper Dep. at 24.

GPM is making a significant effort to grow its dealer-operated business.[7]  Currently, GPM operates approximately 205 convenience stores under the trade names "Fas Mart" and "Shore Stop" and also supplies fuel to approximately 135 independent third party dealers in the states of Virginia, Delaware, Maryland, North Carolina, Rhode Island, Tennessee, Pennsylvania and Connecticut.[8]  In March 2007, GPM purchased the assets of GLeS, Inc. ("GLeS"), T/A Sweet Oil, including the trade name "Sweet Oil."[9]  The Felton franchise lease was entered into between GLeS and the franchisee from whom Felton Petroleum purchased its business.[10]  GLeS operated under the business model of having all of the stores it owned being dealer-operated.[11]  In general, GLeS (or its affiliate, Primo Properties, LLC) owned the land on which its dealers operated and supplied gasoline to such dealers pursuant to supply contracts.[12]  GLeS also had a number of supply contracts with dealers who owned their own stations.  As described below, this is the type of business into which GPM was looking to expand.

### B.    Mr. Patel Purchases the Felton Franchise.

In the Summer of 2006, Mr. Patel began looking for a different line of work and contacted a business broker he found on the Internet.[13]  That broker presented him with the opportunity to purchase the Felton franchise with one year remaining on its lease term with

---

[7]   McComas Dep. at 78-79; William Heinz Dep. at 14-15; Loper Dep. at 25-28; Bassell Dep. at 63-64.

[8]   McComas Dep. at 54; Adam Gray Dep. at 18; Bassell Dep. at 45-47.

[9]   Loper Dep. at 54.

[10]   *See* D.I. 1, Ex. A.

[11]   Bassell Dep. at 47-58.

[12]   ████████████████████████████████████████████████

[13]   Patel Dep. at 19-20.

GLeS.[14]  Around this same time, Mr. Patel learned in the Delaware News Journal that GPM was

in the process of purchasing the Sweet Oil business, so he knew that GLeS would not be the

franchisor in the future if he went through with his purchase of the Felton franchise.[15]

Mr. Patel indicates in his Opening Brief that he performed "some" due diligence on the

purchase before spending his life savings on the Felton franchise.[16]  In fact, except for a couple

of brief visits to the station, Mr. Patel never dealt with the seller directly, instead receiving some

financial information from the business broker regarding the operation of the Felton franchise.[17]

On that basis, Mr. Patel decided to go forward with his contemplated purchase.[18]  After some

negotiation, Mr. Patel agreed to pay the former franchisee $ 332,000 for the franchise.[19]  As part

of the process, Mr. Patel was required to present information to GLeS about his financial

condition, and was interviewed by then GLeS employees – Adam Gray and Bill Heinz –

regarding the franchise.[20]  During the interview process, because the current lease on the Felton

franchise only had one year left before it expired, Mr. Patel asked for a new lease.[21]  Mr. Gray

and Mr. Heinz told him that GLeS did not give new leases for transferred franchises – it merely

used an assignment mechanism by which the new franchisee would be assigned the benefits and

---

[14]    Buono Dep. at 37-38.

[15]    Patel Dep. at 36-37.  The GPM purchase was also discussed with GLeS employees in August
2006. *Id.*

[16]    D.I. 26 at 4.

[17]    Patel Dep. at 21-23, 25-26.

[18]    Patel Dep. at 26.

[19]    Patel Dep. at 28.

[20]    Patel Dep. at 31-35; Heinz Dep. at 83-86.  As part of the application process, a copy of the
franchise purchase agreement was also submitted to GLeS, which copy reported that the purchase
price was $211,000 in order to avoid part of the transfer costs.  After some period of time, Mr.
Patel decided that it would be better to start his relationship with GLeS on good footing, so
disclosed to GLeS that the actual purchase price was $358,000. Heinz Dep. at 87-88; GPM0600-
608.  Mr. Patel testified, however, that Felton paid $332,000 for the franchise. Patel Dep. at 28.

[21]    Heinz Dep. at 84-85; Patel Dep. at 35-36.

burdens of the existing lease.[22]  Mr. Heinz explained to Mr. Patel that under the PMPA, the

franchisor would be required to present proposed lease terms for a new lease at or near the

expiration of the current lease, and that it was GLeS's custom to propose rent terms with a 3 to 5

percent raise in rates.[23]  Mr. Patel did not make inquiry as to what GPM might request in similar

circumstances.  Based on the then current cash flow of the franchise and Mr. Patel's submitted

financial papers, GLeS approved Mr. Patel's application.[24]

   Before Mr. Patel's purchase of the Felton franchise was complete, he decided to establish

a Delaware entity and sought out investors in order not to have to shoulder 100% of the financial

burden of purchasing the franchise entirely by himself.[25]  To that end, Mr. Patel incorporated

Felton Petroleum, Inc., made up of 6 people – Mr. Patel, his wife, his in-laws (Mr. and Mrs.

Vyas), and Darrin and Melissa Buono.[26]  Neither the Vyases nor the Buonos, nor even the Patels,

ever spoke with any representatives of GLeS or GPM prior to the closing of the Felton franchise

purchase on December 14, 2006.  And, only after the closing, did Mr. Buono speak with Bill

Heinz about the fact there was only one year left on the lease.[27]

### C.    GPM's Efforts to Acquire GLeS's Assets.

   As noted above, GPM has had extensive retail experience in owning and operating its

own gas stations and convenience stores, but became interested in the strategic option of

expanding its wholesale distribution of motor fuel through service stations which they did not

---

[22]    Patel Dep. at 35-36.

[23]    Heinz Dep. at 84, 85; Gray Dep. at 54-55, 101-02; Buono Dep. at 38-40.

[24]    Heinz Dep. at 86-87; Gray Dep. at 53, 59.

[25]    Buono Dep. at 13-15.

[26]    Patel Dep. at 38-40; Buono Dep. at 17-18.

[27]    Heinz Dep. at 93-94; Buono Dep. at 38-39.

operate.[28]  In other words, GPM sought to establish relationships with operators in which GPM would supply fuel to such operators who either leased a station from GPM or where the operators owned or controlled the premises.  This was precisely the type of business in which GLeS was engaged.  Discussions between GPM and GLeS began in early Spring 2006, but the transaction was not consummated until March 7, 2007.[29]



---

[28]    McComas Dep. at 34; Bassell Dep. at 63-64.

[29]    McComas Dep. at 37.  GLeS's employees were notified as early as August 2006.  Heinz Dep. at 22-23.

[30]    GPM was also interested in acquiring GLeS's expertise in the form of its employees.  As part of the overall transaction, Bill Heinz and Adam Gray became GPM employees.  Heinz Dep. at 21-22; Gray Dep. at 26-27.

[31]    Bassell Dep. at 90-91. ████████████████████████████████████████

[32]    McComas Dep. at 18; Loper Dep. at 48; Bassell Dep. at 62-63.

[33]    McComas Dep. at 28-29.

[34]    Bassell Dep. at 60-61, 78-80.  *See* D.I. 26, Ex. C (GPM0141-177).



---

[35]  McComas Dep. at 14-16.

[36]  D.I. 27, Ex. C; Bassell Dep. at 28, 59-63.

[37]  D.I. 27, Ex. C; Bassell Dep. at 11.

[38]  Bassell Dep. at 14-17.

[39]  McComas Dep. at 31; Loper Dep. at 46-47, 54-56.

[40]  D.I. 27, Ex. C.

[41]  McComas Dep. at 32-33.



ealer could operate the
stations to generate adequate income necessary to support the new rent, but that it was possible
that the Felton and Berlin dealers would not be able to do it.[46]

---

[42]    McComas Dep. at 35.

[43]    Bassell Dep. at 6-7.

[44]    Bassell Dep. at 11-12, 16-18.

[45]    Bassell Dep. at 9-10, 147-49; McComas Dep. at 39-40, 60.

[46]    Heinz Dep. at 51-54.  Despite this initial belief about Mr. Patel's capabilities, GPM has worked
        extensively with him in order to improve the efficiency and profitability of the Felton franchise,
        (Heinz Dep. at 77-79), but Mr. Patel has nonetheless continued to price his gasoline above his
        competitors.

### E.    GPM Creates Its Rent Calculation and Offers Mr. Patel a New Lease.

In the Summer of 2007, Messrs. McComas, Bassell and Giacobone met to discuss what the calculation would be for the subleases of properties covered by the Master Lease Agreement to lessee-dealers.[47] The need to develop such a calculation was pressing at that time due to the looming expiration of the first two leases for properties that were being leased by GPM pursuant to the terms of the Master Lease – the Felton franchise, and a franchise in Berlin, Maryland.[48]

---

[47]    Bassell Dep. at 16-19, 21-28.

[48]    Plaintiff complains that there were two other leases that GPM created using different formulas. D.I. 26 at 12. These two leases were two of the GLeS leases in the package being negotiated between GLeS and GPM which expired on December 31, 2006 (before the March 7, 2007 closing) – the "Boulevard" and "Christiana" station leases. Loper Dep. at 42; Gray Affidavit at ¶ 3. (Hereafter cited as "Gray Aff. at ¶ [__]"). At the time GPM consummated its GLeS deal, these expired leases were subject to short-term extensions given by GLeS to the dealers in order to allow time for the GPM purchase to be completed. Loper Dep. at 39-40; Gray Aff. at ¶ 3; Gray Dep. at 69. Adam Gray (who had previously been a GLeS employee, but was now employed by GPM) was instrumental in coordinating the new leases. Gray Aff. at ¶¶ 2, 4. Because he was familiar with the rate structure at GLeS (Gray Dep. at 101-02), Mr. Gray provided input into the rate structure based on the properties' business values rather than property values, and caused new leases to be executed for the Boulevard and Christiana properties. Loper Dep. at 42; Bassell Dep. at 33; Gray Aff. at ¶ 4.

[49]    *See* Bassell Dep. at 135-36.

[50]    Bassell Dep. at 109-110.

[51]

█████████████████████████████████ GPM believed that after all of these

costs and expenses for the various properties, it was still entitled to a reasonable return on its

investment.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Based on this calculation, GPM's Max Loper prepared a new lease in

early September 2007 and requested that Bill Heinz present it to Mr. Patel.[54]  Mr. Heinz was not

aware of the new rate structure or how it was determined, ██████████████████████████

████████████████████████████████████ Thus, he was surprised to see a

proposed rental increase that was based upon a different calculation than he had seen in his years

working at GLeS.[56]

Mr. Patel contacted Mr. Loper at GPM who explained that the rent increase was due to

the value of the station and that GPM believed the station could support such amount.[57]  Mr.

Loper further explained that if Mr. Patel did not think he could operate the station at a level

sufficient to pay the requested rent, GPM could offer Mr. Patel other stations to operate.[58]  Either

way, Mr. Loper told Mr. Patel that he needed to tell GPM what he was going to do by the end of

---

[52]     Bassell 18, 107-08.

[53]     McComas Dep. at 35.

[54]     Heinz Dep. at 39; Loper Dep. at 38.  New lease terms based upon the same formula applied to
         Felton were presented to the Berlin franchisee.  Heinz Dep. at 31-32; Gray Dep. at 65-66; Loper
         Dep. at 38, 63; GPM0131.

[55]     Heinz Dep. at 20, 23-24, 43.

[56]     Heinz Dep. at 34-36.

[57]     Patel Dep. at 48-49.

[58]     Patel Dep. at 50.

September.[59]  As the PMPA required 90 days notice of the non-renewal of a franchise, GPM was

required by law to give notice by 90 days before December 31, 2007 – or October 1, 2007.  Mr.

Patel informed GPM that he would not agree to GPM's proposed rent terms, and GPM sent Mr.

Patel timely notice of the non-renewal of the franchise.[60]

**F.    GPM Offers Mr. Patel Alternatives to Running the Felton Franchise.**

Concurrent with the discussions about the proposed rent, GPM also had extensive

discussions with Mr. Patel to operate other alternative GPM stations.[61]  Eventually, GPM offered

a choice of 5 stations of which it proposed to Mr. Patel that he could choose two stations to

operate.[62]  GPM further offered to waive the transfer fees for taking over the two stations, which

fees were typically $25,000.00 per station.[63]  GPM presented its modeling of the financials for

these stations, scheduled a meeting among Messrs. Patel, Heinz, and Gray to discuss the trade of

the stations and offered to accompany Mr. Patel to the stations in order to assist him in his due

diligence.[64]  Mr. Patel decided that he did not want GPM's help, and attempted to perform his

own due diligence.[65]  The night before his meeting with Mr. Heinz and Mr. Gray, Mr. Patel and

Buono went to three of the stations – "Bellefonte", "Castle Hills", and "Chelsea".[66]  At the

---

[59]    Patel Dep. at 53.

[60]    Buono Dep. at 42-43.

[61]    Heinz Dep. at 105; Gray Dep. at 43, 86-87; Buono Dep. at 22-23; Loper Dep. at 107; Patel Dep. at 50-51, 53-54.

[62]    Heinz Dep. at 101-102; Gray Dep. at 47; Patel Dep. 57, 61.

[63]    Patel Dep. at 51; Gray Dep. at 43.  In fact, these transfer fees can be as high as $50,000.  Loper Dep. at 86.

[64]    Heinz Dep. at 97, 99.  GPM believes its projected numbers are accurate and that Castle Hills does have a huge upside potential.  Heinz Dep. at 99, 106; Gray Dep. at 44.  In fact, the projected sales numbers have proven true.  At Castle Hills, the new operator is pumping 1.1 million gallons on an annualized basis up from 300,000 per year – as GPM predicted it would.  Bassell Dep. at 151-52.

[65]    Patel Dep. at 62.

[66]    Buono Dep. at 23-25.  They did not have time to visit the Townsend station, nor have they received information on the Miller Road station  Buono Dep. at 24, 29; Patel Dep. at 57-58, 61.

Bellefonte station, Mr. Patel spoke with the actual operator of the stations who showed him a week's worth of receipts for the station.[67] At the other two stations, he only spoke with clerks.[68] At these two stations, Mr. Patel was shown similar selected days' worth of inside sales receipts.[69] At none of these stations did he attempt to validate the projected gasoline sales numbers. Despite the fact that Mr. Buono also attended these meetings, he did not participate in the conversations – two of them occurred in a language he did not understand,[70] and the one with the college–aged man he discussed the removal of their deli counter.[71] Based upon these short meetings, Mr. Patel rejected out of hand the numbers GPM had given him and declined taking over these stations.[72]

---

[67]   Patel Dep. at 62.

[68]   Patel Dep. at 64. Despite the scarcity of information that Messrs. Patel and Buono were able to acquire and verify, for some reason Plaintiff claims with certainty that the combined income of the stations would generate only one-tenth of the annual profit of the Felton station. D.I. 26 at 10. GPM's numbers, however, are based upon actual gasoline sales numbers together with what it believes to be an accurate projection of the sales potential for the stations.

[69]   Patel Dep. at 62.

[70]   Buono Dep. at 24-25.

[71]   Buono Dep. at 25. In fact, even though Mr. Buono attended all of these meetings with Mr. Patel and apparently helped him develop the P & L sheet upon which Mr. Patel relies, Mr. Buono never saw any of the sales receipts himself. Buono Dep. at 26.

[72]   Gray Dep. at 52-53; Buono Dep. at 27-28.

G.    **GPM Anticipates Severe Losses if Its Rental Plan Is Not Accepted.**

Despite his shortcomings,[73] GPM is willing to have Mr. Patel continue to run the Felton

franchise at the Felton property.[74]  In fact, GPM did made its investment with GLeS specifically

so it would not have to run stations itself.  If it is obligated to take over the station, GPM would

need to close the store to clean it up, and then hire employees to operate the store until it could

be reintroduced into the dealer channel.[75]  GPM offered a new lease with terms based upon the

market value of the property – not based on outdated historic values for the property as operated

in an inefficient manner.[76]  Mr. Patel, however, has continued to refuse the new terms of GPM's

proposed lease, complaining that he cannot pay more than $125,000 per year in rent.[77]  GPM for

its part has continued to try to improve Mr. Patel's sales numbers – both inside the convenience

store as well as by the sale of gasoline.[78]  Such efforts have not been fruitful.  Despite this

---

[73]    The gallons of gasoline that the Felton franchise has gone down from approximately 990,000 to 790,000 by the end of 2007. Heinz Dep. at 90-91; Bassell Dep. at 68, 102. Despite these numbers, Mr. Patel states that he is an exemplary business-man. D.I. 26 at 4. The facts at this station, however, belie this assertion. In addition to the reduction in gasoline sales numbers, Mr. Patel has been barely sliding by on his "Helios 100" reports performed by BP at service stations selling the BP brand. Heinz Dep. at 68; GPM 8174-8196 (Patel Dep. Ex. 19). Those reports are performed by BP on a quarterly basis and GPM has no control or influence over the process. Heinz Dep. at 68. It is prepared by a BP "mystery" shopper and rates a BP-branded franchisee on a number of categories for compliance of BP standards. *Id.* Mr. Patel has failed his past two quarterly reports, indicating that his franchise is in jeopardy. *See* Helios 100 Report, GPM 8174-8196.

[74]    Loper Dep. at 73-74, 78-79; Bassell at 11, 67.

[75]    McComas Dep. at 73-74.

[76]    Bassell Dep. at 108, 113.

[77]    Patel Dep. at 52.

[78]    *E.g.,* Heinz Dep. at 77-79. Plaintiff maligns GPM's "conduct as a franchisor" by implying that it has taken steps to ensure the failure of the franchise. D.I. 26 at 14-15. The statements that Plaintiff makes in this regard are spurious and without foundation. As an initial matter, whether or not GLeS promised a renovation of the restrooms is not relevant to what GPM's obligations may or may not be in that regard. An examination of Felton Petroleum's underlying lease reveals that it is the franchisee – and not the franchisor – who is typically responsible for capital improvements such as these. *See* D.I. 1, Ex. A. Additionally, allegations regarding the misappropriation of funds although absent in the complaint were gratuitously stated at the end of

shortfall, GPM continues to believe that a thoughtful dealer could operate profitably while still paying $200,000 in rent.[79]

Looking forward, GPM anticipates 

---

a statement of "facts".  GPM disputes that it has acted improperly with respect to the bank account and air conditioning, and, in fact, has been investigating these issues.  Heinz Dep. at 81-82.

[79]  McComas Dep. at 66-69; Gray Dep. at 59; Loper Dep. at 83-84; Bassell Dep. at 13-14, 68.

[80]  See Defendant's Responses to Interrogatory Requests, Ex. A.

556583.1 2/14/08

15

**ARGUMENT**

Felton Petroleum seeks an order from this Court enjoining GPM from non-renewing the lease with the Felton franchise until such time as the Court is able to hold a trial on the merits of this action. (D.I. 26 at 1). As stated above, GPM believes the Court should deny Felton Petroleum's request for preliminary injunctive relief as: (i) Plaintiff has not shown the existence of serious questions going to the merits of the case, and (ii) the balance of the hardships weighs in GPM's favor. Alternatively, if the Court grants the Preliminary Injunction, the Court should require the Plaintiff to post a bond sufficient to compensate GPM's potential losses.

## I.  STANDARD OF PRELIMINARY INJUNCTION UNDER THE PMPA

"The PMPA provides a lower threshold for obtaining preliminary injunctive relief than ordinarily permitted under the Federal Rules of Civil Procedure." *N.I. Petroleum Ventures Corp. v. GLeS, Inc.*, 333 F. Supp.2d 251, 255 (D.Del. 2004). The PMPA, however, does not shift the burden of proof for injunction. Under such standard, Felton Petroleum must show that it is a franchisee under a covered franchise agreement which has been not renewed. 15 U.S.C. § 2805(b)(2).[81] Second, Felton Petroleum "must show that there are 'serious questions going to the merits to make such questions a fair ground for litigation.'" *N.I. Petroleum*, 333 F. Supp.2d at 255 *citing* 15 U.S.C. § 2805(b)(2). Third, if the first two elements above are established, the Court must balance the hardships imposed upon GPM by the issuance of such preliminary relief against the hardships which would be imposed upon Felton Petroleum if such preliminary injunctive relief were not granted. *Id.*

---

[81]    GPM concedes that Felton Petroleum is a franchisee under a covered franchise agreement that is not being renewed.

II.    **PLAINTIFF HAS FAILED TO SHOW THE EXISTENCE OF SERIOUS
QUESTIONS GOING TO THE MERITS SUFFICIENT TO JUSTIFY THE
EXTRAORDINARY REMEDY OF COMPELLING THE CONTINUATION OF
THE LEASE.**

Felton Petroleum "must show that there are 'serious questions going to the merits to

make such questions a fair ground for litigation.'" *N.I. Petroleum*, 333 F. Supp.2d at 255 *citing*

15 U.S.C. § 2805(b)(2). This test is also referred to as a requirement to demonstrate "some

reasonable chance of success on the merits." *Mobil Oil Corp. v. Vachon*, 580 F. Supp. 153, 156

(D. Mass. 1983), citing *Saad v. Shell Oil Co.*, 460 F. Supp. 114, 116 (E.D. Mich. 1978)). GPM

denies that there are sufficiently serious questions going to the merits to make a fair ground for

litigation, and Plaintiff has no chance of success if this case is ever adjudicated on the merits.

Under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (the "PMPA"),

Plaintiff has the initial burden of showing that his franchise has not been renewed. *See Duff v.

Marathon Petroleum Co.*, 51 F.3d 741, 744 (7th Cir. 1995).[82] Once that burden is met, GPM's

burden would be to establish that it is entitled to an affirmative defense based on the failure of

the parties to agree to changes in the franchise arrangement that result from "determinations

made ... in good faith and in the normal course of business." *See Id.* citing 15 U.S.C. § 2805(c)

and 2802(b)(3)(A). "If both of these tests are met, the action cannot be said to have been taken

as a pretext for nonrenewal." *Id.*

In order to determine this, the court must perform a two-prong analysis:  (i) determine

whether GPM's actions were taken in good faith, and (ii) made in the normal course of business.

*Duff v. Marathon*, 51 F.3d at 744 citing *Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 977-78 (7th Cir.

1986). "If both of these are met, the action cannot be said to have been taken as a pretext for

---

[82]    GPM concedes that Felton Petroleum's franchise is not being renewed.

nonrenewal." *Id.* Furthermore, such tests are not considered to be a stringent one. *See, e.g., Esso Standard Oil Co. v. Monroig-Zayas,* 445 F.3d 13, 18 (1st Cir. 2006).

To qualify for preliminary injunctive relief under 2805(b)(2), Felton Petroleum must rebut GPM's "evidence that the nonrenewal was permissible, by showing the existence of sufficiently serious questions as to the propriety of the termination under the PMPA to present a fair ground for litigation." *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 788 F. Supp. 616, 621 (D. Mass. 1992) citing *Khorenian v. Union Oil Co.,* 761 F.2d 533, 536 (9th Cir. 1985).

### A. The Calculation for the New Rents Was Determined in Good Faith and in GPM's Normal Course of Business.

Although there are two tests to determine whether a franchisor is entitled to an affirmative defense that its decision to non-renew a franchise was made in good faith and in the normal course of business, the two tests "do not exist in hermetically sealed containers." *Duff v. Marathon,* 51 F.3d at 744. Therefore, an analysis of the method by which the decision was made is "highly relevant and probative evidence on the issue of good faith." *Id.*

Plaintiff argues that the proposed rent increase does not meet "any reasonable objective standards." (D.I. 26 at 19, Section A Heading).[83] An examination of whether GPM's actions were taken in good faith, however, is necessarily a subjective test – not objective. *See Lippo v. Mobil Oil.,* 802 F.2d at 977-78; *Munno v. Amoco Oil Co.,* 488 F. Supp. 1114 (D.Conn. 1980). Good faith under Section 2802(b)(3)(A) requires merely that a franchisor not act "with evil motive or discriminate [] selectively against franchisees." *Esso Standard Oil Co. v. Dept. of Consumer Affairs,* 793 F.2d 431, 432 (1st Cir. 1986). In fact, whether a rate change is

---

[83]    Plaintiff also asserts that the current rent Felton Petroleum is paying was considered "fair" to GPM's predecessor. D.I. 26 at 3. Whether or not this is true is irrelevant to the Court's inquiry, and such amount did not have to factor GPM's underlying costs for the station as GLeS owned the land itself and did not pay rent on it.

reasonable is not relevant to the Court's inquiry. Rather, "[i]f a 'good faith application of a rental formula operates unreasonably in a particular case, the dictates of the marketplace *alone* will govern the transaction,' and the court should not interfere." *Duff v. Marathon Petroleum Co.*, 863 F. Supp. 622, 626 (N.D. Ill. 1994) quoting *Munno. Amoco Oil Co.*, 488 F. Supp. 1114, 1120 (D.Conn. 1980).

**B.    The Reasonableness of GPM's Business Judgment Is Not at Issue.**

Plaintiff makes many derogatory statements regarding GPM's business judgment. The test of good faith is, in fact, *not* a test of whether GPM's decision was a reasonable business judgment. *Chestnut Hill*, 788 F. Supp. at 621 quoting *Esso Standard Oil Co. v. Dept. of Consumer Affairs*, 793 F.2d at 432 (citing 1978 U.S. Code Cong. & Ad. News, 873 895-96). Although Congress intended to protect franchisees such as Felton Petroleum from arbitrary or discriminatory decisions of non-renewal, "[i]t did not give the court the authority to second-guess the wisdom of business decisions." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d at 18; *see also Palmieri v. Mobil Oil Corp.*, 529 F. Supp. 506, 510-511 (D.Conn. 1982) quoting Senate Report No. 95-731, 95th Cong., 2d Sess., reprinted in (1978) U.S. Code Cong. & Admin. News, pp. 873, 895-96. In fact, the Court is precluded from scrutinizing the reasonableness of GPM's business decision. *See Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353, 368 (D.Conn. 1989), *aff'd,* 889 F.2d 1280 (2d Cir. 1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990); *see also Darling v. Mobil Oil Corp.*, 864 F.2d 981, 990 (2d Cir. 1989); *Palmieri v. Mobil Oil Corp.*, 682 F.2d 295, 296 (2d Cir. 1982). As long as the franchisee is given an opportunity to comply with a rental term, the reasonableness of that term to the franchisee is not relevant. *See O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 595 (3d Cir. 1989). As discussed below, Felton Petroleum was given adequate notice of the rent increase and has not agreed to the new terms.

### C.    A Rent Increase of 97% Is Not Evidence of Bad Faith.

Plaintiff attempts to raise an inference of bad faith in the fact that the proposed rent would be an increase of approximately 100%. D.I. 26 at 19. This is not the case under the PMPA. In fact, courts have upheld franchisor demands for rent increases ranging from 100% to 300% when those demands were made in accord with established rental calculations applied to all franchisees and not for the purpose of selectively terminating a particular franchisee. *See, e.g., Esso Standard Oil Co. v. Dept. of Consumer Affairs*, 793 F.2d at 432; *see also Palmieri*, 529 F. Supp. 506 (377% and 125% increases found to be made in good faith); *Munno v. Amoco Oil Co.*, 488 F. Supp. 1114 (D.Conn. 1980) (200-300% increases upheld); *Meyer v. Amerada Hess Corp.*, 541 F. Supp. 321 (D.N.J. 1982) (rental increases of over 300% upheld); *Bellmore v. Mobil Oil Corp.*, 524 F. Supp. 850, 854 (D.Conn. 1981) (rental increase from $7,008 to $13,032 that would effectively drive dealer out of the business upheld), *aff'd*, 672 F.2d 899 (2d Cir. 1981); *Ferriola v. Gulf Oil Corp.*, 496 F. Supp. 158 (E.D. Pa. 1980) (100% rental increase based on new calculation intended to cover franchisor's occupancy costs, including rent paid to ultimate landlord, were upheld); *Ackley v. Gulf Oil Corp.*, 726 F. Supp. at 368-69 (holding that where substantial rental increases imposed by franchisor in good faith were calculated pursuant to the same mathematical calculation, no violation of the PMPA existed). Here, GPM calculated its rental increase using a variety of factors – ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████ is being applied to similarly situated franchisees in the same manner.

Although difficult to separate from the determination of good faith, the Court must determine whether GPM's decision was made in the normal course of business, which requires an examination of GPM's normal decision-making process. *Duff v. Marathon*, 51 F.3d at 744. There is no evidence that GPM deviated from its normal decision-making process when it

developed the new rental rates.  GPM's intent with regard to its calculation of rents is to ████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████  *See Meyer v. Amerada Hess Corp.*, 541 F. Supp. at 330.

The calculation that GPM used is straight-forward.  █████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████  Mr. Patel offered that under his current projections, he could pay up to $125,000 per

rent a year.  The prospect of GPM losing at least $35,000 per year on Felton alone (not to

mention the effect this will have on the remaining 27 stations subject to the Master Lease) may

seem fair to Mr. Patel if it means that Plaintiff can continue operating the Felton station on its

own terms.[86]  This prospect is highly unacceptable to GPM.  While Congress intended to protect

franchisees from discriminatory actions, Congress did not intend "that franchisors [not] be

accorded sufficient flexibility to respond to market conditions … [and] certainly did not

contemplate the perpetuation of an economically burdensome franchise relationship."  *Beirne v.

Getty Petroleum Corp.*, 707 F. Supp. 632, 635 (E.D.N.Y. 1988) quoting *Brach v. Amoco Oil Co.*,

677 F.2d 1213, 1223 (7th Cir. 1982).

---

[84]    Bassell Dep. at 28, 59-63.

[85]    *See* D.I. 26, Ex. C at GPM0177.

[86]    In fact, GPM's formulation of Felton Petroleum's rent in part to stem the tide of its losses on the
Felton property are further evidence of its normal course of decision-making.  *See, e.g., Ferriola*,
496 F. Supp. at 163.

Here, GPM has calculated its rents based on ████████████████████████████

████████████████.[87]  In fact, there is nothing unusual about such a rate of return on GPM's

capital especially since it bears a direct relationship to the rents requested.  *See Meyer v.*

*Amerada Hess Corp.*, 541 F. Supp. at 330.  Even higher rates of return have not been found to be

problematic by courts examining similar cases.  *Duff v. Marathon*, 51 F.3d at 745 (Marathon had

a 17.5% rate of return, but no evidence that the rent was manipulated to obtain a figure other than

the one that franchisee would otherwise have been assigned as a result of the process.); *Chestnut*

*Hill,*788 F. Supp. 616 (11% rate of return based on value of the property and taxes on the

property was acceptable); *Ackley*, 726 F. Supp. at 368 (uniform mathematical calculation

determining monthly rent of 1/12 of the sum of (a) an objective valuation of the fair market value

of the property multiplied by an 11% rate of return PLUS the taxes on the property.)  As GPM

has adequately explained how it came up with its rent calculation, it would then be incumbent

upon Felton Petroleum to come forward with evidence that placed in question the truth of GPM's

submissions.  *Duff v. Marathon*, 51 F.3d at 745; *Lippo v. Mobil Oil*, 802 F.2d at 981 (noting that

franchisee has obligation to refute franchisor's assertion that it had treated its franchisees

evenhandedly).  This, it cannot do.

**D.      GPM's Acceptance of GLeS's Valuation of Property Was Proper.**

Plaintiff makes several mistaken or misleading statements in its opening brief regarding

the valuation of the Felton property.  For instance, Felton Petroleum states that it was GPM that

---

[87] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  *See*

Statement of Facts, Section E, *infra.*

"valued" the property.  D.I. 26 at 19.[88]  The evidentiary record does not support such statement.

As Mr. Bassell and Mr. McComas testified, it was Felton Petroleum's former landlord – GLeS –

that valued the property ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

     A second reason that GPM accepted the value of the property at ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

     Additionally, GPM did not have to accept a value of the property that was based on its

current use as a gasoline and convenience store business as Plaintiff implies that it should.

Rather, the value can easily be based upon the highest and best use of the property if it were sold

for other purposes.  *See, e.g., Chestnut Hill Gulf, Inc.*, 788 F. Supp. at 622 (holding that no lack

---

[88]    Plaintiff also states that GPM has provided no credible support for ███████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████  *See* Statement of Facts, Section D,
*infra*.  Thus, it can hardly be argued that GPM cannot provide any credible support.

of good faith is shown merely because franchisor chooses to appraise his leased properties in a way that reflects the opportunity cost of leasing such premises as service stations as opposed to more efficient, profitable use); *see also Duff v. Marathon*, 863 F. Supp. at 628 (highest and best use value of the property is acceptable).

### E.    Adverse Effect on Felton Petroleum Is Not Relevant to the Court's Inquiry of GPM's Good Faith or Its Acting in the Normal Course of Business.

Plaintiff argues that because he cannot pay the rent and because GPM did not consider Felton Petroleum's financial records, GPM's terms were made in bad faith. (D.I. 26 at 20). Such question is irrelevant to the Court's inquiry. The correct test is not what effect a proposed rent increase has on a franchisee or its business. Rather, the test is whether the franchisor has applied its rental rates selectively and discriminatorily. *Palmieri*, 529 F. Supp. at 511, discussing *Bellmore,* 524 F. Supp. 850. This is because in enacting the PMPA, Congress only intended to protect franchisees from arbitrary or discriminatory acts – not harsh results. *Baldauf v. Amoco Oil Co.*, 553 F. Supp. 408, 412 (W.D. Mich. 1981), *aff'd*, 700 F.2d 326 (6th Cir. 1983). In fact, such results should not even be a consideration of this Court in determining GPM's good faith. *See Beirne v. Getty Petroleum,* 707 F. Supp. at 635, quoting *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1223 (7th Cir. 1982); *see also Ackley*, 726 F. Supp. at 368 (effect on the franchisee is not relevant to inquiry of franchisor's good faith). GPM developed a calculation with objective criteria for the lessee dealer-operated stations whose leases expired in 2007 and has applied this formula uniformly. Thus, its actions cannot be said to be in bad faith or not in the normal course of its business.

Plaintiff further argues that GPM has acted in bad faith because it did not consider Felon Petroleum's current financials that the stations could not be run profitably under the proposed rent. D.I. 26 at 20. Whether or not the new rental formula has the effect of making a station

unprofitable, however, is not determinative of an improper purpose. *Meyer v. Amerada Hess Corp.*, 541 F. Supp. at 330, citing *Munno*, 488 F. Supp. 1114, *Palmieri*, 529 F. Supp. 506, *and Bellmore*, 524 F. Supp. 850.

In point of fact, GPM has been working diligently in order to alleviate whatever results would occur if Felton Petroleum could no longer run the Felton franchise. It has been seeking since September of 2007 to put Mr. Patel in other stations it believes will be profitable to him. The PMPA provides only limited protection for a franchisee, protection from a franchisor's selective and discriminatory application of a rental formula with the intent of forcing the franchisee from the retail petroleum business. *Palmieri*, 529 F. Supp. at 512. The PMPA does not require a franchisor to take steps to ameliorate the financial impact that might occur when a franchisee's lease is not renewed for failure to agree to new terms. Hence, GPM's actions in this regard are actually evidence of its good faith. *See, e.g., Ferriola*, 496 F. Supp. at 163.

Plaintiff also complains that GPM's unwillingness to compromise on the rent is evidence of bad faith. D.I. 26 at 20. The fact that new terms are presented on a take it or leave it basis does not constitute a lack of good faith. *Meyer v. Amerada Hess Corp.*, 541 F. Supp. 321, 330 (D.N.J. 1982) citing *Palmieri v. Mobil Corp.*, 529 F. Supp. 506 (D.Conn. 1982); *cf., Wesley v. Mobil Oil Corp.*, 513 F. Supp. 227 (E.D. Pa. 1981); *Sexe v. Husky Oil Co.*, 475 F. Supp. 135 (D. Mont. 1979). Rather, a showing that the terms are applied without discrimination to all dealers rather than selectively to the complaining franchisee is strongly indicative that there is no intent to cause the nonrenewal of the franchisee. *Meyer v. Amerada Hess Corp.*, 541 F. Supp. at 330. Here, again, GPM gave proposed lease terms to both Felton and Berlin based upon ████████ ████████ a fact that shows its non-discriminatory use of the formula.

**F.    GPM Gave Adequate Notice and Complied with the Terms of the PMPA.**

Finally, Plaintiff complains that GPM gave it only 15 days to consent to doubling its rent and then terminated the franchise prior to September 28, 2007. D.I. 26 at 20. This statement does not make sense, and shows that Felton Petroleum misunderstands the requirements of the PMPA. In fact, the end of the franchise was not set to occur until the expiration of the then current rental term – December 31, 2007. *See* D.I. 26, Ex. C. The PMPA requires that 90 days notice be given prior to the non-renewal of a franchise. 5 U.S.C. § 2804(c)(3)(A). Therefore, if Felton Petroleum was going to fail to agree to the proposed rental terms, GPM was obligated by law to give notice of non-renewal before October 1, 2007. The PMPA also requires notice to be given in writing and personally delivered to the franchisee's representative. *Id.* Such notice was indeed given to the franchisee's representative – Mr. Patel. The notice also stated that it was the intent of GPM to non-renew the franchise, the reasons therefor, the date nonrenewal would take effect and was accompanied by a summary of the PMPA. *See Id.*

Plaintiff cites a case out of the District of Maryland for the proposition that at the time a non-renewal notice is sent, the reason upon which it is based must exist. D.I. 26 at 20 n.103 citing *Eden v. Texaco Refining and Marketing, Inc.*, 644 F. Supp. 1573 (D.Md. 1986). This case is inapposite to the issues presented in this case.[89] Here, GPM's notice to Felton Petroleum set forth that the reason the franchise was not being renewed was that Felton Petroleum had failed to agree to the terms of a new lease. In fact, Felton Petroleum had so failed. Thus, the reasons for the non-renewal existed at the time the notice was sent.

\* \* \*

---

[89]    It is also unclear how persuasive a case can be whose memorandum order has officially been withdrawn.

Although GPM would bear the burden of proof on the ultimate question if this case ever came to trial, Felton Petroleum bears the burden at this juncture to show that there are "sufficiently serious questions" exist on this record. Plaintiff has failed to do this. GPM created its formula on a good faith basis and in the normal course of its business. ███████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ *See Beirne v. Getty Petroleum,* 707 F. Supp. at 635.

## III.    THE BALANCE OF THE HARDSHIPS WEIGHS IN GPM'S FAVOR.

Even under PMPA's standard for a preliminary injunction, seeking to compel the continuation of the contract is extraordinary relief. *See N.I. Petroleum,* 333 F. Supp. 2d at 265. A finding that a sufficiently serious question exists with respect to a franchisor's good faith and normal course of business is merely the beginning of the Court's inquiry. Under, 5 U.S.C. § 2805 (b)(2)(B), the Court must also balance the hardships imposed upon GPM by the issuance of such injunction versus whatever hardships might befall Felton Petroleum by its denial. Essentially, Plaintiff argues that the mere disparity in size between its small business and GPM's much larger business warrants finding in its favor on this point.[90] If this were so, however,

---

[90]    Plaintiff's authority for this proposition is mere dicta in a footnote. *See* D.I. 26 at 18 n.98 citing *Al's Service Center, Inc. v. BP Products North America,* 2006 WL 1697170, at *3 (N.D. Ill. June 9, 2006). Accordingly, the Court should give it no weight.

Congress would not have included a balancing test in the PMPA. A review of the facts shows, in fact, that the balance of hardships tips in GPM's favor.[91]

Plaintiff states that Mr. Patel will lose his entire life savings and be put out of business if the injunction is not issued. (D.I. 26 at 18).[92] In fact, Felton Petroleum could continue its business by operating other stations as offered by GPM on numerous occasions.[93]

In contrast, GPM stands at risk to lose part of its ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ Balancing the potential losses for each party could hardly say to tip heavily in Felton's favor.

---

[91] ███████████████████████████████████████████

[92] In fact, most dealers make similar complaints when their rents are being raised. Gray Dep. at 72. Moreover, GPM should not have to compensate Mr. Patel for his risky investment decision of purchasing a franchise in an industry in which he has had no experience with one year left on its lease and with a new landlord coming in with unknown (to him) philosophies regarding rent increases.

[93] *See* Statement of Facts, Section F, *infra*.

[94] Bassell Dep. at 8 (██████████████████████████████
████████████

**IV.    IN THE ALTERNATIVE, SHOULD THE COURT ISSUE A PRELIMINARY INJUNCTION, IT SHOULD REQUIRE PLAINTIFF TO POST A BOND SUFFICIENT TO MAKE GPM WHOLE.**

GPM requests that if the Court issues the Preliminary Injunction, that Plaintiff be required to post an appropriate bond to compensate GPM for its potential and likely losses due to such status quo. The PMPA provides that whether or not the standard for an injunction is different than that required under the Federal Rules of Civil Procedure, the requirement that a bond be issued is not similarly affected. *See* 15 U.S.C. 2805(b)(3). Thus, this Court should look to the Federal Rules for guidance. Rule 65(c) of the Federal Rules of Civil Procedure governing injunctions provides, in pertinent part, that:

> (c) Security. *No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.*

Fed. R. Civ. P. 65(c) (emphasis provided). Thus, if the Court enters a preliminary injunction in this case, a bond would be required.

The Third Circuit Court of Appeals strictly interprets the bond requirement of Rule 65(c) and has recognized that such a bond "provides a fund to use to compensate incorrectly enjoined defendants." *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir.1990) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 805-06 n. 9 (3d Cir.1989)). "While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id.*

A bond should be set by a reasonable estimation of franchisor's potential damages. *See Dass v. Tosco Corp.*, 136 Fed.Appx. 21, 24 (9th Cir. 2005) (increase of bond from $20,000 to $120,000 not an abuse of discretion). GPM respectfully submits that such bond amount should be that amount would equal the monthly difference of $8,472.71 per month (*i.e.*, between the

$101,672.52 present annual rent and proposed $200,000 annual rent). Assuming the Court will render a judgment on the merits no later than December 31, 2008, the most that the amount of the bond that would make GPM whole would be $93,199.81.[95]

## CONCLUSION

As the *Ackley* court noted:

> There is nothing in the language of the [PMPA] suggesting that a major [] acquisition and large scale divestiture for bona fide business reasons was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms. A permanent status quo in the relationships of major [] corporations was not mandated by Congress through the PMPA. In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors. Change may be required for survival.

*Ackley*, 726 F. Supp. at 370. This Court should apply this same standard here.

For the reasons stated above, GPM respectfully submits that GPM and GLeS negotiated and completed a complicated an arm's-length transaction ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

For these reasons, as well as those discussed above, GPM respectfully requests that the Court deny Plaintiff's motion for preliminary injunction. If such motion is granted, however,

---

[95] In the event the Court does not require the issuance of a bond, GPM reserves its right to seek restitution after trial on the merits of this action. *See Chestnut Hill*, 788 F. Supp. at 622-623.

GPM requests that the Court require Plaintiff to post a bond sufficient to compensate it for its potential and likely losses in this action.


OF COUNSEL

Brian T. Guthrie
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7777 (phone)
(215) 972-7725 (fax)
bguthrie@saul.com

Dated: January 14, 2008

/s/ Michael R. Robinson
Michael R. Robinson (DE Bar No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19801-1611
(302) 421-6800 (phone)
(302) 421-6813 (fax)
mrobinson@saul.com

*Counsel for Defendant*
*GPM Investments, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FELTON PETROLEUM, INC., a          :
Delaware corporation,              :
                                   :
             Plaintiff,            :
                                   :          C.A. No.  07-00760-JJF
      v.                           :
                                   :          **REDACTED VERSION**
GPM INVESTMENTS, LLC, a Delaware   :
limited liability company,         :
                                   :
             Defendant.            :

## CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on this 15th day of February, 2008, I caused to

be electronically filed a true and correct copy of the foregoing ***REDACTED VERSION OF***

***DEFENDANT GPM INVESTMENT, LLC'S ANSWERING BRIEF IN OPPOSITION TO***

***PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*** with the Clerk of Court using

CM/ECF which will send notification of such filing.  A copy of the document was also served

via Electronic Mail upon the following counsel of record:

> David B. Snyder, Esq.
> PRICKETT, JONES & ELLIOTT, P.A.
> 11 North State Street
> Dover, DE  19901

### SAUL EWING LLP

/s/ Michael R. Robinson
Michael R. Robinson (DE Bar No. 4452)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware  19801-1611
(302) 421-6800 (phone)
(302) 421-6813 (fax)
mrobinson@saul.com

*Counsel for Defendant GPM Investments, LLC*

556583.1 2/15/08